Stuart G. Gross (SBN 251019)
Jan W. Jorritsma (SBN 326772)
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
(415) 671-4628

Joseph R. Saveri (SBN 130064)
Cadio Zirpoli (SBN 179108)
David Seidel (SBN 307135)
Regina Wang (SBN 326262)
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, California 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **YesAnd Foundation; NEIGHBORHOODS UNITED SF; STEPHEN BAYNE; AMANDA CLUSE; BRANDON DENO;** and **JOSEPH GABANY**,<br><br>Plaintiffs,<br>v.<br><br>**CITY AND COUNTY OF SAN FRANCISCO,** a municipal corporation; **SARAH DENNIS PHILLIPS**, in her official capacity, **DANIEL TSAI**, in his official capacity, **PACIFIC GAS & ELECTRIC COMPANY**, a California Corporation, **PG&E CORPORATION**, a California Corporation, and **DOES 1-10,**<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

and

**ALIGN REAL ESTATE**, **MARINA PROPERTY OWNER LLC**, **ALBERTSONS COMPANIES, INC.**, and **SAFEWAY INC**.,

Real Parties In Interest

## TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

PARTIES ..................................................................................................................... 7

I. Plaintiffs ................................................................................................................ 7

II. Defendants ............................................................................................................ 10

JURISDICTION and VENUE ..................................................................................... 12

FACTUAL ALLEGATIONS ......................................................................................... 12

I. AB 2011 Streamlines the Approval Process for Certain Residential Projects ..................... 12

II. Align Proposes Residential Development on a Former Industrial Site ............................... 14

III. PG&E, Which Previously Operated a Steam Plant at the Site and Handled Hazardous Wastes at a Nearby MGP, Has Avoided Testing and Remediating Hazardous Wastes in the Vicinity ........................................................................................................................... 17

IV. A Phase I Environmental Site Assessment Detects Hazardous Substances but the Developer Insists AB 2011 Applies ........................................................................................ 21

V. The Phase II Work Plan Has Acknowledged Deficiencies ................................................. 23

VI. The City Advances the Project Even as Community Members Express Concern ............... 25

CLAIMS for Relief ........................................................................................................ 27

FIRST CAUSE OF ACTION (Writ of Mandate for IMPROPER APPROVAL FOR STREAMLINED REVIEW, California Code of Civil Procedure § 1085) ......................... 27

SECOND CAUSE OF ACTION (Writ of Mandate for IMPROPER EXCLUSION FROM CEQA REVIEW, California Code of Civil Procedure § 1085) ............................................ 30

THIRD CAUSE OF ACTION (Writ of Mandate for IMPROPER APPLICATION OF AB 2011, Code of Civil Procedure § 1085, California Government Code § 65912.124) .................... 30

FOURTH CAUSE OF ACTION (Public Nuisance) ............................................................ 34

FIFTH CAUSE OF ACTION (Violation Of Due Process Clause Of Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983 ........................................................ 35

SIXTH CAUSE OF ACTION (Public Nuisance) ............................................................... 36

SEVENTH CAUSE OF ACTION (Negligence) ................................................................. 38

PRAYER FOR RELIEF ................................................................................................... 39

DEMAND FOR JURY TRIAL........................................................................................... 40

Plaintiffs YesAnd Foundation (“YesAnd”), Neighborhoods United SF (“NUSF”), Stephen Bayne, Amanda Cluse, Brandon Deno, and Joseph Gabany (collectively, “Plaintiffs”) allege, on information and belief based upon the investigation of counsel, except where based on personal knowledge, against Defendants City and County of San Francisco, a municipal corporation (“CCSF” or the “City”), acting through the San Francisco Planning Department and/or the San Francisco Department of Public Health (“DPH”); Sarah Dennis Phillips, in her official capacity as the Planning Director of the San Francisco Planning Department; Daniel Tsai, in his official capacity as the Director of the San Francisco Department of Public Health; Pacific Gas and Electric Company (“PG&E”); PG&E Corporation; and real parties in interest Marina Property Owner, LLC, Align Real Estate (collectively with Marina Property Owner, LLC, the “Developer”); and Albertsons Companies, Inc., as well as Does 1–10, (collectively, “Defendants”), as follows:

**INTRODUCTION**

1. For unknown reasons, the City and County of San Francisco’s Planning Department is unlawfully rubber-stamping a massive development project under AB 2011’s “streamlined” review process despite that the project fails to meet the statutory requirements for streamlined review, and is not enforcing the developer’s statutory obligations to perform the required environmental and health and safety assessments necessary to protect neighbors and future occupants from exposure to the serious hazardous wastes that are known to be present on the project site.

2. The Marina Safeway Development Project (the “Project”) is a planned 22-story residential development on the site of the Safeway grocery store and parking lot at 11 and 15 Marina Blvd in the Marina district (the “Marina Safeway Site” or the “Site”), which would include roughly 850 residential units, with a small portion rated affordable.

3. While the Plaintiffs all support the creation of housing generally, and affordable housing specifically—two of them being residents in rent-controlled apartments immediately north of the Site—the Project is being rammed through by the Planning Department and the Developer, without regard for the law or the impacts of the Project.

4. The Site proposed for development is contaminated with a toxic soup of hazardous wastes—including multiple carcinogenic compounds, cyanide, arsenic, and lead—that were left behind when PG&E abandoned an industrial facility (the "Steam Electric Plant") located on almost the exact footprint of the current Safeway grocery store on the Site, which generated electricity from steam created from burning diesel, and a massive industrial facility that covered five blocks immediately to the south and west of the site and extending out into San Francisco Bay (the "North Beach Manufactured Gas Plant" or the "North Beach MGP"), which, through an infamously dirty process, created gas for lighting, heating, and cooking by "cracking" coal and crude oil in massive oxygen deprived furnaces.

5. While the existence of the hazardous wastes on the Site is indisputable, their full nature, extent, and locations on the Site are unknown, as neither PG&E, the Developer, or CCSF has conducted (or in the case of CCSF, has required that there be conducted) anything approaching a full investigation of the wastes' nature and extent on the Site. Indeed, the investigations conducted thus far—which revealed contamination at levels 10 times that deemed safe for residential development—not only completely excluded from their scope wastes typical of manufactured gas plants ("MGPs") and failed to conduct sampling at depths where such contamination is known to exist, ***it completely excluded from its scope the entire 40,000-plus square-foot footprint of the current Safeway store and former Steam Electric Plant***, precisely where the Developer proposes to develop the massive residential complex.

6. As a result, not only will there be no remediation of hazardous waste on the Site before the massive construction project involving excavation of up to 30 feet below ground surface across an enormous area is undertaken, but there also won't be even a close to complete understanding of exactly what hazardous wastes exists, where they are located, how the construction could intersect with those wastes, or how the hazardous wastes and the construction could threaten the health of the Site's immediate neighbors, the health of residents down gradient of the Site, the health of visitors to the popular parks nearby (the Marina Green and Fort Mason), the health of the construction workers on the Site, and of the health of future residents of the development.

7. This lack of care about, and attention to, this fundamental and basic issue—as well as about, and to, a host of other issues and concerns, such as significant flooding, shading, viewsheds, and community character—are the result of the City's illegal application of a "streamlined" approval process under Assembly Bill 2011 ("AB 2011"), and the haphazard, arbitrary, and capricious manner with which it has conducted that process. The existence of a toxic soup of hazardous waste on almost three acres of prime property along San Francisco's northern waterfront is the result of over a hundred years of recklessness and disregard by PG&E.

8. AB 2011 creates a process for "streamlined" or "ministerial" review of certain housing development projects that meet certain site and project criteria, as well as the objective standards of the local city zoning, subdivision, and design review standards in effect at the time of the project submission. Once these conditions are met, AB 2011 provides developers with a streamlined path to construction of the project. In this manner, AB 2011 removes power from local communities to tailor the housing project to the needs of the community and largely places control in the hands of the developer for projects that meet the specified statutory criteria.

9. Because AB 2011 creates such a seismic shift in power in favor of developers for those projects that meet the statutory criteria, AB 2011's "streamlined" approval process was designed to be strictly construed to those run-of-the-mill housing projects that meet all objective criteria and are aligned with the city or county's objective developments standards.

10. By seeking to develop the Project through AB 2011's "streamlined" process, the Developer here seeks to bypass the ordinary environmental, health and safety, and other review processes that would ordinarily allow public comment, open debate, and transparent decision-making.

11. By-passing the ordinary regulations and proceeding through the "streamlined" process of AB 2011, the Developer seeks to build a monumental project on the prime Marina waterfront, that would be entirely out of place on one of San Francisco's most beautiful waterfront locations and fundamentally change the character of the Marina district. Currently, the Project Site's zoning regulations do not permit buildings to be anywhere close to that Project's height, preserving the unobstructed views of Golden Gate bridge, Alcatraz, and Angel Island, the

subject of some of San Francisco's most iconic view points. The Project would also cast substantial shadows on the adjoining Fort Mason and Marina Green parks.

12. However, even for those projects that are subject to AB 2011's "streamlined" review process, AB 2011 still requires critical environmental and health and safety oversight. Specifically, the project developer is still statutorily mandated to complete an environmental assessment to determine if there has been a release of hazardous substances on the site. Then, if the assessment identifies an environmental condition, the developer must then prepare a detailed "preliminary endangerment assessment" to determine if there are any health and safety concerns as a result of potential hazardous exposure before the project is approved. Then, a plan must be put in place to "remove" or "mitigate[] to a level of insignificance" any hazardous substances to prevent significant effects and exposure, both during construction and after.

13. This type of environmental oversight is critical to the health and safety of San Francisco residents. Failing to remove hazardous substances from a housing development site puts the future occupants at serious risk of exposure. Moreover, construction on a known hazardous waste site risks unmooring and spreading the hazardous substances, putting neighbors and other residents at risk as well, and potentially contaminating water sources or other neighboring sites.

14. Although the developers have sought to proceed through the streamlined review process, the Project does not meet the statutorily mandated site and project criteria. The Project is therefore statutorily precluded from AB 2011's "streamlined" review.

15. For unknown reasons, however, the City's Planning Department has unlawfully approved the Project for "streamlined" review, despite that the Project does not meet the statutorily obligated criteria.

16. Similarly, for unknown reasons, the City's Planning Department is also allowing the developer to shirk its statutorily mandated environmental and health and safety regulations. The Planning Department appears to be on a mission to approve the project at all costs—including the health and safety of San Francisco residents and visitors.

17. The Marina Safeway Project Site is known by all parties to have significant hazardous substance contamination from a long history of manufactured gas plants, an electric power plant, and other industrial hazardous material usage on and around the Site since the early 1900s.

18. From about 1900 through 1942, a Steam Electric Plant was operated at the Site by PG&E, including a massive storage tank containing over 1.2 million gallons of petroleum products.

19. In 1956, the former plant was dismantled, and the Site was redeveloped into the Marina Safeway at 15 Marina Blvd, with the grocery store built on almost the exact footprint of the former plant, making it virtually certain that no investigation or cleanup of wastes under the plant has ever been conducted.

20. Directly surrounding the Marina Safeway Site to the West and South, PG&E operated the North Beach MGP, from the mid-1800s through at least 1906, until it was partially destroyed in the Great Earthquake. PG&E then demolished portions of the facility, spreading demolition debris and other waste across the former footprint and its vicinity, while using other portions of the site for, among other things, storing gas manufactured at other MGPs until the 1950s.

21. This history of industrial waste has made everyone aware for a long time that the Site is almost guaranteed to have had the release of hazardous substances—likely numerous releases—and that it almost certainly contains significant hazardous substances beneath the ground.

22. This was confirmed, first, in 2023 and then in 2025, when, first PG&E's consultants, and then the developer prepared highly limited and inadequate environmental assessments. Even those highly limited assessments confirmed at least that the Site is impacted by significant hazardous substances, including residual petroleum-hydrocarbon and polycyclic aromatic hydrocarbon contamination in soil and groundwater in concentrations exceeding applicable screening levels. It also identified separate tetrachloroethene/chloroform soil-vapor at concentrations exceeding commercial/industrial screening levels.

23. The City and other regulators also received a summary of analysis from Michael Harrison, an environmental scientist, who conducted analyses that predicted that the Site was almost certain to be highly contaminated with toxic wastes from the prior manufactured gas plant, but that such wastes were specifically excluded from the scope of the investigations as were large swaths of the site, both laterally and by depth.

24. Thus, at this time, it is known and documented that the Site has significant and substantial hazardous waste on the Site, but the full extent of the toxic Site conditions are not yet fully explored.

25. Karina Navarro, the Unit Chief of the Site Mitigation and Restoration Program of the California Department of Toxic Substances Control, has indicated that the results from a number of sampling locations in the vicinity of the Site yielded readings "about twice the commercial screening level, and ten times the residential screening level." This led her to state that "I don't expect this property to qualify for streamlined approval." She further noted that the Site might have groundwater contamination from the prior hazardous industrial uses.

26. Given the confirmation of a "recognized environmental condition" from the initial environmental assessment, AB 2011 requires the developer to "undertake a preliminary endangerment assessment."

27. A preliminary endangerment assessment has very specific statutory requirements, and must follow the investigation and reporting guidelines specified by the California Department of Toxic Substances.

28. Yet the developer has flatly refused to conduct an adequate and proper endangerment assessment as required by statute, and the City has, for unknown reasons, continued to greenlight the Project.

29. As but one example of their failure to adequately conduct the preliminary endangerment assessment, the developer has yet to conduct <u>***any***</u> sampling below the roughly 40,000 square foot footprint of the Marina Safeway (which was basically the same footprint as the former Steam Electric Plant), on the ground that the Safeway is still operating and won't allow the testing—despite that Albertsons, the owner of the Safeway, is one of the development

sponsors. Without adequate sampling, the dangers of the hazardous wastes cannot be analyzed, the public cannot be made aware of the scope of the problem, and plans to mitigate the risks these wastes pose to human health and the environment cannot be made. Again, for unknown reasons, the City has not required adequate sampling or a statutorily compliant preliminary endangerment assessment as part of the approval process. Instead of complying with its statutory endangerment assessment requirements, the City approved the project for streamlining on August 13, 2026.

30. Because the City Planning Department has, for unknown reasons, unlawfully allowed the developer to proceed with the "streamlined" review process despite that the Project fails to meet the statutory criteria for streamlined review, a writ of mandate is necessary to ensure that the City and the developer complies with the requirements set forth in AB 2011.

31. Further, because the San Francisco Planning Department has, for unknown reasons, put the health and safety of residents at risk by failing to enforce the statutorily mandated preliminary endangerment assessment requirement, a writ of mandate is necessary to ensure compliance with the law and to ensure that hazardous wastes are properly identified, assessed, and removed or otherwise mitigated.

32. And because PG&E has, over the course of two centuries, spread contamination across some of the most beautiful lands in the world and then callously left it there, not even fully investigating its nature and extent, an injunction requiring that it finally conduct that investigation and cleanup is required.

## PARTIES

### I. Plaintiffs

33. Plaintiff YESAND FOUNDATION ("YesAnd") is a California non-profit public benefit corporation based in San Francisco that works to educate the public concerning housing, land use, development, environmental conditions, and public health and safety; promote community welfare; and encourage informed public participation in governmental decision-making. Its activities include informing and organizing residents, supporting independent

environmental and public-safety review, and advocating for responsible housing, development and community voice.

34. Plaintiff NEIGHBORHOODS UNITED SF ("NUSF") is a coalition of long-established neighborhood, business, and civic organizations (whose members include residents of homes and operators of businesses in the vicinity of the Site) united to strengthen San Francisco's communities, promote equitable growth, protect valuable resources, ensure meaningful public participation, and prevent displacement.

35. Plaintiff STEPHEN BAYNE ("Bayne") is an elderly, disabled resident of a rent-controlled apartment in a building located to the immediate south of the Site. Mr. Bayne has lived alone there since 2019. Mr. Bayne has difficulty walking and cannot drive and so has used a mobility scooter to get around for the last two years. Mr. Bayne uses the current Safeway store to meet his basic needs, including for food and medicine, and does not have other options for either that he can reach on his scooter. Mr. Bayne uses and enjoys the bike path along the Marina Green in order to get fresh air, sunlight, and human connection, on almost a daily basis. Mr. Bayne would suffer significant harm in the event that the Project proceeds along its current path. As an elderly, limited mobility resident of a rent-controlled apartment of a building immediately north of the Site, Mr. Bayne would likely suffer from significant impacts from the construction of the Project, including, without limitation, likely inhalation of dust containing (known, as well as uninvestigated) hazardous wastes, (likely extreme) noise impacts, and exhaust and traffic associated with the construction. Mr. Bayne would also suffer from the loss of the grocery store and pharmacy he uses to meet his basic needs and would be harmed by the disruption and degradation that construction of the massive project would cause to his ability to use and enjoy the Marina Green for fresh air and recreation. Mr. Bayne would continue to suffer once the Project is complete by profound change of character it would wreak upon his neighborhood and community and the harms it would cause to his ability to use and enjoy the Marina Green, including from the severe shading it would cause to it.

36. Plaintiff AMANDA CLUSE ("Cluse") is the owner and resident of a property on the corner of Lombard and Fillmore Streets. Ms. Cluse has owned and resided in the property

since 2021. Ms. Cluse frequently uses both the Marina Green and Fort Mason for recreation, walking along the Marina Green's path for sunshine, fresh air, exercise, and community, and picnicking and socializing with friends on the lawns of Fort Mason. Ms. Cluse would likely suffer from significant impacts from the construction of the Project, including, without limitation, likely inhalation of dust containing (known, as well as uninvestigated) hazardous wastes, both at her residence when north winds off the Bay blow across the Site and send dusts her way and when she attempts to use and enjoy the Marina Green and Fort Mason. That use and enjoyment would also be heavily impacted by the construction, with the peaceful sounds of seagulls and merriment drowned out by the cacophony of construction and huge machinery. And her ability to use and enjoy the Marina Green and Fort Mason would be fundamentally degraded once the Projected was built, with large shadows enveloping both and turning them from sunny oases for enjoyment into dark pockets of the city. She would also be harmed by the likely decrease in the value of her residence as a result of the Project, absolute and/or relative to its likely appreciation absent the Project. And she would be harmed by the fundamental change in character to her neighborhood and community that the Project would cause.

37. Plaintiff BRANDON DENO ("Deno") is a resident of a rent-controlled property in the building to the immediate south of the Site. Mr. Deno and his wife have lived in the building since 2012, and have lived in an apartment that looks upon the Site, with a patio from which they currently have partial views of the Bay. Mr. Deno and his wife have college-age children who are with them for the summer and holidays. Mr. Deno and his wife keep the window open almost every day to let the fresh, cool bay air into the apartment. They go for frequent walks along Marina Harbor, Fort Mason, and Marina Green. Every Sunday, they go to the farmer's market at Fort Mason. Because the building is rent controlled and they love their apartment and its location, Mr. Deno and his wife plan on staying there long-term.

38. However, if construction of the Project starts, they will be forced to move, giving up their rent-controlled apartment and all the quality of life benefits they enjoy from their apartment and its location. The construction would be approximately sixty feet from their apartment. They will not be able to open the windows due to construction dust, including known

(and uninvestigated) toxic chemicals contained therein. Moreover, the noise from demolishing Safeway, pile drivers for foundations, and general construction and heavy equipment noise would be unbearable for their day-to-day life and for working from home. Especially as the construction project would take several years, and Mr. Deno and his wife cannot live under such conditions.

39. Plaintiff JOSEPH GABANY ("Gabany") is the owner and resident of a house located on Marina Blvd., which is downgradient from the Site. Mr. Gabany and his wife—who previously resided elsewhere in the neighborhood—built the house approximately six years ago and live in it with their children. Mr. Gabany and his family frequently use and enjoy the Marina Green and Fort Mason for recreation, and chose to build their home to take advantage of these amenities, the beauty, fresh air, and community of the Marina neighborhood. Mr. Gabany and his family would likely suffer significant harms as a result of the Project. Because their home is downgradient from the Site, it would be placed at risk from increased flooding along Marina caused by construction of the Project and any increased mobilization of toxic contaminants in groundwater caused thereby. They would further be harmed by dust (including that containing toxic chemicals), noise, and exhaust that would result from the construction, which would impair their ability to use and enjoy the neighborhood's parks. Once built, Mr. Gabany and his family would continue to be harmed, including by the increased risks of flooding and ground water contamination that the Project would cause, as well as the shadowing of the Marina Green and Fort Mason, greatly reducing their ability to use and enjoy those areas, and the fundamental change in neighborhood character that it would cause. These impacts would not only degrade the quality of life of Mr. Gabany and his family but would also reduce the value of the home into which they have poured so much.

## II. <u>Defendants</u>

40. Defendant CITY AND COUNTY OF SAN FRANCISCO (the "City" or "CCSF") is, and at all relevant times was, a California municipal corporation. At all relevant times, the City acted by and through the San Francisco Planning Department and/or the San Francisco Department of Public Health, which are subdivisions of the City.

41. Defendant SARAH DENNIS PHILLIPS is sued in her official capacity as the Planning Director of the San Francisco Planning Department.

42. Defendant DANIEL TSAI is sued in his official capacity as the Director of the San Francisco Department of Public Health.

43. Defendant PACIFIC GAS & ELECTRIC COMPANY ("PG&E") is a California corporation with principal executive offices located at 300 Lakeside Drive, Oakland, California 94612.

44. Defendant PG&E CORPORATION is a California corporation that owns PG&E, with principal executive offices at 300 Lakeside Drive, Oakland, California 94612

45. Real Party in Interest ALIGN REAL ESTATE is an unfunded company based in Orlando, Florida that does business in California. Align Real Estate does business in California including by developing the property that is the subject of this action.

46. Real Party in Interest MARINA PROPERTY OWNER LLC is an entity linked to Align Real Estate's ongoing development project that is the subject of this action.

47. Real Party in Interest ALBERTSONS COMPANIES, INC. is a Delaware corporation with its principal office in Boise, Idaho. Albertsons Companies, Inc. is registered to do business in California and has extensive business in California including by owning and operating the Marina Safeway that is the site of this action. Albertsons Companies, Inc. is the parent company of Real Party in Interest Safeway Inc.

48. Real Party in Interest SAFEWAY INC. is a Delaware corporation with its principal office in Pleasanton, California. Safeway Inc. is registered to do business in California and has extensive business in California including by owning and operating the Marina Safeway that is the site of this action.

49. Does 1–10 are defendants whose true names are unknown to Plaintiffs. Each of these fictitiously named defendants is in some way liable to Plaintiff for the occurrences and injuries alleged in this complaint.

50. At all relevant times, each of the Doe Defendants was an agent, servant, partner, alter ego, and/or joint venturer of his/her/its co-defendant(s) in the acts and omissions that have

caused the injuries to Plaintiffs and was at all times, acting within the course and scope of said agency, service, partnership, conspiracy, alter ego status, and/or joint venture.

## JURISDICTION AND VENUE

51. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 with respect to the cause of action arising under the United States constitution and supplemental jurisdiction under 28 U.S.C. § 1367(a) with respect to the causes of action arising under state law.

52. This Court has personal jurisdiction over each Defendant because each Defendant is located in California, conducts business in California, and committed the wrongful acts and breaches alleged herein in California.

53. Venue is proper under 28 U.S.C.§ 1391 and Civil L.R. 3-2(c) and (d) because all Defendants reside in this district, the events and omissions giving rise to the claims occurred in the county of San Francisco in this district, and the property that is the subject of the action is situated in San Francisco in this district.

## FACTUAL ALLEGATIONS

### I. AB 2011 Streamlines the Approval Process for Certain Residential Projects

54. On September 28, 2022, Assembly Bill 2011, the Affordable Housing and High Road Jobs Act of 2022 ("AB 2011") was signed into law with an effective date of July 1, 2023.

55. AB 2011 allows a streamlined ministerial approval process for certain eligible residential developments that meet site eligibility requirements, affordability requirements, and development standards for 100% affordable housing and mixed-income housing. A housing development is subject to streamlined, ministerial review pursuant to Section 65912.124 if the proposed housing development satisfies all of the requirements in Sections 65912.121, 65912.122, and 65912.123. Cal. Gov. Code § 65912.120.

56. Development projects must meet all the requirements set forth in AB 2011 to qualify for ministerial review. For example, a development project is not subject to ministerial

review unless at least 75 percent of the perimeter of the site adjoins parcels that are developed with urban uses. Cal. Gov. Code § 65912.121(e).

57. Even if a site qualifies for streamlined review under AB 2011, before approving a project, the local government must require the development proponent (1) to complete a phase I environmental assessment under Health and Safety Code section 78090 (Cal. Gov. Code § 65912.124(k)(1)), to determine whether there has been, or may have been, a release of a hazardous substance on the project site (Cal. Health & Safety Code § 78090), and if a recognized environmental condition is found, (2) to undertake a preliminary endangerment assessment under Health and Safety Code section 78095 to determine the existence of any release of a hazardous substance on the site and the potential for exposure of future occupants to significant health hazards from any nearby property or activity (Cal. Gov. Code § 65912.124(k)(2)).

58. A preliminary endangerment assessment includes sampling and analysis of the site, a preliminary determination of the type and extent of hazardous material contamination of a site, and a preliminary evaluation of the risks the hazardous materials contamination may pose to public health or the environment. Cal. Health & Safety Code § 78095. If a release of hazardous substance is found, the release must be removed or any significant effects mitigated to a level of insignificance during the project and before the local government may issue a certificate of occupancy. Cal. Gov. Code § 65912.124(k)(2)(A). If a potential for exposure to significant hazards from surrounding properties or activities is found, the effects of the potential exposure must also be mitigated to a level of insignificance during the project and before the local government may issue a certificate of occupancy. *Id.* § 65912.124(k)(2)(A).

59. The San Francisco Planning Department ("San Francisco Planning") publishes bulletins to provide official administrative interpretation, implementation guidance, and standardized procedures for state and local programs. San Francisco Planning drafted Planning Director Bulletin No. 9, Ministerial Approval Processes for Mixed-Income Housing ("Bulletin No. 9") in June 2023 to provide an overview of the ministerial approval process for mixed-income housing under SB 423, AB 2011, and AB 507. Bulletin No. 9 has many provisions in common with Planning Director Bulletin No. 5, Ministerial Approval Processes for Affordable

and Supportive Housing ("Bulletin No. 5"), which provides an overview of the ministerial approval process for affordable and supportive housing under SB 423, AB 2162, AB 2011, and SB 4.

60. As of August 11, 2026, Bullet No. 9 provided that "[i]f the Phase 1 Environmental Assessment finds that hazardous materials are present, Planning staff will determine the application to be ineligible for ministerial approval until the Department of Public Health, in conjunction with the Planning Department, develops conditions of approval that will successfully mitigate any hazards to insignificant levels as set forth in State Law." Bulletin No. 5 still has this same language today.

61. On August 14, 2026, the day after the Project was approved for streamlined review, and three days after NUSF and others sent a letter to the Planning Department and the Department of Public Health, requesting that they meet their obligations under Cal. Gov. Code § 65912.124(k) and Bulletin No. 9, the Planning Department changed Bulletin No. 9 to remove the language.

## II. <u>Align Proposes Residential Development on a Former Industrial Site</u>

62. On November 11, 2025, Safeway Inc. as owner of two adjoining real property parcels located at 11 and 15 Marina Blvd. in San Francisco authorized Marina Property, Owner, LLC to take all necessary actions for approval of a high-rise housing project at the Site.

63. On December 4, 2025, Align Real Estate, acting through Marina Property Owner, LLC (collectively, the "Developer") submitted its Notice of Intent to Submit a Project Application Pursuant to SB 423, AB 2011, or SB 4 to merge the two adjoining parcels and replace the existing grocery store at 15 Marina Blvd., and surface parking lot located at 11 Marina Blvd., with 790 residential units in a 25-story building, a new grocery store, and retail parking (the "Project"). The Notice of Intent indicated that the building would have 86 affordable dwelling units and 704 market rate dwelling units. The Developer indicated the Project would use the AB 2011 Affordable Housing and High Road Jobs Act of 2022 and checked the box that the

project would require approvals under the Subdivision Map Act, such as a parcel map, tentative map, or condominium map.

64. 15 Marina Blvd. is currently the site of the Marina Safeway, which is one of the first modern Safeway stores and was designed by master architect William Wurster. The Marina Safeway became an influential blueprint for future large modern grocery stores. The potentially historic building will be dismantled as part of the Project.

65. 11 Marina Blvd. is a vacant site that contains only a parking lot and no existing buildings. The Site has been zoned for a maximum of 40-feet in height and four stories, and no other buildings in the neighborhood rise higher than that.

66. The north edge of the Site adjoins the Marina Green, a waterfront park, and the San Francisco Marina Yacht Harbor, which is owned by the San Francisco Recreation & Park Department. The Marina Yacht Harbor is zoned as "Public District" in the property information map, and San Francisco Planning has consistently described the parcel as "a recreational boating center" in environmental review documents. Because the Marina Yacht Harbor is subject to the Public Trust Doctrine, uses in this parcel must be tied to water access, recreation, or maritime activity.

67. The east edge of the site borders Fort Mason, a national park.



68. Above is a rendered image of the Project viewed from the water.

69. Below is a rendered image of the Project viewed from the east, including the shadows it would cast in the afternoon over Fort Mason.



70. In 2021, the City's Recreation and Park Development approved a settlement agreement with PG&E to develop a joint San Francisco Marina Improvement and Remediation Project. The project approved in April 2026 will begin construction in spring 2027 in the area directly north of the Site, as shown in the below image from the presentation for the San Francisco Marina Improvement & Remediation Project by the Rec Park Commission (April 16, 2026).



71. The Site is shown at the bottom of the image, directly south of the kayaks.

## III. PG&E, Which Previously Operated a Steam Plant at the Site and Handled Hazardous Wastes at a Nearby MGP, Has Avoided Testing and Remediating Hazardous Wastes in the Vicinity

72. From the mid-1800s through at least 1906, Defendant Pacific Gas and Electric Company and its predecessors operated the North Beach Manufactured Gas Plant or MGP. When the MGP was partially destroyed in the Great Earthquake, PG&E demolished portions of the facility, spreading demolition debris and other waste across the former footprint and its vicinity. PG&E used other portions of the site for, among other things, storing gas manufactured at other MGPs until the 1950s. The site of North Beach MGP covered at least five city blocks, extending north from Bay Street and west from Laguna Street and across what is now Marina Blvd. As

shown in the image below, the former North Beach MGP surrounded the Site to the south and west.[1]




73. From about 1900 through 1942, PG&E also operated a steam electric plant directly at the Site (the "Steam Electric Plant"), first under a lease and then as owner . The Site included three above-ground storage tanks, including one massive tank containing over 1.2 million gallons of petroleum products.

74. In 1956, the former plant was dismantled, and the Site was redeveloped into the Marina Safeway at 15 Marina Blvd.

[1] This image is from Emily Green & David R. Baker, PG&E quietly clearing toxic soil from pricey Marina district, S.F. Chronicle (March 16, 2017), https://www.sfchronicle.com/bayarea/article/PG-E-quietly-cleaning-contaminated-soil-in-pricey-11028095.php.

75. In April 2023, PG&E's consultants conducted a limited investigation of the contamination at 15 Marina Blvd. (the "2023 Investigation").[2] The 2023 Investigation excluded from evaluation potential MGP impacts from the neighboring former North Beach MGP. Rather, the investigation was limited to evaluating subsurface conditions at the Site to determine whether the Site was eligible for closure by the State Water Resources Control Board. The figure below is from the 2023 Investigation and shows that the Steam Electric Plant operated in the same location as the Marina Safeway Site.




76. Notwithstanding this limited scope of the 2023 Investigation, it revealed contamination that exceeded the Commercial/Industrial Direct Exposure Soil Environmental Screening Level in soil samples, multiple volatile organic compounds and total petroleum hydrocarbons gas in soil vapor, as well as chloroform and tetrachloroethene ("PCE") in soil vapor samples at concentrations exceeding the commercial/industrial ESLs of 18 micrograms per cubic meter (µg/m3) and 67 µg/m3, respectively. Chloroform and PCE are chemicals known to cause

[2] The report from the investigation is available at: https://documents.geotracker.waterboards.ca.gov/regulators/deliverable_documents/5245221793/Site%20Characterization%20Investigation%20Report_11032023.pdf.

cancer in humans. These tests thus found toxic and cancer-causing chemicals above commercial-industrial levels. Residential levels are even lower and more health-protective.

77. The 2023 Investigation also departed from accepted practices for evaluating whether light non-aqueous phase liquid ("LNAPL") exists at the Site. At location SWB-06, the sample collected at 5.5 feet below ground surface (the deepest sample collected at that location) contained motor-oil-range hydrocarbons above the Water Board soil saturation limit of 5,100 mg/kg, along with very high PAH concentrations. This data suggests that separate-phase product exists at that location. However, no groundwater sample was collected at SWB-06, and soil saturation limits were not discussed in the Report.

78. Groundwater samples were collected at locations SWB-01 and SWB-03, and these samples contained motor-oil-range hydrocarbons significantly above solubility estimates, suggesting that separate-phase product exists at these locations. This sample collection also deviated from standard practice because the groundwater samples were collected using a peristaltic pump. A disposable bailer is generally preferred where LNAPL is being investigated because a bailer facilitates sample collection at the groundwater interface and direct inspection of the interface water and/or product. Peristaltic pump sampling requires advancing the sample intake tubing below the free water surface and may miss floating product, thereby underestimating LNAPL concerns.

79. Although the 2023 Investigation did not study MGP impacts, Section 5.1.1 of the 2023 Investigation described "possible MGP-related residues, including clinker-like material, asphalt-like material, coal-like material, and ash-like material," including a "slight mothball-like odor" at boring SWB-08, which were not incorporated into an evaluation of potential MGP impacts. Section 3.2.1 of the 2023 Investigation noted that benzo(a)pyrene equivalent ("BaP EQ") data for shallow soil samples collected adjacent to the Site range in concentration from 0.01 mg/kg to 139.98 mg/kg. BaP EQ is a relative toxicity-based calculation of polyaromatic hydrocarbon contamination, where the commercial / industrial environmental screening level ("ESL") is 2.1 mg/kg. BaP EQ levels so far above the screening level indicates that the Site lies within the former North Beach MGP contamination halo.

80. Despite these results, on November 27, 2024, the Water Board issued a "closure" letter to PG&E (the former property owner) and Albertsons (the current property owner of the Marina Safeway) which stated that "[w]hile the information provided indicates the subject site is satisfactorily cleaned up to standards consistent with intended commercial/industrial land use, we may reconsider these findings should land use change, the configuration of site features change, or new information be discovered regarding previously undetected contamination." Ex. 1. This is because much higher levels of contamination are allowed at commercial-industrial sites, where adult workers are exposed for at most 8 hours per day, whereas much more stringent cleanup levels are required for residential uses, where sensitive populations such as infants and elderly people may be exposed up to 24 hours per day.

81. With this closure letter, PG&E has not remediated the risks associated with its prior activities at the Site.

## IV. <u>A Phase I Environmental Site Assessment Detects Hazardous Substances but the Developer Insists AB 2011 Applies</u>

82. On December 5, 2026, a Department of Toxic Substances Control ("DTSC") environmental planner reached out for guidance on Align seeking ministerial approval for the Project, and DTSC Site Mitigation and Restoration Program Unit Chief Karina Navarro responded that the Site was downgradient from the "North Beach Manufactured Gas Plant (MGP) site" and "the Water Board said in their latest document (2024) that certain requirements apply to the property, including notification to them if there are any proposed changes to the land use." Ex. 2. The DTSC Unit Chief noted 2017 impacts that "may have been the result of a prior petroleum release from the property" and 2023 "petroleum impacts to the soil . . . about twice the commercial screening level, and ten times the residential screening level. Therefore, I don't expect this property to qualify for streamlined approval." *Id.* She further noted that the Site "might be impacted by MGP contamination in the groundwater." *Id.*

83. Nonetheless, on December 22, 2025, the Developer submitted its formal application seeking ministerial approval pursuant to AB 2011. The application included a Phase I Environmental Site Assessment ("Phase I Assessment") completed by Langan CA, Inc. on

December 8, 2025 pursuant to the Developer's written authorization. This Phase I Assessment detected petroleum hydrocarbon and polycyclic aromatic hydrocarbon contamination in concentrations exceeding Regional Water Quality Control Board commercial/industrial ESLs. It also detected chloroform and PCE in soil vapor samples at concentrations exceeding their respective ESLs. Ex. 3, Table ES-1.

84. While Phase I Assessment detected these contaminants, it did not evaluate the North Beach MGP-related impacts like BaP EQ concentrations, even though the 2023 Investigation detected these contaminants. Ex. 4.

85. As discussed by Michael Harrison, P.E., who has worked on dozens of sites affected by MGP contamination, the Site is almost certain to be highly contaminated with toxic wastes from the operation of a former MGP in the Site's immediate vicinity. Ex. 4.

86. At the North Beach MGP and the steam electric plant PG&E operated at the Site, PG&E disposed of wastes in several ways, including, without limitation: dumping the wastes into the San Francisco Bay, dumping the wastes into onshore wells, dumping wastes into onshore depressions, abandoning wastes in tanks and other components of the former facilities, spreading wastes throughout the soil of the site and its vicinity, and abandoning belowground and/or spreading above-ground components of the facilities that contain toxic wastes during the decommissioning and demolition of the facilities. Furthermore, PG&E handled, stored, treated, and transported wastes at the Site including by handling liquid-form wastes, including tars and liquor, generated by the processes; storing such liquid-form wastes on the sites; transporting liquid-form wastes from various locations on the sites to other locations on the sites; handling solid-form wastes generated by the facilities; storing solid-form wastes generated by the facilities; transporting solid-form wastes from various locations on the sites to other locations on the sites; and treating various forms of wastes to remove certain components of them for sale or otherwise.

87. The wastes disposed of, handled, stored, treated, and/or transported by PG&E on and in the vicinity of the Site include: polyaromatic hydrocarbons ("PAHs"), which are carcinogenic and can lead to reproductive harms, still births, fetal deformities, liver damage, liver toxicity, liver enzyme disruption, liver cirrhosis, endocrine disruption, lung and kidney toxicity,

scoliosis, skin disease; lead, a well-known human neurotoxin; cyanide, which is acutely toxic to humans and other animals and can cause respiratory failure, neurological effects, and liver stress; arsenic, a carcinogen that can cause skin lesions, liver cancer, still birth and deformities; benzene, a human carcinogen for which the World Health Organization has found there is no safe level of human exposure that can cause leukemia, aplastic anemia, and immune disorders; and other volatile organic compounds, including ethylbenzene, toluene, and xylenes, which can cause hearing loss, liver and kidney toxicity, neurological damage, reproductive harm, and central nervous system depression.

88. On January 22, 2026, the Department of Public Health ("DPH") requested a Phase II Work Plan for the Site, the submission of a Phase 2 Work Plan due to the presence of hazardous substances in the subsurface, and a site-specific dust control plan due to the size of the project and its proximity to sensitive receptors. Ex. 5.

## V. <u>The Phase II Work Plan Has Acknowledged Deficiencies</u>

89. On February 20, 2026, Langan provided the requested Phase II Work Plan. On February 24, 2026, DPH asked why no soil samples were proposed from within the existing Safeway building as "[t]his could pose a data gap issue." Ex. 6. The Developer's environmental consultant responded: "We know that there is a data gap" but stated that Safeway—who is a co-venturer in the Project—would not permit drilling while the store remains active. *Id*.

90. The 40,212-square-foot portion of the Site on which the Developer is refusing to conduct sampling is near the location of the former MGP and its fuel tanks, is roughly co-extensive with the former footprint of the Steam Electric Plant, and historical data shows other features that strongly suggest the likely existence of additional serious hazardous contamination in that part of the Site. The Developer is planning extensive excavation (approximately 30 feet below ground surface) and construction both below ground surface (including subsurface parking) and above ground surface (including residential construction) in this area.

91. On March 5, 2026, DPH asked for modifications to the work plan to explain the samples the Developer proposed collecting at a later date, and Langan submitted a Revised Phase II Work Plan on May 20, 2026.

92. In addition to including no samples from under the Safeway, the Revised Phase II Work Plan does not provide (a) a residential human-health risk evaluation, (b) a cumulative-risk analysis, or (c) an evaluation of the potential impact of contamination from adjoining-property recognized environmental conditions or the additional contamination located thereon.

93. The Revised Phase II Work Plan also does not assess risk for the building's new residential use. To sample indoor air, the work plan proposes to rely on data from existing indoor-air testing, which consisted of samples collected under the current commercial use and current building configuration, without evaluating chronic residential exposure potential for the Project as designed, which would include periods much longer than the eight hours contemplated for commercial exposures. The Revised Phase II Work Plan does not propose any additional soil-vapor or indoor air sampling. The proposed investigation also does not propose any additional groundwater sampling, soil-vapor sampling, or sampling beneath the current Safeway footprint while the Safeway is operating, even as it acknowledges the Project would involve excavation to approximately 30 feet, artificial fill to approximately 10 feet, groundwater at approximately 10 to 15 feet, and the possible need for dewatering and treatment. The Project would also involve the driving of piles even deeper.

94. The work plans also do not acknowledge that the Site is within a known "vulnerability zone" bounded by the historic shoreline within Marina Blvd., Bay St., Laguna St., and Fillmore St. The Marina has been subject to frequent flooding (much more than once every 100 years), and indeed the San Francisco Department of Public Works issued a report in 2022 documenting flooding problems in the immediate area. The Site is entirely within San Francisco's Tsunami Evacuation and Inundation Zones Map. The San Francisco Property Information Map indicates the property is highly like to experience deep and contiguous flooding in a 100-year storm. A street sign on the west side of Buchanan at North Point reads: "Leaving Tsunami

Evacuation Zone."[3] The Department of Public Works has also documented serious overflows of the combined sewer systems that serves the area.

95. Below are images from 2021 of flooding along the Marina Blvd. from a study by the City.





## VI. The City Advances the Project Even as Community Members Express Concern

96. On March 19, 2026, San Francisco Planning provided a Notice of Conditional Project Eligibility for AB2011 Approval. In that notice, San Francisco Planning indicated that the project sponsor would receive a Notice of Final AB2011 Approval upon completion of design review.

97. On May 1, 2026, local organizations Marina Community Association, Cow Hollow Association, Golden Gate Valley Neighborhood Association, Marina-Cow Hollow Neighbors and Merchants, and Neighborhoods United SF wrote to the San Francisco Planning Department through counsel objecting to the Notice of Conditional Project Eligibility for AB 2011 including because the project does not qualify for streamlining, is not exempted from CEQA, and public hearings are required to allow the affected community to have a voice.

---

[3] https://sfgov.maps.arcgis.com/apps/instant/basic/index.html?appid=05ed171c2be8403fb7368be2284bf2ff.

98. On July 14, 2026, the Developer submitted revised plans to lower the Project's two high-rise towers from 25 and 22 stories to 22 and 18, respectively, while increasing the number of housing units from 790 to 848. The revisions did not increase the project's affordable unit count, which remained at 86 units as originally planned.

99. After District 2 Supervisor Stephen Sherrill wrote to San Francisco Planning questioning whether the Site met AB 2011's requirement that "at least 75 percent of the perimeter of the site adjoins parcels that are developed with urban uses" and met the environmental site criteria outlined in AB 2011, San Francisco Planning responded on July 20, 2026 that it considered the Site to be surrounded by "urban use."

100. Under Government Code section 65912.101(x), "'[u]rban use' means any current or former residential, commercial, public institutional, public park that is surrounded by other urban uses, parking lot or structure, transit or transportation passenger facility, or retail use, or any combination of those uses."

101. According to the Planning Department:

> Because the term "urban use" includes any combination of a wide variety of uses, most parcels in dense urban environments like San Francisco will qualify as having an "urban use." The parking lot across Marina Boulevard is part of a larger parcel under the jurisdiction of the Recreation and Park Department. This does not change the fact that part of the parcel is used for parking, which constitutes an "urban use." By the same logic, the parcel to the east of the project site, Fort Mason, contains parking, retail, and residential uses. The combination of those uses means that the parcel is also considered to have an "urban use" pursuant to AB 2011. After evaluating the use of the adjacent properties and the language of the statute, we consider the subject site to be surrounded by "urban uses."

Ex. 7.

102. According to the Planning Department's interpretation of the term "urban use," any park is considered an "urban use" so long as it has a parking lot in it, despite the statutes' clear language that only public parks "surrounded by other urban uses" are considered urban uses themselves. Under the City's interpretation, Yosemite National Park is an "urban use" because it has a parking lot in it.

103. On August 11, 2026, organizations Marina Community Association, the Cow Hollow Association, and Neighborhoods United SF wrote to the Department of Public Health and

the San Francisco Planning Department about the Project and revisions submitted in July 2026. The organizations requested that DPH and Planning pause approval of the project for streamline review under AB 2011 until, the Developer completed the preliminary endangerment assessment required by Cal. Gov. Code § 65912.124(k), and DPH and the Planning Department had "develop[ed] conditions of approval that will successfully mitigate any hazards to insignificant levels as set forth in State Law," as stated in Bulletin No. 9.

104. Because the Developer submitted its revised plan on July 14, 2026, the Planning Department had to determine within 30 days (by August 13, 2026) whether the Project was approved for streamlining under AB 2011, and, if no action was taken, the Project was automatically approved for streamlined review. After the community organizations sent their letter on August 11, 2026, the Planning Department allowed the Project to be approved for streamlining on August 13, 2026, without issuing any kind of notice or decision.

105. On August 14, 2026, after approval of the Project for streamlining review the Planning Department changed its Bulletin No. 9. It now provides that "[i]f a recognized environmental condition is found, the project sponsor shall prepare a preliminary endangerment assessment. If a release of a hazardous substance is found to exist on the site, before the City issues a certificate of occupancy, the release shall be removed, or any significant effects of the release shall be mitigated to a level of insignificance in compliance with current state and federal requirements. If a potential for exposure to significant hazards from surrounding properties or activities is found to exist, before the the [sic] City issues a certificate of occupancy, the effects of the potential exposure shall be mitigated to a level of insignificance in compliance with current state and federal requirement."

## CLAIMS FOR RELIEF

### <u>FIRST CAUSE OF ACTION</u>

### Writ of Mandate for IMPROPER APPROVAL FOR STREAMLINED REVIEW, California Code of Civil Procedure § 1085

**(Against City & County of San Francisco)**

106. Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

107. In enacting AB 2011, the Legislature sought to increase the development of multi-family residential projects throughout the state by streamlining the approval process for certain types of multi-family housing projects that meet statutory criteria.

108. The "streamlined" process is only applicable to projects that meet specified site and project requirements. It was designed to streamline run-of-the-mill residential projects that are generally in compliance with ordinary community zoning and design standards and that would not cause significant environmental impacts.

109. The bill authorizes a developer to submit an application for a multifamily housing development that will be subjected to the streamlined, ministerial approval process if the development satisfies specified, objective, state-mandated planning standards. Assemb. B. 2011, ch. 647, 2022 Cal. Stat. (Legis. Counsel's Dig.).

110. Specifically, a proposed mixed-income housing project along a commercial corridor is not subject to the streamlined review process unless the site on which it is located meets certain specified site criteria. Cal. Gov't Code § 65912.121.

111. One of the site criteria required for streamlined review is that "[a]t least 75 percent of the perimeter of the site adjoins parcels that are developed with urban uses." Cal. Gov't Code § 65912.121(e). By using the word "parcels," the statute necessarily requires a parcel/lot-level analysis of the area adjoining the project site.

112. "Urban Uses" is defined as "any current or former residential, commercial, public institutional, public park that is surrounded by other urban uses, parking lot or structure, transit or transportation passenger facility, or retail use, or any combination of those uses." Cal. Gov. Code § 65912.101(x).

113. In addition to the requirements for the project site, streamlined review is also not applicable unless the proposed project meets certain state-mandated objective development standards. Cal. Gov't Code § 65912.123.

114. The development standards include various height, density, usage and other requirements, including that the project must comply with the local city's ordinary zoning, subdivision, and design requirements at the time the project is proposed, but only those "for the

closest zone in the city, county, or city and county that allows multifamily residential use at the residential density proposed by the project." Cal. Gov't Code § 65912.123.

115. As part of the Project requirements for streamlined review, the proposed project must meet the "objective zoning standards, objective subdivision standards, and objective design review standards" that are in effect "at the time that the development application is submitted," with some limited exceptions. Cal. Gov't Code § 65912.123.

116. Such objective standards, include, among others, a shadow analysis that meet the requirements of section 295 of the San Francisco Planning Code, also known as "Proposition K" and "the Sunlight Ordinance." Planning Code Section 295 mandates that new structures above 40 feet in height that would cast additional shadows on properties under the jurisdiction of, or designated to be acquired by the Recreation and Parks Department, including, for example, the directly adjacent and iconic Fort Mason park and Marina Yacht Harbor, are not permitted unless the shadow is either insignificant or not adverse to the use of the park.

117. The project must also meet certain affordability criteria to be subject to streamlined review. Cal. Gov't Code § 65912.122.

118. A writ of mandate should issue to preclude streamlined review for the Project because the Site and Project do not meet several of the statutory requirements for streamlined review.

119. For example, among other things, the Site does not satisfy the requirement that at least 75 percent of the perimeter of the site adjoins parcels that are developed with urban uses. The north edge of the Site is across from the San Francisco Marina Yacht Harbor, which is owned by the San Francisco Recreation & Park Department and is restricted to water access, recreation, maritime, and supporting activities. The east edge of the site borders Fort Mason, a national park, which is not surrounded by other urban uses and is therefore not an urban use itself. And the immense shadow cast on Fort Mason, the Yacht Harbor, and Marina Green is not insignificant and is adverse to the use of those public spaces. These are but some of the ways in which the Site fails to satisfy the applicable requirements.

120. Defendant CCSF violated AB 2011 by determining that the Project qualified for streamlined, ministerial approval when it failed to meet the statutory criteria for streamlined review.

121. Petitioners have no other plain, speedy, and adequate remedy in the ordinary course of law and will suffer irreparable injury unless this Court issues the relief requested in this Petition and Complaint.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**SECOND CAUSE OF ACTION**

**Writ of Mandate for IMPROPER EXCLUSION FROM CEQA REVIEW, California Code of Civil Procedure § 1085**
**(Against City & County of San Francisco)**

122. Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

123. As alleged above, the Project is not eligible for "streamlined" "ministerial" review or approval pursuant to AB 2011. Therefore, the "ministerial basis" for the City not to apply CEQA is erroneous as a matter of law. CEQA review is required. *See generally* Cal. Pub. Res. Code § 21050 et seq.

124. The City failed to proceed in a matter required by law by failing to conduct CEQA review for the Project.

125. Petitioners have no other plain, speedy, and adequate remedy in the ordinary course of law and will suffer irreparable injury unless this Court issues the relief requested in this Petition and Complaint.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**THIRD CAUSE OF ACTION**
**Writ of Mandate for IMPROPER APPLICATION OF AB 2011, Code of Civil Procedure § 1085, California Government Code § 65912.124**
**(Against City & County of San Francisco)**

126. Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

127. Even under the streamlined review process for projects meeting the specified criteria, important environmental and health and safety oversight and protections still remain, including hazardous waste detection and removal.

128. Government Code section 65912.124(k)(1)-(2) requires that "[t]he local government shall, as a condition of approval of the development, require the development proponent to complete a phase I environmental assessment, as defined in Section 78090 of the Health and Safety Code," and "[i]f a recognized environmental condition is found, the development proponent shall undertake a preliminary endangerment assessment, as defined in Section 78095 of the Health and Safety Code, prepared by an environmental assessor to determine the existence of any release of a hazardous substance on the site and to determine the potential for exposure of future occupants to significant health hazards from any nearby property or activity."

129. On December 8, 2025, the Developer conducted a phase I environmental assessment. Despite the profound inadequacies of that assessment, which make the City's acceptance arbitrary and capricious, that assessment identified a recognized environmental condition involving tetrachloroethene ("PCE") and chloroform in soil vapor at concentrations exceeding applicable *commercial/industrial* screening levels and *ten times residential screen levels*. (Exhibit 3, Executive Summary & Table 5-1.) In other words, the assessment detected concentrations of those contaminants that were ten times the level that is deemed safe for residential development. It also identified a controlled recognized environmental condition involving residual petroleum hydrocarbons and polycyclic aromatic hydrocarbons in soil and groundwater.

130. Michael Harrison, P.E. an environmental scientist, noted in a letter to the City that the Site is almost certain to be highly contaminated with toxic wastes from the operation of a former manufactured gas plant in the Site's immediate vicinity; however, the phase 1 environmental assessment did not sample for MGP wastes. It also limited the scope of its sampling to a small portion of the Site and shallow soils thereof.

131. Karina Navarro, the Unit Chief of the Site Mitigation and Restoration Program of the Department of Toxic Substances Control, has indicated that the results from a number of sampling locations in the vicinity of the Site yielded readings "about twice the commercial screening level, and ten times the residential screening level," leading her to note "I don't expect this property to qualify for streamlined approval," further noting that the Site "might be impacted by MGP contamination in the groundwater."

132. Given that "a recognized environmental condition [was] found," the developer was required to "undertake a preliminary endangerment assessment, as defined in Section 78095 of the Health and Safety Code, prepared by an environmental assessor to determine the existence of any release of a hazardous substance on the site and to determine the potential for exposure of future occupants to significant health hazards from any nearby property or activity." Cal. Government Code section 65912.124(k)(2).

133. The Planning Department clearly recognized that Cal. Government Code section 65912.124(k) required that a Developer conduct a full environmental investigation of a site before it was approved for streamlined review, as Bulletin No. 9 previously provided that "[i]f the Phase 1 Environmental Assessment finds that hazardous materials are present, Planning staff will determine the application to be ineligible for ministerial approval until the Department of Public Health, in conjunction with the Planning Department, develops conditions of approval that will successfully mitigate any hazards to insignificant levels as set forth in State Law," and it would be impossible for such conditions to be developed in the absence of preliminary endangerment assessment.

134. Health and Safety Code section 78095 provides that a preliminary endangerment assessment include "[s]ampling and analysis of a site"; "[a] preliminary determination of the type and extent of hazardous material contamination of a site"; and "[a] preliminary evaluation of the risks the hazardous materials contamination of a site may pose to public health or the environment." Cal. Health & Safety Code § 78095(a)-(c). It further requires that the preliminary endangerment assessment be "conducted in a manner that complies with the guidelines published by the department entitled "Preliminary Endangerment Assessment: Guidance Manual." The

Preliminary Endangerment Assessment: Guidance Manual may be found on the State of California, Environmental Protection Agency, Department of Toxic Substances Control's website, at https://dtsc.ca.gov/wp-content/uploads/sites/31/2023/06/PEA_Guidance_Manual.pdf.

135. Despite these statutory requirements for the protection of the health and safety of San Francisco residents, the Developer did not undertake a preliminary endangerment study before the Project was approved for streamlined review on August 13, 2026, and the City did not require that it do so.

136. In fact, the Developer informed the City that it would not conduct any sampling and analysis of the portion of the Project Site at 15 Marina Blvd., currently occupied by the Marina Safeway, prior to the approval of the Project, because Safeway's business is still operating, despite that Safeway is one of the Project's co-venturers.

137. Pursuant to AB2011, the City was required, "as a condition of approval of the development," to require the developer to "undertake a preliminary endangerment assessment." Cal. Gov't Code § 65912.124(k)(1)-(2).

138. However, the City accepted this statement, meaning that the City is now poised to approve the Project without requiring that the Developer do anything close to a preliminary endangerment assessment that is compliant with Health & Safety Code section 78095.

139. Indeed, this massive and acknowledged data gap is not even close to the only shortcoming in the planned—but not yet implemented environmental investigation that the Developer has proposed and the City has agreed to. Rather, as detailed in the letter from Michael Harrison attached hereto as Exhibit 4, numerous other shortcomings afflict it.

140. However, despite this the City is not requiring that the Developer agree to do anything more before approving the Project.

141. In addition to requiring a preliminary endangerment assessment, AB 2011 further requires that if "a release of a hazardous substance is found to exist on the site, before the local government issues a certificate of occupancy, the release shall be removed, or any significant effects of the release shall be mitigated to a level of insignificance in compliance with current state and federal requirements." Cal. Gov't Code § 65912.124(k)(2)(A)

142. The statute requires the same removal or mitigation even if only "a potential for exposure to significant hazards from surrounding properties or activities is found to exist." Cal. Gov't Code § 65912.124(k)(2)(B).

143. Despite these clear requirements to remove or mitigate the hazardous substances, the City has not required the Developer to conduct adequate testing to understand the extend of the problem and the potential harm to SF residents, let alone begun to prepare removal or mitigation requirements as conditions of the Project.

144. Petitioners have no other plain, speedy, and adequate remedy in the ordinary course of law and will suffer irreparable injury unless this Court issues the relief requested in this Petition and Complaint.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## **<u>FOURTH CAUSE OF ACTION</u>**
## **PUBLIC NUISANCE**
## **(Against City & County of San Francisco)**

145. Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

146. A nuisance is "[a]nything which is injurious to health . . . or is indecent or offensive to the senses . . . so as to interfere with the comfortable enjoyment of life or property." Cal. Civ. Code § 3479. "No lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right." Cal. Civ. Code § 3490.

147. "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Cal. Civ. Code § 3480. "A private person may maintain an action for a public nuisance, if it is specially injurious to himself." Cal. Civ. Code § 3493. "A public nuisance cause of action is established by proof that a defendant knowingly created or assisted in the creation of a substantial and unreasonable interference with a public right." *People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 79 (2017).

148. The City by its affirmative acts and omissions has created, contributed to, and/or assisting in creating conditions that constitute a nuisance by allowing the Project to go forward, despite the fact that it will cause injuries to the health of Plaintiffs and the community, will be indecent and offensive to their senses, and will interfere with their comfortable enjoyment of life or property.”.

149. These conditions substantially and negatively affect the interests of the public at large.

150. The seriousness and/or gravity of this harm outweighs the social utility of the City's conduct alleged herein.

151. Plaintiffs will suffer harm that is different from the type of harm that will be suffered by the general public. These harms include the interference with the free use and enjoyment of their property and the health and safety risks associated with the Project.

152. The City's conduct and the resulting hazardous and harmful conditions will substantially interfered with Plaintiffs' use and enjoyment of their property.

153. The City's conduct alleged herein will be a substantial factor in causing Plaintiffs' harms. As a direct and legal cause of the City's wrongful acts and/or omissions alleged herein, Plaintiffs will suffer harms, injuries, and/or losses as herein set forth, economic and otherwise.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF DUE PROCESS CLAUSE OF FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION AND 42 U.S.C. § 1983**
**(Against City & County of San Francisco)**

154. Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

155. It is well-settled that nearby property owners who may suffer deprivation of substantial property rights have a procedural due process right to notice and opportunity to be heard before approval of such a use permit. *Horn v. County of Ventura*, 24 Cal.3d 605, 612

(1979). The Legislature and City cannot deprive its citizens of constitutional due process rights. *Selinger v. City Council*, 216 Cal.App.3d 259, 274 (1989).

156. Plaintiffs have a protected life, liberty and/or property interest in their right to quiet enjoyment in their homes, including the right to be free from the release of hazardous substances currently contained in the neighboring Site.

157. Absent the unlawful approval of streamlined review, hearings, public comment, and a right to be heard would be present with respect to the approval of the demolition of the Marina Safeway and construction of the 22-story building, including the environmental and hazardous health conditions that risk being unleashed by the project without adequate hazardous substance investigation and mitigation.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**<u>SIXTH CAUSE OF ACTION</u>**
**PUBLIC NUISANCE**
**(Against PG&E)**

158. Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

159. A nuisance is "[a]nything which is injurious to health . . . or is indecent or offensive to the senses . . . so as to interfere with the comfortable enjoyment of life or property." Cal. Civ. Code § 3479. "No lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right." Cal. Civ. Code § 3490.

160. "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Cal. Civ. Code § 3480. "A private person may maintain an action for a public nuisance, if it is specially injurious to himself." Cal. Civ. Code § 3493. "A public nuisance cause of action is established by proof that a defendant knowingly created or assisted in the creation of a substantial and unreasonable interference with a public right." *People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 79 (2017).

161. Defendant PG&E by its affirmative acts and omissions has created, contributed to, and/or assisting in creating conditions that constitute a nuisance by contaminating the soil, groundwater, and vapor on and in the vicinity of 11 & 15 Marina Blvd. through its operation of the North Beach manufactured gas plant and the Steam Electric Plant.

162. The conditions created by PG&E substantially and negatively affect the interests of the public at large. As described above, the pollution from PG&E's operations is injurious to human health and interfere with the public's use and enjoyment of California's coasts, soil, and air.

163. The seriousness and/or gravity of this harm outweighs the social utility of PG&E's conduct alleged herein because, among other things:

a. PG&E's conduct created substantial harm including from the destruction and loss of use and enjoyment of California's environment and its waterfront property by making the property unsafe for habitation, with the potential to release contaminants that will harm the surrounding properties and neighbors.
b. The burden on the public to mitigate and prevent the interference is significant and severe;
c. The social benefit of PG&E's operations without sufficient remediation is outweighed by PG&E's ability to abate the harm including through an adequate investigation, property cleanup, and post-cleanup property restoration.

164. It is practical for PG&E, in light of its knowledge and experience, to abate the harm from its past practices through an adequate investigation, property cleanup, and post-cleanup property restoration.

165. Plaintiffs have suffered, and will suffer, harm that is different from the type of harm suffered by the general public. These harms include the interference with the free use and enjoyment of their property and the health and safety risks associated with the hazardous waste released by PG&E.

166. PG&E's conduct and the resulting hazardous conditions have substantially interfered with Plaintiffs' use and enjoyment of their property.

167. PG&E's conduct alleged herein was and is reasonably certain to be a substantial factor in causing Plaintiffs' harms. As a direct and legal cause of PG&E's wrongful acts and/or omissions alleged herein, Plaintiffs have suffered and will suffer harms, injuries, and/or losses as herein set forth, economic and otherwise.

168. The acts and omissions of PG&E alleged herein were intentional and unreasonable, and at minimum reckless, as the pollution that PG&E has created and permitted to persist is hazardous.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE
## (Against PG&E)

169. Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

170. PG&E owed a duty to Plaintiffs to exercise reasonable and ordinary care in operating the North Beach MGP and Steam Electric Plant, storing and handling fuel oil and other hazardous materials, containing releases, properly disposing of hazardous byproducts, investigating known or suspecting contamination, and taking reasonable steps to limit harm from its contamination.

171. PG&E breached its duty of care to Plaintiffs by, among other things, creating hazardous contamination through its operation of the North Beach MGP and Steam Electric Plant, failing to consider MGP impacts when it conducted the 2023 Investigation, failing to investigate further given the results of the 2023 Investigation, and failing to remediate the Site given the results of the 2023 Investigation.

172. As a result of its operation of the North Beach MGP and Steam Electric Plant, PG&E learned or had reason to know that its former facility had contaminated soil and groundwater.

173. Through the 2023 Investigation, PG&E learned about contamination and the associated risks and the need for further investigation.

174. PG&E had the ability to further investigate the contamination and take reasonable measures to remediate the contamination.

175. PG&E nevertheless failed to take reasonable measure to investigate and then contain, remove, monitor, or otherwise address the contamination.

176. As a result, PG&E was negligent in its acts and omissions concerning MGP wastes and other hazardous wastes at and/or in the vicinity of the subject sites.

177. As a proximate result of these negligent actions, Plaintiffs have been harmed and will be harmed including without limitation in the ways set forth herein.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and further relief as follows:

1. A writ of mandate enjoining Defendant San Francisco Planning Department from approving the Project for streamlined review under AB 2011 because the Project and Site do not meet the statutory criteria for streamlined approval;

2. In the alternative, if streamlined review does apply, a writ of mandate requiring the Planning Department and Department of Public Health to comply with AB 2011's environmental and health and safety requirements, and require, as a condition of approval, that the developer complete the required environmental and health and safety requirements, and also to prepare a plan to remove or mitigate the hazardous waste prior to construction.

3. An injunction preventing Defendants from unlawfully proceeding with the Project without complying with the statutory and regulatory requirements;

4. A mandatory injunction requiring PG&E to study, abate, remove and/or mitigate the hazardous waste that exists on the Site as a result of PG&E's negligence and continued nuisance;

5. An injunction preventing Defendant San Francisco Planning Department from unlawfully proceeding with the Project without providing Plaintiffs adequate Due Process;

6. Any other equitable remedies to the extent necessary to cure or prevent the unlawful conduct;

7. Attorney fees and costs to the maximum extent permitted by law;

8. Plaintiffs reserve the right to add a claim for damages to the extent damages are identified or arise as a result of the Defendants' continued course of conduct.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated: September 11, 2026

By: */s/ Stuart G. Gross*

Stuart G. Gross (SBN 251019)
Jan W. Jorritsma (SBN 326772)
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
(415) 671-4628
*sgross@grosskleinlaw.com*
*tsmith@grosskleinlaw.com*
*jjorritsma@grosskleinlaw.com*

*Counsel for Plaintiffs*

Dated: September 11, 2026

By: */s/ Joseph R. Saveri*

Joseph R. Saveri (SBN 130064)
Cadio Zirpoli (SBN 179108)
David Seidel (SBN 307135)
Regina Wang (SBN 326262)
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, California 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
Email: czirpoli@saverilawfirm.com
Email : dseidel@saverilawfirm.com
Email : rwang@saverilawfirm.com

*Counsel for Plaintiffs*

# EXHIBIT 1

CALIFORNIA
Water Boards

GAVIN NEWSOM
GOVERNOR

YANA GARCIA
SECRETARY FOR
ENVIRONMENTAL PROTECTION

# San Francisco Bay Regional Water Quality Control Board

November 27, 2024
GeoTracker ID: T10000017511

Pacific Gas and Electric Company (PG&E)
Environmental Remediation Department
Attn: Brenda McConathy
300 Lakeside Drive
Oakland, CA 94612-3534
Email: Brenda.McConathy@pge.com

Albertsons
Attn: Dean Frederickson
250 E Parkcenter Blvd
Boise, ID 83706
Email: Dean.Frederickson@albertsons.com

**Subject: No Further Action, San Francisco Marina Safeway, 15 Marina Boulevard, San Francisco, San Francisco County**

Dear Brenda McConathy and Dean Frederickson:

This letter confirms the completion of site investigation for the pollutant releases at the subject site. The attached Case Closure Summary describes our case-closure rationale.

Based upon the available information, including the current land use, and with the provision that the information provided to this agency was accurate and representative of site conditions, no further action (NFA) related to the pollutant releases at the subject site is required at this time.

**Basis and Assumptions**

This NFA status applies only to releases of petroleum hydrocarbons associated with historical site use (storage of crude oil for steam electric power plant). While the information provided indicates the subject site is satisfactorily cleaned up to standards consistent with intended commercial/industrial land use, we may reconsider these findings should land use change, the configuration of site features change, or new information be discovered regarding previously undetected contamination.

This NFA assumes that shallow groundwater beneath the site is not suitable for drinking water or other potential uses, such as landscape and garden irrigation, and will not be used without further assessment and mitigation of potential risks.

**Land Use Controls/Covenants**

This NFA status does not require a land use controls/covenant or deed restriction to secure the conditions and requirements presented below.

**Conditions and Requirements**

To ensure protection of public health, safety, or the environment, and to be consistent with the land and groundwater use assumptions above, the following conditions/requirements apply:

- San Francisco Department of Public Health Notification – Maher Ordinance: the Site is within the expanded Maher zone and subject to requirements of the City and County of San Francisco Maher Ordinance. This requires site assessment if more than 50 cubic yards of soil will be disturbed during construction. The objective of Maher investigation and mitigation tasks is to ensure that hazardous materials encountered during excavation or present at properties, if any, are properly managed.

- Regional Water Board Notification – Land/Groundwater Use Change: The Regional Water Board must be notified of any proposed changes in future land use or groundwater use at the site. Formal Regional Water Board concurrence may be required.

- Site Management Plan: On August 28, 2024, the Regional Water Board concurred with the August 14, 2024, Site Management Plan (SMP) prepared for the subject site. The Site Management Plan shall be followed for future site work that involves the handling of soil or otherwise involves subsurface disturbance or repairs. The plan describes the environmental conditions (i.e. contamination left-in-place) and required procedures and notifications should contaminated soil or buried features (e.g., pipes) be encountered during any subsurface activities. If there are any questions, please contact the Regional Water Board.

**Closing**

The Regional Water Board may require a separate cost recovery agreement for regulatory oversight with the future landowner to evaluate conditions or to review any proposed change in land use, site configuration, or groundwater use.

If you have any questions, please contact Jacob T. Henry of my staff at 510.622.2408 or via email at jacob.henry@waterboards.ca.gov.

Sincerely,

Eileen M. White, P.E.
Executive Officer

Attachment:
Case Closure Summary

Copy:
Gina Withy, PG&E contract project manager, gina.withy@arcadis.com
Jane Anderson, Albertsons, jane.anderson@albertsons.com

# CASE CLOSURE SUMMARY

## I. AGENCY INFORMATION

**Preparation Date:** November 27, 2024

| | |
|---|---|
| Agency Name: San Francisco Bay Regional Water Quality Control Board | Address: 1515 Clay Street, Suite 1400 |
| City/State/Zip: Oakland, CA 94612 | Phone: 510-622-2300 |
| Responsible Staff Person: Jacob T. Henry, P.G. | Title: Engineering Geologist |

## II. SITE INFORMATION

| | | |
|---|---|---|
| Site Facility Name: San Francisco Marina Safeway | | |
| Site Facility Address: 15 Marina Boulevard, San Francisco CA 94123 | | |
| Regional Water Board Case No.: GeoTracker ID T10000017511 | Local Case No.: Not applicable | Priority: Not applicable |
| Responsible Parties (include addresses and phone numbers) | | |
| Former Owner/Operator: Pacific Gas and Electric Company, 300 Lakeside Drive, Oakland, CA 94612. Attn: Brenda McConathy, Brenda.McConathy@pge.com, 916-201-8571 | | |
| Property Owner: Albertsons, 250 E Parkcenter Boulevard, Boise, ID 83706. Attn: Dean Frederickson, Dean.Frederickson@albertsons.com, 208-571-1486 | | |

| Above-Ground Tank No. | Size in Gallons | Contents | Closed In—Place/Removed? | Date |
|---|---|---|---|---|
| 1 | 16,000 | Crude oil | Removed | By 1956 |
| 2 | 16,000 | Crude oil | Removed | By 1956 |
| 3 | 1,260,000 (30,000 barrels) | Crude oil | Removed | By 1956 |

## III. RELEASE AND SITE CHARACTERIZATION INFORMATION

| | |
|---|---|
| Cause and Type of Release: Unknown. Potential releases during operation or during dismantling of the former steam electric plant with three above ground storage tanks containing petroleum crude oil. | |
| Site characterization complete? | Date Approved by Oversight Agency: |

| | | |
|---|---|---|
| Yes | January 2, 2024 | |
| Monitoring wells installed?<br>No | Number:<br>Not applicable | Proper screened interval?<br>Not applicable |
| Highest GW Depth Below Ground Surface:<br>11.1 feet | Lowest Depth:<br>17 feet bgs | Flow Direction:<br>North, towards San Francisco Bay |
| Most Sensitive Current Use: Commercial (grocery store) | | |
| Most Sensitive Potential Use: Residential<br>and Probability of Use: Low. Property is zoned commercial | | |
| Are drinking water wells affected?<br>No | Aquifer Name:<br>Marina | |
| Is surface water affected?<br>No | Nearest surface water name:<br>San Francisco Bay | |
| Offsite Beneficial Use Impacts (Addresses/Locations): Not applicable | | |
| Report(s) on file?<br>Yes | Where is report(s) filed?<br>GeoTracker ID T10000017511 | |

**Treatment and Disposal of Affected Material**

| Material | Amount (Include Units) | Action (Treatment or Disposal w/Destination) | Date |
|---|---|---|---|
| Remediation was neither required nor performed. | | | |

**Maximum Documented Pollutant Concentrations For Key Constituents**

| POLLUTANT | Soil (mg/kg) | Water (µg/L) | Soil Vapor (µg/m$^3$) |
|---|---|---|---|
| Benzene | ND | ND | 1.4 |
| Ethylbenzene | ND | ND | 4.0 |
| Naphthalene | 26 | ND | 4.8 |
| Benzo[a]pyrene | 77 | n/a | n/a |
| Petroleum-Gasoline | ND | 66 | 18 |
| Petroleum-Diesel | 2,500 | 450 | n/a |
| Petroleum-Motor Oil | 5,600 | 2,000* | n/a |

| | | | |
|---|---|---|---|
| Petroleum Hydrocarbon Oxidation Products (HOPs)** | n/a | 28 to 918 | n/a |

**Comments:**
n/a – not applicable or not analyzed
ND – non-detect
* – This result likely indicates that contaminated soil was mixed in the sample during the process of collecting groundwater from a soil boring. Therefore, the concentration is biased high.
** – HOPs concentration range was estimated per the 2019 ESL User's Guide (see section 4.5.3) for both TPHd and TPHmo. Then, the results for TPHd and TPHmo were added together to provide broader representation of the HOPs present. Additionally, reporting or detection limits for non-detect results were halved and included in the HOPs calculation.

## IV. CLOSURE

Does completed corrective action protect existing beneficial uses per the Regional Board Basin Plan? Not applicable. Existing beneficial uses are protected.

Does completed corrective action protect potential beneficial uses per the Regional Board Basin Plan? Not applicable. Potential beneficial uses are protected.

Does corrective action protect public health for current land use? Not applicable. There are no unacceptable public health risks for the current land use

Risk Management Measures, Conditions and Requirements:

This NFA status does not require a land use controls/covenant or deed restriction to secure the conditions and requirements presented below. However, given the presence of residual petroleum-related pollutants in soil and groundwater, to ensure protection of public health, safety, or the environment, and to be consistent with the land and groundwater use assumptions in the related "No Further Action" letter the following conditions/requirements apply:

- San Francisco Department of Public Health Notification – Maher Ordinance: the Site is within the expanded Maher zone and subject to requirements of the City and County of San Francisco Maher Ordinance. This requires site assessment if more than 50 cubic yards of soil will be disturbed during construction. The objective of Maher investigation and mitigation tasks is to ensure that hazardous materials encountered during excavation or present at properties, if any, are properly managed.

- Regional Water Board Notification – Land/Groundwater Use Change: The Regional Water Board must be notified of any proposed changes in future land use or groundwater use at the site. Formal Regional Water Board concurrence may be required.

- Site Management Plan: On August 28, 2024, the Regional Water Board concurred with the August 14, 2024, Site Management Plan (SMP) prepared for the subject site. The Site Management Plan shall be followed for future site work that involves the handling of soil or otherwise involves subsurface disturbance or repairs. The plan describes the environmental conditions (i.e., contamination left-in-place) and required procedures and notifications should contaminated soil or buried features (e.g., pipes) be encountered during any subsurface activities. If there are any questions, please contact the Regional Water Board.

| | | |
|---|---|---|
| Monitoring Wells Decommissioned: Not applicable | Number Decommissioned: Not applicable | Number Retained: Not applicable |
| List Enforcement Actions Taken: Water Code Section 13267 Order dated April 12, 2022 | | |
| List Enforcement Actions Rescinded: Not applicable | | |

## V. ADDITIONAL COMMENTS, DATA, ETC.

This case meets the criteria in the Regional Water Board's 2009 Assessment Tool for Closure of Low-Threat Chlorinated Solvent Sites (Low-Threat Assessment Tool) as described in Attachment 1 (closure rationale).

## VI. TECHNICAL REPORTS, CORRESPONDENCE, ETC., THAT THIS CLOSURE RECOMMENDATION WAS BASED UPON

| Report | Issuance Date |
|---|---|
| Site Characterization Investigation Work Plan (includes Site History Report in Appendix A) | 10/28/2022 |
| Report on Site Characterization Investigation Report | 11/03/2023 |
| Results of Indoor Air Sampling | 5/17/2024 |
| Site Management Plan | 8/14/2024 |

This document and the related NO FURTHER ACTION LETTER shall be retained by the lead agency as part of the official site file.

Attachments:
- Attachment 1 Rationale for Closure
- Figure 1 Project Locus
- Figure 2 Investigation Locations
- Figure 3 Soil Analytical Results
- Figure 4 Groundwater Analytical Results

**Attac ment to t e Case Closure Summary: Rationale for Closure**
San Francisco Marina Safeway
15 Marina Boulevard
San Francisco

**Site Description**

The San Francisco Marina Safeway (Site) occupies the property bound by Marina Boulevard, Laguna Street, North Point Street, and Buchanan Street and partially overlies an area that was previously part of San Francisco Bay's Gashouse Cove before the filling of the northwest portion of the Site began in the latter half of the 1800s. The Site was used for industrial purposes beginning in about 1893 by Phelps Manufacturing Company, which made screws, cables, and rail car components using coal-fired furnaces and boilers. In about 1900, the Site was cleared, and a steam electric plant was constructed. The steam electric plant was operated until 1942. During the course of operations, Pacific Gas and Electric Company first leased and later acquired the plant. In 1956, the former plant was dismantled, and the Site was redeveloped into a grocery store that continues to operate.

This case meets the criteria in the San Francisco Bay Regional Water Quality Control Board's (Regional Water Board's) 2009 Assessment Tool for Closure of Low-Threat Chlorinated Solvent Sites (Low-Threat Assessment Tool) as described herein.

**Criterion a Pollutant sources are identified and e aluated**

The primary sources—three above ground storage tanks (AST) containing petroleum crude oil—were removed by 1956. The chemicals of potential concern (COPCs) are petroleum hydrocarbons, primarily total petroleum hydrocarbons (TPH) in the motor oil range (TPHmo C24-C36) and some TPH as diesel (TPHd C10-C24). The primary contaminated media are soil and to a lesser extent groundwater. Soil vapor is not significantly impacted. The COPCs are consistent with the former steam electric plant operations, which were powered using crude oil.

**Criterion T e site is ade uately c aracteri ed**

The nature, distribution, and extent of contamination in subsurface media (soil, soil vapor, and groundwater) have been adequately characterized. The distribution and magnitude of detected COPCs is consistent with the past use. Since no significant soil vapor impacts were encountered, a summary of the soil and groundwater impacts is presented below.

- Soil – There are two areas of petroleum-contaminated soil at the Site. The first area is around the former 1,260,000-gallon AST in the southeastern portion of the Site (borings SWB-01, SWB-02, SWB-03, and former location TG-28). TPHmo-contaminated soil is present at depths of approximately 5 feet below ground surface. The second area is in the northwestern portion of the Site, near the former boiler and engine rooms with TPHmo at similar depths along with

some TPHd-contaminated soil at boring location SWB-06B. The only exceedance of the Commercial/Industrial Direct Exposure Soil Environmental Screening Level (ESL) is in a 5.5-foot depth sample at SWB-06B.

- Groundwater – Groundwater contamination is limited to the area near the former 1,260,000-gallon AST, at borings SWB-01 and SWB-03. The TPHd and TPHmo results with and without silica gel cleanup (SGC) were reviewed along with the chromatograms. The detections of TPHd and TPHmo after SGC at these borings indicate that the materials detected are hydrocarbons. This result likely indicates that contaminated soil was mixed in the sample during the process of collecting groundwater from a soil boring. Therefore, the concentration is biased high. The TPHd concentrations were detected up to 450 μg/L, which is below the TPHd Aquatic Habitat ESL of 640 ug/L, the most relevant exposure pathway. Review of the chromatograms for TPHd and TPHmo after SGC indicate that petroleum hydrocarbon oxidation products (HOPs) are present. The HOPs concentration range was estimated per the 2019 ESL User's Guide (see section 4.5.3) for both TPHd and TPHmo. Then, the results for TPHd and TPHmo were added together to provide broader representation of the HOPs present. Additionally, reporting or detection limits for non-detect results were halved and included in the HOPs calculation. The estimated concentration at SWB-03 is 918 µg/L, which is approximately twice the HOPs Aquatic Habitat ESL of 510 μg/L. However, the presence of HOPs is an indication biodegradation is occurring. Coupled with no threat of a release to the Bay means there is no to very low risk.

**Criterion c Exposure pat ways, receptors, and potential ris s, t reats, and ot er en ironmental concerns are identified and assessed**

Based on available soil vapor data, residual COPCs do not present a significant soil vapor intrusion risk. The relevant exposure pathways for soil are direct contact for commercial workers and construction/maintenance workers for situations where there is subsurface work. The relevant exposure pathway for groundwater is potential discharge to the Bay (aquatic habitat). Although groundwater concentrations are above the Aquatic Habitat ESLs, the contamination is isolated and not migrating to the Bay where exposure could occur. Drinking water exposures are unlikely given that there is supplied municipal drinking water and that shallow groundwater conditions in the area meets the beneficial use exception criteria in State Water Resources Control Board Resolution No. 88-63 and Regional Water Board Resolution No. 89-39 as described in the Regional Water Board July 14, 2023, letter.

**Criterion a Pollutant sources are remediated to t e extent feasi le**

The residual COPC concentration strengths are low, such that source remediation is not warranted.

**Criterion Unaccepta le ris s to uman ealt , ecolo ical ealt , and sensiti e receptors, considerin current and future land and water uses, are miti ated**

There are no unacceptable risks to human or ecological (i.e., aquatic habitat) receptors considering the current and reasonably foreseeable future land and water uses. Though there are exceedances of the appropriate soil and groundwater ESLs, the exceedances are isolated and exposure is unlikely to occur. Moreover, the concentrations likely will decline over time due to biodegradation, which will improve water quality.

Sea level rise (SLR) and groundwater rise (GWR) are not a concern for this site given the low residual mass in soil and groundwater. However, a more in-depth assessment of SLR and GWR was completed to be consistent with standard practices employed by the Regional Water Board.

The Regional Water Board relied on two documents to assess potential risks due to SLR: State Agency Sea Level Rise Action Plan for California (February 2024) (Action Plan) and State of California Sea Level Rise Guidance (June 2024) (SLR Guidance). The Action Plan advocates for the assessment of five potential sea level rise scenarios (low, intermediate-low, intermediate, intermediate-high, and high), which are dependent on the nearest tide gauge and a range of years up to 2150. Application of the SLR Guidance should account for variability in the prediction models and ensure resiliency of existing infrastructure (including remedial), buildings, and remaining contamination. Regional Water Board staff evaluated the potential adverse effects from an intermediate, intermediate-high, and high SLR scenario using the San Francisco tide gauge. This assessment included the potential for flooding and erosion due to SLR that could expose the residual contamination and the increased potential for contaminant dissolution, mobilization, and soil vapor generation due to GWR rise.

Based on the recommendation in the Action Plan and the SLR Guidance, along with publicly available sea level rise interactive models from Our Coast Our Future (OCOF) and Adapting To Rising Tides (ART), Regional Water Board staff conducted the assessment to determine if SLR and GWR would present an unacceptable risk to human health or the environment. Based on the assessment and the continued attenuation of remaining impacts, it is reasonable to assume remaining impacts will continue to present a low risk as per the Low-Threat Assessment Tool if SLR reaches 6.5 feet by 2100.

Below are the key findings from the assessment:

Intermediate to High SLR of 0.8 to 1.3 Feet by 2050: The OCOF and ART models were set to the closest available SLR scenarios that represent a SLR of 0.8 feet, 1.0 feet, and 1.3 feet. Both models show no flooding will occur at the Site. The OCOF model also accounts for potential GWR and even with a SLR of 1.6 feet (closest to 1.3 feet predicted), groundwater would be expected at approximately similar levels currently measured (7 to 11 feet deep) at the Site.

<u>Intermediate to High SLR of 3.1 to 6.5 Feet by 2100:</u> The OCOF and ART models were set to the closest available SLR scenarios that represent a SLR of 3.1 feet, 4.8 feet, and 6.5 feet. Both models show no flooding will occur at the Site. The OCOF model also accounts for potential GWR and even with a SLR of 6.6 feet (closest to 6.5 feet predicted), groundwater would be expected at a depth of less than 1 foot to over 16 feet at the Site.

**Criterion c Unaccepta le t reats to roundwater and surface water resources, considerin existin and potential eneficial uses, are miti ated**

There are no significant threats to groundwater or surface water resources (see Criteria 1c and 2b).

**Criterion a Groundwater plumes are decreasin**

The groundwater plume is limited in areal extent and predominantly consists of HOPs, which are an indicator of the breakdown of petroleum hydrocarbons. Water quality is expected to improve over time.

**Criterion Cleanup standards can e met wit in a reasona le timeframe**

No cleanup is required. See also Criteria 2a, 2b, and 3b.

**Criterion c Ris mana ement measures are appropriate, documented, and do not re uire future Water Board o ersi t**

This NFA status does not require a land use controls/covenant or deed restriction to secure the conditions and requirements presented below. However, given the presence of residual petroleum-related pollutants in soil and groundwater, to ensure protection of public health, safety, or the environment, and to be consistent with the land and groundwater use assumptions in the related “No Further Action” letter the following conditions/requirements apply:

- San Francisco Department of Public Health Notification – Maher Ordinance: the Site is within the expanded Maher zone and subject to requirements of the City and County of San Francisco Maher Ordinance. This requires site assessment if more than 50 cubic yards of soil will be disturbed during construction. The objective of Maher investigation and mitigation tasks is to ensure that hazardous materials encountered during excavation or present at properties, if any, are properly managed.

- Regional Water Board Notification – Land/Groundwater Use Change: The Regional Water Board must be notified of any proposed changes in future land use or groundwater use at the site. Formal Regional Water Board concurrence may be required.

- Site Management Plan: On August 28, 2024, the Regional Water Board concurred with the August 14, 2024, Site Management Plan (SMP) prepared for the subject site. The Site Management Plan shall be followed for future site work that involves the handling of soil or otherwise involves subsurface disturbance or repairs. The plan describes the environmental conditions (i.e., contamination left-in-place) and required procedures and notifications should contaminated soil or buried features (e.g., pipes) be encountered during any subsurface activities. If there are any questions, please contact the Regional Water Board.







MAP SOURCE: ESRI
SITE COORDINATES: 37°48'17"N, 122°25'58"W

HALEY ALDRICH

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
15 MARINA BOULEVARD
SAN FRANCISCO, CALIFORNIA

PROJECT LOCUS

APPROXIMATE SCALE: 1 IN = 2000 FT
AUGUST 2024

FIGURE 1

GIS: \\haleyaldrich.com\share\CF\Projects\0205609\GIS\Maps\2024_04\205609_000_0001_PROJECT_LOCUS.mxd - dverrier - 4/24/2024 6:27:04 PM




**LEGEND**

- SOIL BORING AND GRAB GROUNDWATER
- SOIL BORING
- SOIL BORING, GRAB GROUNDWATER, AND/OR SOIL VAPOR PROBE

PREVIOUS EXPLORATION

- SOIL BORING
- SOIL BORING AND SOIL VAPOR PROBE
- MONITORING WELL
- TARGOST
- GEOTECH SOIL BORING
- EXISTING BUILDING FOOTPRINT
- SITE BOUNDARY
- PARCEL BOUNDARY

**NOTES**

1. ALL LOCATIONS AND DIMENSIONS ARE APPROXIMATE.
2. A REVIEW OF PREVIOUS INVESTIGATION LOCATION DATA INDICATED THAT THE ACTUAL LOCATIONS OF TG80 AND HA45 DID NOT MATCH THE LOCATIONS PRESENTED IN PREVIOUS REPORTS. THE LOCATION DATA FOR TG80 AND HA45 HAS BEEN UPDATED BASED ON THE MOST CURRENT AVAILABLE GPS SURVEY.
3. ASSESSOR PARCEL DATA SOURCE: SAN FRANCISCO COUNTY
4. PREVIOUS EXPLORATION DATA SOURCE: HALEY & ALDRICH
5. PREVIOUS GEOTECH SOIL BORING DATA SOURCE: "GEOTECHNICAL INVESTIGATION, PROPOSED REMODEL OF SAFEWAY STORE #711" PREPARED BY HAZRA CONSULTING ENGINEERS AND SCIENTISTS, 21 MARCH 1995
6. BASE MAP SOURCE: "1915 CERTIFIED SANBORN MAP" PREPARED BY THE SANBORN LIBARY LLC, 30 DECEMBER 2013
7. AERIAL IMAGERY SOURCE: NEARMAP, 18 MAY 2022

0 50 100
SCALE IN FEET

HALEY ALDRICH

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
15 MARINA BOULEVARD
SAN FRANCISCO, CALIFORNIA

INVESTIGATION LOCATIONS

AUGUST 2024

FIGURE 2

GIS: \\haleyaldrich.com\share\CF\Projects\0205609\GIS\Maps\2024_04\205609_000_0002_INVESTIGATION_LOCATIONS.mxd - dverrier - 4/24/2024 6:28:08 PM




**SWB-09**
**04/18/2023**

| DEPTH(FT) | 1.2 | 5.0 | 7.1 |
|---|---|---|---|
| BENZENE | <0.0044 J | <0.0043 J | <0.0043 J |
| NAPHTHALENE | <0.0049 | 2.6 | <0.29 |
| TPH-DRO | 2.6 J | 160 J | 160 J |
| TPH-GRO | <0.44 J | <0.43 J | <0.43 J |
| TPH-MO | 15 | 770 | 1,000 |

**SWB-10**
**04/24/2023**

| DEPTH(FT) | 1.3 | 5.0 |
|---|---|---|
| BENZENE | <0.0046 | <0.0041 |
| NAPHTHALENE | 0.013 | 0.56 |
| TPH-DRO | 8.5 | 540 |
| TPH-GRO | <0.46 | <0.41 |
| TPH-MO | 51 | 1,300 |

**SWB-05**
**04/26/2023**

| DEPTH(FT) | 1.0 | 5.0 | 9.5 |
|---|---|---|---|
| BENZENE | <0.0045 | <0.0042 | <0.0035 |
| NAPHTHALENE | 0.038 J | 0.13 | 0.13 |
| TPH-DRO | 18 J | 43 J | 64 J |
| TPH-GRO | <0.45 | <0.42 | <0.35 |
| TPH-MO | 98 | 230 | 390 |

**SWB-04**
**04/27/2023**

| DEPTH(FT) | 1.0 | 5.0 |
|---|---|---|
| BENZENE | <0.0039 | <0.0036 |
| NAPHTHALENE | 0.0048 | 0.034 |
| TPH-DRO | 3.6 J | 8.0 J |
| TPH-GRO | <0.39 | <0.36 |
| TPH-MO | 22 | 52 |

**SWB-04C**
**05/03/2023**

| DEPTH(FT) | 10.0 | 13.0 |
|---|---|---|
| BENZENE | <0.0045 | <0.0040 |
| NAPHTHALENE | <0.0046 | <0.0049 |
| TPH-DRO | <0.97 | <0.98 |
| TPH-GRO | <0.45 | <0.40 |
| TPH-MO | <4.9 | <4.9 |

**SWB-06B**
**04/19/2023**

| DEPTH(FT) | 1.5 | 5.0 | 5.5 |
|---|---|---|---|
| BENZENE | <0.0046 J | <0.0041 J | <0.52 J |
| NAPHTHALENE | <0.0049 | 14 | **26** |
| TPH-DRO | <0.99 | 350 J | **2,500 J** |
| TPH-GRO | <0.46 J | <0.41 J | <10 J |
| TPH-MO | <4.9 | 1,100 J | 5,600 J |

**SWB-03**
**04/21/2023**

| DEPTH(FT) | 1.3 | 5.0 | 10.4 | 15.0 |
|---|---|---|---|---|
| BENZENE | <0.0040 | <0.0041 | <0.0036 | <0.0037 |
| NAPHTHALENE | 0.94 | <0.072 | <0.049 | <0.0048 |
| TPH-DRO | 30 | 150 | 20 | <0.99 |
| TPH-GRO | <0.40 | <0.41 | <0.36 | <0.37 |
| TPH-MO | 100 | 1,500 | 120 | <5.0 |

**SWB-08**
**05/02/2023**

| DEPTH(FT) | 2.0 |
|---|---|
| BENZENE | <0.0046 |
| NAPHTHALENE | 0.86 |
| TPH-DRO | 330 J |
| TPH-GRO | <0.46 |
| TPH-MO | 1,100 |

**SWB-07**
**04/20/2023**

| DEPTH(FT) | 1.3 | 5.0 | 10.0 |
|---|---|---|---|
| BENZENE | <0.0044 J | <0.0040 | <0.0044 |
| NAPHTHALENE | 0.0072 | <0.0047 | <0.0048 |
| TPH-DRO | 4.2 | 1.2 | <1.0 |
| TPH-GRO | <0.44 | <0.40 | <0.44 |
| TPH-MO | 42 | 13 | <5.0 |

**SWB-01**
**04/28/2023**

| DEPTH(FT) | 1.3 | 5.0 | 7.0 | 11.0 | 15.0 |
|---|---|---|---|---|---|
| BENZENE | <0.0039 | <0.0042 | <0.0041 | <0.0043 | <0.0040 |
| NAPHTHALENE | 0.050 | 0.089 | <0.50 | <0.24 | <0.0047 |
| TPH-DRO | 14 J | 32 J | 290 J | 150 J | <0.98 |
| TPH-GRO | <0.39 | <0.42 | <0.41 | <0.43 | <0.40 |
| TPH-MO | 44 | 78 | 1,600 | 890 | <4.9 |

**SWB-02**
**04/25/2023**

| DEPTH(FT) | 1.0 | 5.0 | 8.0 | 13.7 |
|---|---|---|---|---|
| BENZENE | <0.0044 | <0.0046 | <0.0040 | <0.0035 |
| NAPHTHALENE | <0.29 | 1.2 | <0.070 | <0.0049 |
| TPH-DRO | 140 | 230 | 150 | 3.9 |
| TPH-GRO | <0.44 | <0.46 | <0.40 | <0.35 |
| TPH-MO | 640 | 1,200 | 1,200 | 25 |

**LEGEND**

- SOIL BORING AND GRAB GROUNDWATER
- SOIL BORING
- SOIL BORING, GRAB GROUNDWATER, AND/OR SOIL VAPOR PROBE

PREVIOUS EXPLORATION

- SOIL BORING
- SOIL BORING AND SOIL VAPOR PROBE
- MONITORING WELL
- TARGOST
- GEOTECH SOIL BORING
- EXISTING BUILDING FOOTPRINT
- SITE BOUNDARY
- PARCEL BOUNDARY

**NOTES**

1. ALL LOCATIONS AND DIMENSIONS ARE APPROXIMATE.
2. CONCENTRATIONS SHOWN ARE IN MILLIGRAMS PER KILOGRAM (mg/kg).
3. CONCENTRATIONS IN **BOLD TE T** ARE ABOVE THE SCREENING LEVEL.
4. DEFINITIONS:
TPH-DRO = TOTAL PETROLEUM HYDROCARBONS, DIESEL RANGE
TPH-GRO = TOTAL PETROLEUM HYDROCARBONS, GASOLINE RANGE
TPH-MO = TOTAL PETROLEUM HYDROCARBONS, MOTOR OIL, SILICA GEL CLEANUP
FT = FEET
J = ESTIMATED VALUE
5. A REVIEW OF PREVIOUS INVESTIGATION LOCATION DATA INDICATED THAT THE ACTUAL LOCATIONS OF TG80 AND HA45 DID NOT MATCH THE LOCATIONS PRESENTED IN PREVIOUS REPORTS. THE LOCATION DATA FOR TG80 AND HA45 HAS BEEN UPDATED BASED ON THE MOST CURRENT AVAILABLE GPS SURVEY.
6. ASSESSOR PARCEL DATA SOURCE: SAN FRANCISCO COUNTY
7. PREVIOUS EXPLORATION DATA SOURCE: HALEY & ALDRICH
8. PREVIOUS GEOTECH SOIL BORING DATA SOURCE: "GEOTECHNICAL INVESTIGATION, PROPOSED REMODEL OF SAFEWAY STORE #711" PREPARED BY HAZRA CONSULTING ENGINEERS AND SCIENTISTS, 21 MARCH 1995
9. BASE MAP SOURCE: "1915 CERTIFIED SANBORN MAP" PREPARED BY THE SANBORN LIBARY LLC, 30 DECEMBER 2013
10. AERIAL IMAGERY SOURCE: NEARMAP, 18 MAY 2022

0 50 100
SCALE IN FEET

HALEY ALDRICH

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
15 MARINA BOULEVARD
SAN FRANCISCO, CALIFORNIA

SOIL ANALYTICAL RESULTS

AUGUST 2024

FIGURE 3

GIS: \\haleyaldrich.com\share\CF\Projects\0205609\GIS\Maps\2024_04\205609_000_0003_SOIL_ANALYTICAL_RESULTS.mxd - dverrier - 4/24/2024 6:28:12 PM




LEGEND

- SOIL BORING AND GRAB GROUNDWATER
- SOIL BORING
- SOIL BORING, GRAB GROUNDWATER, AND/OR SOIL VAPOR PROBE

PREVIOUS EXPLORATION

- SOIL BORING
- SOIL BORING AND SOIL VAPOR PROBE
- MONITORING WELL
- TARGOST
- GEOTECH SOIL BORING
- EXISTING BUILDING FOOTPRINT
- SITE BOUNDARY
- PARCEL BOUNDARY

NOTES

1. ALL LOCATIONS AND DIMENSIONS ARE APPROXIMATE.
2. CONCENTRATIONS IN BOLD TEXT ARE ABOVE THE SCREENING LEVEL.
3. DEFINITIONS:
TPH-DRO* = TOTAL PETROLEUM HYDROCARBONS, DIESEL RANGE, SILICA GEL CLEANUP
TPH-GRO = TOTAL PETROLEUM HYDROCARBONS, GASOLINE RANGE
TPH-MO* = TOTAL PETROLEUM HYDROCARBONS, MOTOR OIL, SILICA GEL CLEANUP
J = ESTIMATED VALUE
µG/L = MICROGRAMS PER LITER
/ = PRIMARY/DUPLICATE RESULT
4. ASSESSOR PARCEL DATA SOURCE: SAN FRANCISCO COUNTY
5. PREVIOUS EXPLORATION DATA SOURCE: HALEY & ALDRICH
6. A REVIEW OF PREVIOUS INVESTIGATION LOCATION DATA INDICATED THAT THE ACTUAL LOCATIONS OF TG80 AND HA45 DID NOT MATCH THE LOCATIONS PRESENTED IN PREVIOUS REPORTS. THE LOCATION DATA FOR TG80 AND HA45 HAS BEEN UPDATED BASED ON THE MOST CURRENT AVAILABLE GPS SURVEY.
7. PREVIOUS GEOTECH SOIL BORING DATA SOURCE: "GEOTECHNICAL INVESTIGATION, PROPOSED REMODEL OF SAFEWAY STORE #711" PREPARED BY HAZRA CONSULTING ENGINEERS AND SCIENTISTS, 21 MARCH 1995
8. BASE MAP SOURCE: "1915 CERTIFIED SANBORN MAP" PREPARED BY THE SANBORN LIBARY LLC, 30 DECEMBER 2013
9. AERIAL IMAGERY SOURCE: NEARMAP, 18 MAY 2022

N

0 50 100
SCALE IN FEET

HALEY ALDRICH

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
15 MARINA BOULEVARD
SAN FRANCISCO, CALIFORNIA

GROUNDWATER ANALYTICAL RESULTS

AUGUST 2024

FIGURE 4

GIS: \\haleyaldrich.com\share\CF\Projects\0205609\GIS\Maps\2024_04\205609_000_0004_GROUNDWATER_ANALYTICAL_RESULTS.mxd - dvernier - 4/24/2024 6:28:21 PM

# EXHIBIT 2

**From:** Navarro, Karina@DTSC <Karina.Navarro@dtsc.ca.gov>
**Sent:** Friday, December 5, 2025 5:27 PM
**To:** Sheyner, Tania (CPC) <tania.sheyner@sfgov.org>
**Cc:** Conner, Kate (CPC) <kate.conner@sfgov.org>; Lin, Joann@DTSC <Joann.Lin@dtsc.ca.gov>; Hughes, Marikka@DTSC <Marikka.Hughes@dtsc.ca.gov>; Walsh, Kimberly@DTSC <Kimberly.Walsh@dtsc.ca.gov>; Yuen, Nicole@DTSC <Nicole.Yuen@dtsc.ca.gov>; Raskin, Emma@DTSC <Emma.Raskin@dtsc.ca.gov>; Pisani, Federico@DTSC <Federico.Pisani@dtsc.ca.gov>
**Subject:** RE: 15 Marina Boulevard, SF - Cortese List status

Tania,

The 15 Marina Boulevard property is downgradient from the North Beach Manufactured Gas Plant (MGP) site, and the Regional Water Board is the lead regulatory agency for that property (2021 Framework for Division of Oversight). The property is on GeoTracker as the SF Marina Safeway. The Water Board said in their latest document (2024) that certain requirements apply to the property, including notification to them if there are any proposed changes to the land use.

Here is some background about the known impacts at the property. The Right-of-Way Areas, Mediated Investigation Agreement Joint Investigation Report (2017), described shallow (5.7 to 8 feet below ground surface) impacts at two borings along North Point Street (TG28 and TG80). That report noted that those impacts may have been the result of a prior petroleum release from the property. More recent investigation under Water Board oversight (2023) showed petroleum impacts to the soil including up to 2,500 mg/kg total petroleum hydrocarbons as diesel (TPH-d). This is about twice the commercial screening level, and ten times the residential screening level. Therefore, I don't expect this property to qualify for streamlined approval. I recommend confirming that with the Water Board project manager, Jacob Henry.

The 1598 Bay Street site boundary does not extend up to this property. We can confirm that this property is not on DTSC's Cortese list, however, it may be impacted by the MGP contamination in groundwater.

Best regards,
**Karina Navarro, PE (CA)**
Unit Chief
Site Mitigation and Restoration Program
Department of Toxic Substances Control
700 Heinz Avenue, Berkeley, California 94710-2721
510-540-3768

DTSC
Department of Toxic Substances Control

This communication is subject to the California Public Records Act (Government Code § 7920 *et seq.*). Public disclosure may be expected unless applicable law provides a valid basis for not releasing this document and its attachments.

**From:** Sheyner, Tania (CPC) <tania.sheyner@sfgov.org>
**Sent:** Friday, December 5, 2025 2:02 PM

**To:** Lin, Joann@DTSC <Joann.Lin@dtsc.ca.gov>; Navarro, Karina@DTSC <Karina.Navarro@dtsc.ca.gov>; Hughes, Marikka@DTSC <Marikka.Hughes@dtsc.ca.gov>; Walsh, Kimberly@DTSC <Kimberly.Walsh@dtsc.ca.gov>; Yuen, Nicole@DTSC <Nicole.Yuen@dtsc.ca.gov>
**Cc:** Conner, Kate (CPC) <kate.conner@sfgov.org>
**Subject:** 15 Marina Boulevard, SF - Cortese List status

Good afternoon -

Apologies for casting a wide net. I'm writing to request a confirmation from DTSC that the project site at 15 Marina Boulevard is **not considered to be on the Cortese list**. We have received interest in potential redevelopment of this site to residential uses (from current commercial uses as a Safeway store) and are reviewing whether such project would qualify for streamlined approval pursuant to one or more of the state's ministerial housing programs. As you may know, these programs have specific eligibility requirements related to site's inclusion on the Cortese list.

Of note, the site is about a block north of the 1598 Bay Street (60002282) EnviroStor site, which is under DTSC's Voluntary Agreement oversight (https://www.envirostor.dtsc.ca.gov/public/profile_report.asp?global_id=60002282).

Could you please confirm that the Bay Street project boundary does not extend north to the adjacent block containing 15 Marina Blvd and that the 15 Marina Blvd. site is not on the Cortese list? Are there any other considerations we should be aware of if a developer would like to pursue ministerial approval for a residential project at 15 Marina?

This is time-sensitive so any feedback on this as soon as possible would be greatly appreciated.

Thanks,

**Tania Sheyner (she/hers)**
**Principal Environmental Planner**
**Environmental Planning Division**
San Francisco Planning Department
49 South Van Ness Avenue, Suite 1400, San Francisco, CA 94103
Direct: 628.652.7578 | www.sfplanning.org
San Francisco Property Information Map

# EXHIBIT 3

# PHASE I ENVIRONMENTAL SITE ASSESSMENT

## for

## 15 Marina Boulevard
## San Francisco, California

***Prepared for:***


**Align Real Estate**
**123 Mission Street, Suite 700**
**San Francisco, California 94105**


***Prepared by:***


**Langan CA, Inc**
**135 Main Street, Suite 1500**
**San Francisco, California 94105**

**Sarah Middleton**
**Senior Staff Geologist**

**Peter J. Cusack**
**Associate Principal**


**Report Date:** **8 December 2025**
**180-Day Viability Date:** **25 April 2026**
**731786102**

LANGAN

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ..... 1
1.0 INTRODUCTION ..... 1
1.1 Purpose ..... 1
1.2 Scope of Services ..... 1
1.2.1 Records Review and Local Government Interviews ..... 2
1.2.2 Site Reconnaissance and Owner/Operator/Occupant Interviews ..... 2
1.2.3 Evaluation, Report and Parts Used in Concert ..... 3
1.2.4 Non-ASTM Scope Services ..... 3
1.3 User Responsibilities ..... 3
1.4 Limiting Conditions/Deviations ..... 4
1.5 Data Gaps ..... 4
2.0 SUBJECT PROPERTY DESCRIPTION AND CURRENT USE ..... 4
2.1 Location, Legal Description, and Ownership ..... 4
2.2 Physical Setting ..... 4
2.2.1 Topography ..... 4
2.2.2 Geology ..... 5
2.2.3 Hydrogeology ..... 5
2.3 Subject Property Description ..... 6
2.4 Current Subject Property Use ..... 7
2.5 Hazardous Substances and Petroleum Products ..... 7
2.5.1 Underground Storage Tanks (USTs) ..... 7
2.5.2 Aboveground Storage Tanks (ASTs) ..... 7
2.5.3 Drums, Totes, and Intermediate Bulk Container ..... 7
2.5.4 Other Chemical Storage, Containers, or Equipment ..... 8
2.6 Air Emissions ..... 8
2.7 Waste Management ..... 8
2.7.1 Hazardous Waste ..... 8
2.7.2 Non-Hazardous Waste ..... 8
2.7.3 Fill Areas or Solid Waste ..... 8
2.8 Wastewater ..... 8
2.9 Storm Water ..... 9
3.0 SUBJECT PROPERTY HISTORY AND RECORDS REVIEW ..... 9
3.1 Historical Summary ..... 9
3.2 Regulatory Database Review ..... 10
3.3 Prior Report Review ..... 12
4.0 ADJOINING PROPERTIES AND SURROUNDING AREA ..... 15
4.1 Current Use of Adjoining Properties and Surrounding Area ..... 15
4.2 Adjoining Properties and Surrounding Area History ..... 16
4.3 Regulatory Database Review ..... 17
4.3.1 Adjoining Properties ..... 17
4.3.2 Surrounding Area ..... 21
5.0 CONCLUSIONS, FINDINGS AND OPINIONS ..... 22
6.0 ENVIRONMENTAL PROFESSIONAL STATEMENT ..... 25

**7.0 REFERENCES ....................26**
**8.0 LIMITATIONS AND DEFINITIONS ....................27**
**8.1 ASTM Definitions ....................28**
**8.2 Standard Environmental Record Sources ....................31**

**FIGURES**

**APPENDICES**

## TABLES

Table ES-1 Conclusions, Findings and Opinions

Table 2-1 Utility Providers

Table 3-1 Subject Property History

Table 4-1 Current Use of Adjoining Properties and Surrounding Area

Table 4-2 Historical Use of Adjoining Properties

Table 5-1 Conclusions, Findings and Opinions

Table 7-1 Dates of Assessment Components

## APPENDICES

Appendix A Figure 1 - Subject Property Location Map
Figure 2 - Subject Property Layout
Figure 3 - Nearby Properties Map

Appendix B Agency Records and Other Reports

Appendix C Site Reconnaissance Checklist and Photographs

Appendix D User Provided Information

Appendix E Historical Resources

Appendix F Environmental Database Report

Appendix G Resumes of Environmental Professionals

## EXECUTIVE SUMMARY

Langan CA, Inc. (Langan) completed this Phase I Environmental Site Assessment (ESA) for the property located at 15 Marina Boulevard in San Francisco, San Francisco County, California (the "subject property") under the written authorization of Align Real Estate ("Client" and "User").

The Phase I ESA was completed following the guidelines of ASTM International Standard Practice E1527-21 (ASTM E1527-21), the United States Environmental Protection Agency's (U.S. EPA) All Appropriate Inquiries (AAI) Rule, and industry standard practice. The user requested this ESA as part of their environmental due diligence prior to redeveloping the subject property and to identify recognized environmental conditions (RECs) associated with the subject property.

<u>Subject Property Layout</u>

The approximately 2.62-acre subject property is located southwest of the intersection of Marina Boulevard and Laguna Street. The subject property consists of the San Francisco County Assessor Parcel Numbers (APNs): 0446-002 and 0446-003 and includes the 11 and 15 Marina Boulevard addresses. The subject property is improved with an approximately 40,212-square-foot (sqft), single-story retail building. The building is located on the southern portion of the subject property, and the remainder of the subject property is improved with asphalt-paved parking and vegetation.

<u>Subject Property Current Use</u>

The retail building located on the subject property is currently occupied by Safeway grocery store. The remainder of the subject property is developed with asphalt-paved parking areas.

<u>Subject Property History</u>

The subject property is depicted as developed and occupied by The Phelps Manufacturing Co. (Phelps) consisting of a blacksmith shop and forge, coal furnaces, an office, and sheds in 1893. Phelps manufactured screws, cables, and railroad car components using coal-fired furnaces and boilers. A wooden wharf located on the northwest corner of the subject property connects the forge and blacksmith shop to the former Gashouse Cove Marina (currently East Harbor Marina). Additionally, one dwelling was present on the northern portion of the subject property. The subject property is depicted as vacant by 1899, with the exception of the dwelling on the

northern portion of the subject property. The subject property is located along the San Francisco Bay shoreline at approximately 0 to 10 feet above mean sea level (amsl).

By 1913,  the Sierra & San Francisco Power Company Auxiliary Steam Plant had been developed on the subject property consisting of an engine and boiler room present on the northern portion of the subject property and multiple aboveground storage tanks (including water tanks, dual estimated 16,000-gallon-capacity crude oil storage tanks, and a 1,260,000-gallon holding tank storing crude oil on the southeast corner of the subject property).

By 1929, the auxiliary steam plant is owned and operated by Pacific Gas & Electric (PG&E). The San Francisco Bay shoreline has been infilled and has moved approximately 300 feet to the north of the subject property. The subject property is now located at approximately 22 feet above mean sea level (msl). Marina Boulevard is present to the north of the subject property by 1947. The subject property remains in similar configuration through 1950.

The 1963 aerial photograph depicts the southwestern portion of the subject property as being redeveloped with one building and the remaining areas are complete with asphalt-paved parking. According to city directories, the building has been occupied by Safeway grocery store since approximately 1962. By 1987, the subject property building appears to have been re-constructed to the current configuration. The building remains occupied by Safeway grocery store through present day.

Adjoining Properties and Surrounding Area

The surrounding area was depicted as developed with surrounding roadways in the topographic maps in the late 1800s. Commercial development is observed on aerial photographs as early as 1890s. Residences were observed on aerial photographs in the early 1900s. Fort Mason Park is developed by the 1980s. The surrounding area appears in similar configuration from the early 1980s to present.

Conclusions

Langan completed a Phase I ESA of the subject property using the scope guidelines and inherent limitations of ASTM E1527-21. Table ES-1 presents the conclusions of the Phase I ESA.

## TABLE ES-1
## Conclusions, Findings and Opinions

| ASTM E1527-21 Scope Items |
|---|
| **Recognized Environmental Conditions (RECs)** |
| *REC 1 – Presence of Volatile Organic Compounds in Soil Vapor:*<br>During the subsurface investigation conducted in April through August 2023, Haley & Aldrich, Inc. (H&A) collected six soil vapor samples at the subject property. Based on the analytical results, chloroform and tetrachloroethene (PCE) were detected in soil vapor samples at concentrations exceeding their respective Regional Water Quality Control Board (RWQCB) Commercial/Industrial environmental screening levels (ESLs). H&A concluded that the chloroform and PCE exceedances in soil vapor are not related to former subject property operations. According to H&A, chloroform is a chemical that is often associated with leaking sewer pipes, which is prevalent in the Marina District. Additionally, H&A stated that the PCE exceedances are associated with the known dry cleaner businesses in the vicinity of the subject property. The 3717 Buchanan Street property, located across Buchanan Street to the west of the subject property, has been occupied by a dry-cleaning facility since 1986 (Marina Cleaners). The facility operates under a hazardous waste generator permit for the disposal of liquids with halogenated organic compounds. However, it is possible for dry cleaners to have discharged hazardous substances to the subsurface environment. Based on the results of the 2023 subsurface investigation and the proximity of this facility to the subject property, it is possible that this facility is the source of PCE below the subject property. Langan considers the adjoining dry cleaner facility and the presence of PCE and chloroform in soil vapor at concentrations exceeding RWQCB Commercial/Industrial ESLs to be a REC for the subject property. |
| **Controlled Recognized Environmental Conditions (CRECs)** |
| *CREC 1 – Presence of Petroleum Hydrocarbon and Polycyclic Aromatic Hydrocarbon Contamination:*<br>The subject property was formerly a steam electric power plant that operated through the 1950s and utilized crude oil for fuel. H&A prepared a Site Characterization Investigation Report in November 2023 on behalf of Pacific Gas & Electric (PG&E), in response to the RWQCB April 2022 letter requesting a subsurface investigation of the former PG&E power plant. H&A conducted a subsurface investigation at the subject property between April and August 2023, which included the collection of 32 soil samples, seven groundwater samples, and six soil vapor samples (as discussed above). Based on the updated 2025 RWQCB Commercial/Industrial ESLs for total petroleum hydrocarbons as diesel (TPHd), six of the soil samples contained concentrations of TPHd exceeding Commercial/Industrial ESLs. Six polycyclic aromatic hydrocarbons (PAHs) were also detected at concentrations exceeding the 2025 RWQCB Commercial/Industrial ESLs in soil eight samples. Additionally, TPHd was detected in groundwater samples exceeding the respective RWQCB ESL for Saltwater Ecotox Aquatic Habitat. PAHs were not analyzed for the groundwater samples.<br><br>Based on a review of the EDR database report, the former address 1575 North Point Street, historically to the west and south of the subject property, was utilized as the former North Beach Manufactured Gas Plant (MGP). The facility produced gas used for lighting, cooking, and heating from coal and oil. Based on a review of the State Water Resource Control Board (SWRCB) GeoTracker database (T10000008919) and Department of Toxic Substance Control (DTSC) EnviroStor database (60001239 and 38490007), the North Beach MGP was destroyed in the 1906 earthquake and resulting fire. Soils and groundwater are impacted with MGP residues, including PAHs. Site-wide and off-site investigation of MGP impacts to soil, soil vapor, and groundwater have been conducted since 2014. In 2016, PG&E excavated and disposed of approximately 9,000 cubic yards of impacted soil from the former PG&E MGP site. Because the former North Beach MGP historically surrounded the subject property to the south and the west, it is possible that some of the residual TPH and PAH contamination present at the subject property is a result of the former MGP operations. |

| **ASTM E1527-21 Scope Items** |
|---|
| Langan considers the presence of TPH and PAHs in soil at concentrations exceeding 2025 RWQCB Construction Worker and Commercial/Industrial ESLs and concentrations of TPHd in groundwater exceeding RWQCB ESL for Saltwater Ecotox Aquatic Habitat to be an environmental concern for the subject property. However, because an RWQCB approved Site Management Plan (SMP) has been prepared to manage the contamination in soil and groundwater below the subject property, Langan considers the known residual PAH and TPH contamination below the subject property to be a CREC. |
| **Historical Recognized Environmental Conditions (HRECs)** |
| *HREC 1 – Closed Regulatory Status*:<br>The subject property was formerly a steam electric power plant that operated through the 1950s and utilized crude oil for fuel. The RWQCB issued a letter in April 2022 requesting a subsurface investigation of the former PG&E power plant. A subsurface investigation was conducted in 2023 which identified limited petroleum contamination in soil. Based on a review of the SWRCB GeoTracker database (T10000017511), the RWQCB granted case closure with no further action for the subject property in November 2024, following the subsurface investigation and the preparation of an approved SMP. The no further action letter states that the closed regulatory status is only applicable to the release of petroleum hydrocarbons from historical operations (crude oil used in steam electric power plant). The letter states that closure is based on commercial land use and assumes that shallow groundwater beneath the site is not suitable for drinking water or use in landscaping. If conditions change, regulatory status will be reevaluated. Langan considers the closed regulatory status to be an HREC for the subject property. |
| **De Minimis Conditions (DMCs)** |
| Langan did not identify any DMCs. |
| **Significant Data Gaps** |
| Langan did not identify any significant data gaps. |
| **Business Environmental Risks (BERs)** |
| *BER 1 – Presence of Soil Vapor Probes:*<br>During the site reconnaissance, Langan observed two soil vapor probes within the subject property. The observed soil vapor probes are assumed to be associated with the subsurface investigation conducted by H&A in 2023. The existing soil vapor probes will need to be properly demolished by a State of California C-57 licensed driller under regulatory oversight prior to any construction activities. Langan considers the presence of the two soil vapor probes within the subject property boundary to be a BER for the subject property. |

**PHASE I ENVIRONMENTAL SITE ASSESSMENT**
**15 Marina Boulevard**
**San Francisco, California**

## 1.0 INTRODUCTION

Langan CA, Inc. (Langan) completed this Phase I Environmental Site Assessment (ESA) for the property located at 15 Marina Boulevard in San Francisco, San Francisco County, California (the "subject property") under the written authorization of Align Real Estate (the "Client" and the "user"). A Subject Property Location Map is provided in Appendix A (Figure 1).

The Phase I ESA was completed following the guidelines of ASTM International Standard Practice E1527-21 (ASTM E1527-21), the United States Environmental Protection Agency's (U.S. EPA) All Appropriate Inquiries (AAI) Rule, and industry standard practice. The user requested this ESA as part of their environmental due diligence prior to redeveloping the subject property and to identify recognized environmental conditions (RECs) associated with the subject property.

### 1.1 Purpose

The purpose of this Phase I ESA is to identify RECs associated with the subject property. This purpose also includes identifying controlled recognized environmental conditions (CREC), historical recognized environmental conditions (HREC), de minimis conditions, and significant data gaps. The definitions of REC, CREC, HREC, de minimis condition and other select ASTM terms used in this report are in Section 8.

### 1.2 Scope of Services

Langan's scope of services consisted of the completion of a Phase I ESA following the guidelines of ASTM E1527-21. Langan's scope of services as it pertains to the elements of a Phase I ESA as specified in ASTM E1527-21 is described below.

On 8 July 2024, the US EPA final rule designating two per- and polyfluoroalkyl substances (PFAS) – perfluorooctanoic acid (PFOA) and perfluorooctanesulfonic acid (PFOS) including their salts and structural isomers – as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) became effective. Because of the complex and varied historical use of PFAS in various industries; limited prior disclosures of PFAS content on product specification sheets, Material Safety Data Sheets (MSDS), and Safety Data Sheets (SDS); the complex chemistry and chemical transformations associated with some PFAS; and the ever-growing and varied list of state regulations, it is not feasible to evaluate PFOA and PFOS

without also considering other PFAS. As such, absent analytical data, Langan incorporated a review of PFAS as a general class into this Phase I ESA.

PFAS and other CERCLA hazardous substances and petroleum products have been detected in background environmental samples across the globe, including in areas removed from specific recognized sources. This Phase I ESA was not intended to evaluate background concentrations of CERCLA hazardous substances or petroleum products, regardless of whether the source is naturally occurring or anthropogenic. The objective of Langan's scope of services was to identify the presence, likely presence, and/or material threat of a release of CERCLA hazardous substances and petroleum products related to specific property uses that are generally recognized as known or potential sources of such substances and products.

#### 1.2.1 Records Review and Local Government Interviews

Langan contracted a third-party provider to search environmental regulatory databases and provide historical records. The database search included select federal, state, local and tribal standard source environmental databases within the approximate search radii specified by ASTM E1527-21.

Langan submitted Freedom of Information Act (FOIA) requests to supplement environmental database listing information. The FOIA requests were submitted to the San Francisco Fire Department (SFFD) and the City and County of San Francisco Department of Public Health (SFDPH). Online EnviroStor and GeoTracker databases, operated by the California Department of Toxic Substances Control (DTSC) and the State of California Water Resources Control Board (SWRCB), respectively, were searched as well as United States Geological Survey (USGS) mapping and US EPA databases. Agency FOIA-requested information, where received, is discussed in relevant sections of this report and referenced in Section 7. Pertinent documents are provided in Appendix B.

Langan supplemented the third-party provided historical records with review of online historical record sources including Google Earth Pro and NETR Online.

#### 1.2.2 Site Reconnaissance and Owner/Operator/Occupant Interviews

Dulce M Rodriguez of Langan completed the site reconnaissance on 14 November 2025. Langan walked the periphery of the subject property, observed the subject property from adjoining public thoroughfares, and walked the accessible interiors of structures at the subject property. Langan observed the adjoining properties and the surrounding area from the periphery of the subject

property and from public thoroughfares adjoining to or traveled on to access the subject property. The weather at the time of the site reconnaissance was approximately 60ºF and partly cloudy. Photographs from the site reconnaissance are provided in Appendix C.

Langan interviewed Dev Mukherjee of Align Real Estate (Client and User) via the user questionnaire on 18 November 2025. Additionally, Langan interviewed Dean Fredrickson of Safeway, Inc. (owner representative), via a questionnaire on 11 November 2025 (Appendix D).

#### 1.2.3 Evaluation, Report and Parts Used in Concert

Langan evaluated the information obtained from the records reviews, site reconnaissance and interviews described above, and from the user as described in Section 1.3 in concert with each other. Langan's findings, opinions, and conclusions are discussed throughout this report. Significant assumptions, or deletions, deviations, or exceptions to ASTM E1527-21 are noted in Section 1.4.

#### 1.2.4 Non-ASTM Scope Services

The scope of services for the Phase I ESA did not include non-scope ASTM considerations.

### 1.3 User Responsibilities

Langan requested that the user provide the results of tasks the user is responsible for completing to satisfy the requirements of AAI. The tasks include: searching for known environmental liens and activity and use limitations (AULs) filed or recorded against the subject property, and provision of information related to specialized knowledge or experience of the user or the degree of obviousness relative to conditions indicative of releases or threatened releases; actual knowledge of the user regarding environmental liens or AULs related to the subject property; specialized knowledge or experience of the user; reasons for significantly lower purchase prices, and commonly known or reasonably ascertainable information within the local community about the subject property. Langan also requested that the user state the reason the Phase I ESA was requested. A summary of the user's responses is provided in Appendix D and relevant information provided by the user is discussed in applicable sections of this report.

Unless specifically included in the scope of services, Langan did not complete a title search or a search for environmental liens or AULs, as that is the responsibility of the user. If the user requested that Langan complete such searches on the user's behalf, the information was supplied to Langan by a vendor, and to the vendor by government sources; therefore, neither

Langan nor the vendor can verify the completeness or accuracy of the title search, or AUL searches.

## 1.4 Limiting Conditions/Deviations

Langan did not encounter any limiting conditions during this Phase I ESA. Langan did not delete or deviate from the ASTM E1527-21 guidelines during this Phase I ESA.

## 1.5 Data Gaps

Data gaps, if encountered, are discussed throughout the report. Significant data gaps, if any, are summarized in Section 5.0.

## 2.0 SUBJECT PROPERTY DESCRIPTION AND CURRENT USE

The following sections describe the subject property location, ownership, physical setting, and current layout and operations.

## 2.1 Location, Legal Description, and Ownership

The approximately 2.62-acre subject property is located southwest of the intersection of Marina Boulevard and Laguna Street. The subject property consists of the San Francisco County Assessor Parcel Numbers (APNs): 0446-002 and 0446-003 and includes the 11 and 15 Marina Boulevard addresses. A legal description of the subject property is provided on the title report in Appendix D. The subject property is owned by Safeway Stores, Incorporated who acquired title as Safeway Holding Inc., a Corporation.

## 2.2 Physical Setting

The physical setting that includes the geologic, hydrogeologic, hydrologic, and topographic characteristics of the subject property and surrounding area is discussed below.

### 2.2.1 Topography

The 2021 United States Geological Survey (USGS) 7.5-minute quadrangle topographic map for northern San Francisco depicts the subject property at an elevation of approximately 22.44 feet above mean sea level (amsl). The current ground surface slopes to the northwest from approximately 22.44 feet amsl near the southeast corner of the subject property to less than 10 feet amsl north of Marina Boulevard. The regional topography slopes downward toward the northwest and the San Francisco Bay.

In the 1895, 1899, and 1915 historical topography maps, the subject property is along the San Francisco Bay shoreline and located at approximately 0 to 10 feet amsl. By the 1947 historical topography map, the San Francisco Bay shoreline has been infilled and has moved approximately 300 feet to the north of the subject property. The site location and topography remain unchanged through the 2021 historical topography map.

### 2.2.2 Geology

According to the U.S. Department of Agriculture's (USDA) National Cooperative Soil Survey (NCSS) Soil Survey Geographic (SSURGO) data for San Francisco, soils at the subject property are comprised of primarily sand. According to USGS information, the subject property is located in the area of San Francisco consisting of Quaternary-age dune sand consisting of well-sorted, fine to medium grained sand as well as artificial fill material.

Based on a review of the November 2023 Site Characterization Investigation Report prepared for the subject property by Haley & Aldrich, Inc. (H&A), the subject property is located within the Marina Groundwater Basin and overlies a valley of bedrock filled by deposits of Pleistocene and Holocene age. The subject property partially overlies an area that was previously part of a shallow harbor in San Francisco Bay known as East Harbor Marina. Beginning in the late 1800s, placement of sandy fill along the Bay shore extended the shoreline northward.

The subject property is within the expanded Maher Ordinance boundary limits and therefore is subject to the requirements of San Francisco Public Health Code (SFPHC) Article 22A (Maher Ordinance). Article 22A states that construction projects in San Francisco, which are bayward of the historic 1852 high tide line or within the expanded boundary, and disturb more than 50 cubic yards of soil, require assessment of the property history and environmental subsurface quality. Previous investigations of properties within the Article 22A area have found fill material with elevated levels of metals and petroleum hydrocarbons as a result of the 1906 earthquake and fire and other contamination related to leaking underground storage tanks (LUST) cases and historical cleaners. The contaminated fill is a regional issue in areas of San Francisco, not associated with any specific subject property activity, and is frequently identified and managed during construction/development projects in this area. Environmental subsurface investigation has been conducted at the subject property and is discussed further in Section 3.3 below.

### 2.2.3 Hydrogeology

Surface water bodies are not present within the boundary of the subject property. The nearest surface water body is East Harbor Marina, an inlet branching off the San Francisco Bay, and is

located approximately 300 feet (0.05 miles) north of the subject property. Based on the 2023 subsurface investigation conducted by H&A at the subject property, groundwater has been encountered at approximately depths of 11 to 17 feet below ground surface (bgs). Groundwater flow can be influenced by several factors such as surface water bodies, wetlands, hydrogeologic and anthropogenic variables. However, based on topographic gradient and proximity to East Harbor Marina, it is expected that groundwater generally flows to the north-northwest.

A review of the Geocheck section of the LightBox Environmental Data Resources (EDR) Regulatory Database Report (Appendix F) did not identify any groundwater monitoring wells on the subject property. However, during the site reconnaissance, Langan observed two soil vapor probes within the subject property and five soil vapor probes on the sidewalks and public roadways surrounding the subject property. Additionally, five groundwater monitoring wells were observed on the sidewalks and public roadways surrounding the subject property. Locations of the observed soil vapor probes and groundwater monitoring wells are presented on Figure 2. The observed soil vapor probes are assumed to be associated with the subsurface investigation conducted by H&A in 2023. The existing soil vapor probes will need to be properly demolished by a State of California C-57 licensed driller under regulatory oversight prior to construction activities. Langan considers the presence of the two soil vapor probes within the subject property boundary to be a business environmental risk (BER) for the subject property (See Langan BER 1). The observed groundwater monitoring wells are assumed to be associated with the former PG&E North Beach Manufactured Gas Plant (MGP) facility historically located to the south and west of the subject property. The former North Beach MGP is discussed further in Section 4.3.

## 2.3 Subject Property Description

The subject property is approximately 2.62-acres and is improved with an approximately 40,212-square-foot (sqft), single-story retail building. The building is located on the southern portion of the subject property, and the remainder of the subject property is improved with asphalt-paved parking and vegetation.

The subject property is bound by Marina Boulevard to the north, Laguna Street to the east, North Point Street to the south, and Buchanan Street to the west. The subject property can be accessed from Buchanan Street, Marina Boulevard, or Laguna Street.

A Subject Property Layout Map is provided in Figure 2 of Appendix A. Photographs of the subject property and a checklist documenting Langan's observations relative to the features, activities, uses, and conditions outlined in Section 9.4 of ASTM E1527-21 are in Appendix C.

## 2.4 Current Subject Property Use

The retail building located on the subject property is currently occupied by Safeway grocery store with a bakery and pharmacy. Safeway receives, stores, and sells consumer products. Langan observed the products stored on racks and pallets. The products observed during the site reconnaissance included general groceries and household items.

The following table summarizes subject property current utility providers.

**TABLE 2-1**
**Utility Providers**

| Utility | Providers |
|---|---|
| Electricity (used for cooling) | Pacific Gas & Electric (PG&E) |
| Natural gas (used for heating) | PG&E |
| Water | San Francisco Public Utilities Commission (SFPUC) |
| Sewer | SFPUC |

## 2.5 Hazardous Substances and Petroleum Products

Langan did not observe hazardous substances or petroleum products.

### 2.5.1 Underground Storage Tanks (USTs)

The EDR database report did not identify USTs at the subject property, and Langan did not observe any evidence of USTs at the subject property during the site reconnaissance.

### 2.5.2 Aboveground Storage Tanks (ASTs)

The EDR database report did not identify ASTs at the subject property; however, Langan observed multiple 20-pound propane tanks located along the exterior of the Safeway building, which are for sale to the general public. Langan also observed helium tanks within the flower shop area of the Safeway used for filling decorative balloons. The observed propane and helium tanks were intact and in good condition with no leaks observed.

### 2.5.3 Drums, Totes, and Intermediate Bulk Container

Langan did not observe any drums, totes, and intermediate bulk containers at the subject property during the site reconnaissance.

2.5.4 Other Chemical Storage, Containers, or Equipment

Langan observed retail-size containers of cleaning supplies within the subject property. The containers appeared to be in good condition. Additionally, a concrete pad-mounted transformer was observed along the southern subject property boundary, just outside of the subject property. Labels indicating the polychlorinated biphenyls (PCB) content were not identified. Langan did not observe leaks or stains from the cleaning supply containers or transformer.

## 2.6 Air Emissions

Langan did not observe any air emission sources at the subject property. Langan does not consider air emissions an environmental concern for the subject property.

## 2.7 Waste Management

The following sections describe current hazardous and non-hazardous waste streams, and observations of fill areas or other solid waste throughout the subject property.

2.7.1 Hazardous Waste

Hazardous waste is currently generated at the subject property in relation to grocery store and pharmacy operations. Langan did not observe any hazardous waste storage within the subject property during the site reconnaissance. According to the EDR database, the subject property has a history of hazardous waste generation. Further details regarding historical hazardous waste generation at the subject property is presented in Section 3.2.

2.7.2 Non-Hazardous Waste

Non-hazardous waste at the subject property included carboard, flowers, and general food waste. Solid waste containers were observed at the subject property to be intact.

2.7.3 Fill Areas or Solid Waste

Langan did not observe areas that suggest the presence of garbage, construction debris, demolition debris, or other solid waste disposal, or mounds or depressions suggesting solid waste disposal.

## 2.8 Wastewater

Langan did not observe wastewater discharges at the subject property during the reconnaissance.

## 2.9 Storm Water

Storm water at the subject property percolates through pervious areas or sheet flows to the adjoining roadways into the municipal storm system. Storm drains were observed throughout the paved parking area of the subject property. Langan did not observe evidence of impact (e.g., sheens, staining) to storm water pathways.

## 3.0 SUBJECT PROPERTY HISTORY AND RECORDS REVIEW

The following sections provide summaries of the historical uses of the subject property, and available information regarding documented environmental conditions associated with the historical uses.

## 3.1 Historical Summary

Langan compiled the following summary of the subject property history based on a review of readily available and reasonably ascertainable sources and interviews. Historical resources are provided in Appendix E.

**TABLE 3-1**
**Subject Property History**

| Time Period | Historical Discussion |
|---|---|
| 1890s – 1910s | The 1893 Sanborn Map depicts the subject property as developed and occupied by The Phelps Manufacturing Co. (Phelps) consisting of a blacksmith shop and forge, coal furnaces, an office, and sheds. Phelps manufactured screws, cables, and railroad car components using coal-fired furnaces and boilers. A wooden wharf located on the northwest corner of the subject property connects the forge and blacksmith shop to Gashouse Cove (now known as East Harbor Marina). Additionally, one dwelling is present on the northern portion of the subject property. The subject property is depicted as vacant by the 1899 Sanborn Map with the exception of the dwelling on the northern portion of the subject property. The subject property is located along the San Francisco Bay shoreline at approximately 0 to 10 feet amsl.<br><br>The 1913 through 1915 Sanborn Maps depict The Sierra & San Francisco Power Company Auxiliary Steam Plant has been developed on the subject property consisting of an engine and boiler room present on the northern portion of the subject property and multiple aboveground storage tanks (including water tanks, dual estimated 16,000-gallon-capacity crude oil storage tanks, and a 1,260,000-gallon holding tank storing crude oil on the southeast corner of the subject property). |

| Time Period | Historical Discussion |
|---|---|
| 1920s – 1950s | By the 1929 Sanborn Map, the auxiliary steam plant is owned and operated by PG&E. The 1938 aerial photograph and 1947 historical topography map depict the San Francisco Bay shoreline has been infilled and has moved approximately 300 feet to the north of the subject property. The subject property is now located at approximately 22 feet amsl. Marina Boulevard is present to the north of the subject property in the 1947 topographic map. The subject property remains in similar configuration through the 1950 Sanborn Map. |
| 1960s – Present | The 1963 aerial photograph depicts the southwestern portion of the subject property has been redeveloped with one building and the remaining areas are complete with asphalt-paved parking. The building is labeled as a store in the 1968 and 1974 Sanborn Maps. According to city directories, the building has been occupied by Safeway grocery store since approximately 1962. By the 1987 aerial photograph, the subject property building appears to have been re-constructed to the current configuration. The building remains occupied by Safeway grocery store through present day. The subject property is currently zoned as Neighborhood Commercial – Shopping Center (NC-S). |

Environmental concerns related to historical operations are discussed further in Section 3.3.

### 3.2 Regulatory Database Review

Langan reviewed the EDR database for the subject property and surrounding area. The database search report includes a listing of properties identified on select federal, state, local and tribal standard source environmental databases within the approximate minimum search radii outlined in ASTM E1527-21. This information was supplied to Langan by the environmental database search provider, and to the environmental database search provider by government sources; therefore, neither Langan nor the environmental database search provider can verify the completeness and accuracy of the database information.

The EDR radius report includes searches of numerous PFAS related databases maintained by the US EPA. According to the EDR radius report, the subject property and adjoining properties were not identified on PFAS-related databases.

The subject property is identified on the Emissions Inventory (EMI), Cleanup Program Sites – Spills, Leaks, Investigations, and Cleanups (CPS-SLIC), Recycler (SWRCY), Certified Unified Program Agency (CUPA) Listings, Emergency Response Notification System (ERNS), San Francisco Maher, Hazardous Waste Tracking System (HWTS), Hazardous Waste Information System (HAZNET), California Environmental Reporting System (CERS), CERS Hazardous Waste, Resource Conservation and Recovery Act Non-Generator/No Longer Regulated (RCRA NONGEN/NLR), Facility Index System (FINDS), E Manifest, California Hazardous Material Incident

Report System (CHMIRS), and Enforcement and Compliance History Online (ECHO) databases as Safeway, Inc., KeyMe, Inc., and the general subject property address 15 Marina Boulevard. The environmental database report is attached as Appendix F. The database listings are related to tenants that have occupied the subject property buildings and are summarized below.

Safeway, Inc. – 15 Marina Boulevard

Safeway (current subject property occupant) was identified on the EMI, CPS-SLIC, SWRCY, HAZNET, HWTS, CERS, CERS Hazardous Waste, CUPA Listings, FINDS, RCRA NONGEN/NLR, E MANIFEST, and ECHO databases. The subject property was formerly a steam electric power plant that operated through the 1950s and utilized crude oil for fuel. The Regional Water Quality Control Board (RWQCB) issued a letter in April 2022 requesting a subsurface investigation of the former PG&E power plant. A subsurface investigation was conducted in 2023 which identified petroleum contamination in soil and groundwater and VOCs in soil vapor. Based on a review of the SWRCB GeoTracker database (T10000017511), indoor air sampling was completed to confirm vapor intrusion was not occurring into the building based on contamination identified in the subsurface. The RWQCB granted case closure with no further action for the subject property in November 2024 following the subsurface investigation and the preparation of a Site Management Plan (SMP). The no further action letter states that the closed regulatory status is only applicable to the release of petroleum hydrocarbons from historical operations (crude oil used in steam electric power plant). The letter states that closure is based on commercial land use and assumes that shallow groundwater beneath the site is not suitable for drinking water or use in landscaping. If conditions change, regulatory status will be reevaluated (Appendix B). Langan considers the closed regulatory status to be an HREC for the subject property (See Langan HREC 1).

Additional database listings are associated with an active hazardous waste generation permit. Hazardous waste transported off the facility includes surplus organics, asbestos containing waste, pharmaceutical waste, waste aerosols, and flammable and corrosive liquids. SFDPH has conducted various compliance evaluation inspections at the facility from 2000 through 2025 (Appendix B). None of the identified violations were indicative of a release to the environment and all former violations have been returned to compliance. The facility was verified as a non-generator of federal hazardous waste in 2010. Langan does not consider the hazardous waste generation and off-property transport as likely to represent an environmental concern based on the lack of evidence indicative of a release.

KeyMe Inc. – 15 Marina Boulevard

KeyMe Inc., a locksmith Kiosk located inside the Safeway building, was identified on the HWTS, ECHO, and RCRA NONGEN/NLR databases. The database listing indicates that this property is verified as a non-generator of federal hazardous waste. The facility was temporarily listed in the HWTS database from January through June 2019. No further details are available regarding the temporary listing. Langan does not consider the database listings as likely to represent an environmental concern based on the lack of evidence indicative of violation or release.

15 Marina Boulevard

15 Marina Boulevard was identified on the ERNS, CHMIRS, and San Francisco Maher databases. The listings are associated with a spill that occurred at the subject property in 1997. According to the database listings, a diesel-powered truck drove from the subject property into the San Francisco Bay and an unknown quantity of diesel was released. Based on the amount of time since the spill and the location of the spill being within the San Francisco Bay, Langan does not consider the database listings as likely to represent an environmental concern.

Additionally, the subject property is listed on the San Francisco Maher database. As discussed in Section 2.2.2, previous investigations of properties within the Article 22A area have found fill material with elevated levels of metals and petroleum hydrocarbons as a result of the 1906 earthquake and fire and other contamination related to LUST cases and historical cleaners. The contaminated fill is a regional issue in areas of San Francisco, not associated with any specific subject property activity, and is frequently identified and managed during construction/development projects in this area. An environmental subsurface investigation has been conducted at the subject property and is discussed further in Section 3.3 below.

### 3.3 Prior Report Review

Langan has reviewed prior environmental documents prepared for the subject property and adjoining properties. The reports are referenced in Section 7 and summarized below.

Technical Report Requirements – April 2022

The RWQCB issued a letter in April 2022 stating that during a January 2017 subsurface investigation in the right-of-way along North Point Street and Buchanan Street (adjacent to the south of the subject property), petroleum hydrocarbon contamination was discovered in soil indicative of a release from the former North Beach MGP (located at 1575 North Point Street, adjacent to the south of the subject property). Further details regarding the investigation conducted south of the subject property related to the former North Beach MGP is discussed in

Section 4.3 below. Because the subject property is a former PG&E manufactured gas power plant, the RWQCB requested a historical summary and subsurface investigation be conducted to identify any residual contamination that may be present from former PG&E operations.

<u>Site Characterization Investigation Report – November 2023</u>

H&A prepared a Site Characterization Investigation Report in November 2023, on behalf of PG&E, in response to the April 2022 RWQCB request. H&A conducted a subsurface investigation at the subject property between April and August 2023, which included the collection of 32 soil, seven grab groundwater, and six soil vapor samples. Soil samples were analyzed for petroleum hydrocarbons; benzene, toluene, ethylbenzene, and xylene (BTEX); and polycyclic aromatic hydrocarbons (PAHs). Groundwater was analyzed for petroleum hydrocarbons and BTEX. Soil vapor samples were analyzed for total petroleum hydrocarbons as gasoline (TPHg) and VOCs.

TPHg and BTEX were not detected above laboratory reporting limits in soil samples collected. TPH as diesel (TPHd) and TPH as motor oil (TPHmo) were detected in 26 of 32 soil samples, at concentrations ranging from 1.2 milligrams per kilogram (mg/kg) to 2,500 mg/kg. TPHd was detected in one sample at a concentration of 2,500 mg/kg (collected from SWB-06B at a depth of 5.5 feet bgs, located on the northwestern portion of the subject property, in the area of the former boiler room), which exceeded the RWQCB 2019 construction worker and Commercial/Industrial environmental screening levels (ESLs) of 1,100 mg/kg and 1,200 mg/kg, respectively. Based on the updated 2025 RWQCB ESLs (210 for Construction Worker and 540 for Commercial/Industrial), six of the soil samples contained concentrations of TPHd exceeding the Commercial/Industrial ESLs. None of the TPHmo detections exceeded 2019 or 2025 RWQCB Commercial/Industrial ESLs. Additionally, six PAHs were detected at concentrations exceeding the 2019 and 2025 RWQCB ESLs in eight soil samples.

TPHd was detected in groundwater samples exceeding the respective RWQCB ESL for Saltwater Ecotox Aquatic Habitat. PAHs were not analyzed in groundwater. Langan considers the presence of petroleum hydrocarbons and PAHs in soil at concentrations exceeding 2025 RWQCB construction worker and commercial/industrial ESLs and concentrations of TPHd in groundwater exceeding RWQCB ESL for Saltwater Ecotox Aquatic Habitat to be an environmental concern for the subject property. However, because a SMP has been prepared to manage the contamination in soil and groundwater (discussed below), Langan considers the presence of contamination in soil and groundwater to be a CREC (See Langan CREC 1).

Multiple VOCs as well as TPHg were detected in soil vapor samples above their laboratory reporting limit. Chloroform and tetrachloroethene (PCE) were detected in soil vapor samples at

concentrations exceeding the RWQCB commercial/industrial ESLs of 18 micrograms per cubic meter (µg/$m^3$) and 67 µg/$m^3$, respectively. H&A concluded that the chloroform and PCE exceedances in soil vapor are not related to former subject property operations. According to H&A, chloroform is a chemical that is often associated with leaking sewer pipes, which is prevalent in the Marina District and PCE is associated with the known dry cleaner businesses in the vicinity of the subject property. Although the VOC contamination is assumed to be from an off-site source, Langan considers the presence of PCE and chloroform in soil vapor at concentrations exceeding RWQCB ESLs to be a REC for the subject property (See Langan REC 1). Additionally, based on site reconnaissance observations, the soil vapor probes installed during the 2023 subsurface investigation remain at the subject property (See Langan BER 1).

Results of Indoor Air Sampling – May 2024

Based on the presence of PCE and chloroform in soil vapor at concentrations exceeding RWQCB ESLs, EKI Environmental & Water, Inc. (EKI) conducted indoor and ambient air sampling at the subject property to assess whether vapor intrusion is occurring. Seven indoor air samples and two ambient air samples were collected over an eight-hour period consistent with the commercial use of the property. Chloroform and benzene were detected above their respective RWQCB commercial/industrial ESLs in the indoor air samples. Benzene was also detected above the RWQCB commercial/industrial ESL in the ambient air samples. EKI concluded the following:

- The presence of chloroform in indoor air may be the result of chlorinated potable water sources and is not likely the result of intrusion of chloroform vapors from the subsurface.
- Benzene concentrations in indoor air are largely from ambient air sources, and not due to the intrusion of benzene vapors from the subsurface; and
- Concentrations of PCE are not present in indoor air, indicating vapor intrusion is not occurring at the subject property.

Therefore, although PCE and chloroform are present in soil vapor at concentrations exceeding indoor air RWQCB ESLs, vapor intrusion does not appear to be occurring at the subject property.

Site Management Plan – August 2024

H&A prepared a SMP for the subject property on behalf of PG&E to provide guidelines for any subsurface activities that may disturb soil and/or groundwater. Although a petroleum hydrocarbon release was not identified at the subject property, elevated levels of TPHd and PAHs are present in subsurface soils due to the presence of urban fill material. The SMP provides mitigation measures for managing potentially impacted soil and groundwater at the subject property.

No Further Action – November 2024

The RWQCB granted case closure in a letter dated 27 November 2024 (Appendix B). The letter states that based on the subsurface investigations performed; no further action is required related to potential release of petroleum hydrocarbons associated with the historical PG&E use of the subject property. The RWQCB requires notification regarding any proposed changes in future land use or groundwater use at the subject property and that the August 2024 SMP is followed for future work involving the handling of soil or subsurface disturbance.

## 4.0 ADJOINING PROPERTIES AND SURROUNDING AREA

The following sections describe current and historical uses of and database listings for adjoining properties and the surrounding area.

### 4.1 Current Use of Adjoining Properties and Surrounding Area

The current use of adjoining and surrounding properties is summarized in Table 4-1 and shown on Figure 3 in Appendix A.

**TABLE 4-1**
**Current Use of Adjoining Properties and Surrounding Area**

| Direction | Adjoining Properties | Surrounding Area |
|---|---|---|
| **North** | Marina Boulevard followed by the Fort Mason Center (2 Marina Boulevard) | East Harbor Marina (San Francisco Bay) |
| **East** | Laguna Street followed by Fort Mason Park and Pyron Park | Residential properties |
| **South** | North Point Street followed by a mixed use building with commercial properties on the first floor, Smith Architects (1501 North Point Street), Round Table Pizza (1503 North Point Street), Synergy Fitness Studio (1505 North Point Street), Kumon Math and Reading Center (1515 North Point St), and Mail Boxes & Co. (1517 North Point St), and four floors of residential apartments above (Marina Cove Apartments); a Marina Substation building; and a Tusker Corp property management building (3636 Buchanan Street) | Residential properties |
| **West** | Buchanan Street followed by commercial properties: USPS (3749 Buchanan St), State Farm Insurance and Marina Cleaners (3717 Buchanan Street), Stone Clinic Orthopedic (3727 Buchanan Street), Starbucks (3735 Buchanan Street), and Alpha School (3741 Buchanan Street) | Residential properties |

Langan did not observe obvious conditions likely to represent environmental concerns for the subject property from current uses of adjoining or surrounding properties.

## 4.2 Adjoining Properties and Surrounding Area History

Langan compiled the following summaries of the adjoining properties and surrounding area history based on a review of historical resources and interviews. Historical resources are provided in Appendix E.

**TABLE 4-2**
**Historical Use of Adjoining Properties**

| Direction | Adjoining Properties |
|---|---|
| **North** | The 1893 Sanborn Map and the 1895 and 1899 topographic maps depict the northern adjoining property as the San Francisco Bay (Gashouse Cove). The 1913 Sanborn Map and the 1915 topographic map depict the San Francisco Bay shoreline has been infilled by approximately 300 feet and the northern adjoining property occupied by a hydroplane hangar. The hydroplane hangar is no longer present in the 1915 Sanborn Map.<br><br>The 1938 aerial photograph depicts structures associated with Fort Mason Center are present to the northeast of the subject property. The 1968 aerial photograph depicts an asphalt paved parking lot has been developed on the northern adjoining property associated with the Fort Mason Center. Additionally, boat docks have been developed within Gashouse Cove, which is currently known as the East Harbor Marina. Database listings associated with the northern adjoining properties are discussed in Section 4.3. |
| **East** | The 1893 through 1999 Sanborn maps depict the eastern adjoining property as the Fort Mason U.S. Military Reservation (Fort Mason). The 1895 through 1915 topographic maps depict the eastern adjoining property as vacant land with roadways. By the 1938 aerial photograph, structures related to Fort Mason are present on the east adjoining property. The eastern adjoining property remains in similar configuration through 1968. The 1974 aerial photograph shows some of the Fort Mason structures on the eastern adjoining property have been demolished. By 1982, the aerial photograph depicts the eastern adjoining property has been redeveloped for recreational use and is occupied by Fort Mason Park. The eastern adjoining properties appear to remain in a similar configuration through present day. Database listings associated with the eastern adjoining properties are discussed in Section 4.3. |
| **South** | The 1893 through 1899 Sanborn Maps depict the southern adjoining property to be occupied by the San Francisco Gas and Electric Co. consisting of gas holding tanks, coal piles, an office building, and engine room. The 1913 Sanborn Map shows the southern adjoining property is now operated by PG&E and is labeled as the Buchanan Street Station (former North Beach MGP). The property consists of a transformer station and office building, two gas holding tanks (149,000 cubic feet capacity and 2,000,000 cubic feet capacity), a storeroom, and pump house. The southern adjoining property remains in similar configuration through the 1950 Sanborn Map. The 1986 Sanborn Map shows the former North Beach MGP is no longer present and two buildings have been developed on the southern adjoining property including the Marina Substation and the 3636 Buchanan Street building. By the 1974 Sanborn Map and aerial photograph, the current Marina Cove |

| Direction | Adjoining Properties |
|---|---|
| | Apartment building has been developed on the southern adjoining property. The southern adjoining property remains in similar configuration through present day. Database listings associated with the southern adjoining properties are discussed in Section 4.3. |
| **West** | The 1893 and 1899 Sanborn Map depicts the western adjoining properties as developed land with a retort house, petroleum tank, and coal pile associated with the San Francisco Gas Light Company (former North Beach MGP). The 1915 and 1929 Sanborn Maps depict the western adjoining properties as vacant with all former features removed. By the 1938 aerial photograph, multiple structures are present on the western adjoining properties. The 1950 Sanborn Map labels the structures as commercial stores and a Gas & Oil service station (former 1501 Beach St). The 1968 and 1974 Sanborn Maps label one of the western adjoining buildings as an apartment building. By 1986, the Sanborn Map shows the former Gas & Oil service station has been redeveloped with a new building with a basement parking garage. Additionally, two other buildings on the western adjoining property are labeled as offices and commercial. The western adjoining property remains in similar configuration from the 1987 aerial photograph to present day.<br><br>Database listings associated with the western adjoining properties are discussed in Section 4.3. |

The surrounding area was depicted as developed with surrounding roadways in the topographic maps in the late 1800s. Commercial development is observed on aerial photographs as early as 1890s. Residences were observed on aerial photographs in the early 1900s. Fort Mason Park is developed by the 1980s. The surrounding area appears in similar configuration from the early 1980s to present.

### 4.3 Regulatory Database Review

Langan reviewed the environmental database report to evaluate if adjoining or surrounding area properties identified in the database report are suspected to represent an environmental concern for the subject property (see Section 8.2). Langan did not consider request and review of the associated regulatory agency files necessary to evaluate potential RECs for the subject property unless discussed in Section 4.3.1 or 4.3.2 below.

#### 4.3.1 Adjoining Properties

Database listings for adjoining properties are summarized as follows.

East Harbor Marina/Former Gashouse Cove Marina – 10 Marina Boulevard (northern adjoining, inferred downgradient)

The 10 Marina Boulevard property, located across Marina Boulevard to the north of the subject property, was identified on the EDR Historical Auto, CERS, CERS Hazardous Waste, UST, RCRA

NONGEN/NLR, E MANIFEST, CERS TANKS, HWTS, LUST, CHMIRS, CPS-SLIC, CORTESE, HIST CORTESE, and CUPA listing databases. Additionally, database listings SWEEPS UST and CA FID UST are listing for the Gashouse Cove Marina under the address 3799 Laguna Street. The database listings indicate that this property operated as a marine gasoline service station from approximately 1990 through 2014. Based on the closed LUST case file of SWRCB GeoTracker (T0607501199), five USTs containing diesel and gasoline were removed from the property in 1998 under SFDPH oversight and 300 cubic yards of contaminated soil were excavated and disposed of at an approved landfill. The LUST case was closed in March 2009. Langan does not consider the closed LUST cases to be an environmental concern for the subject property.

The 10 Marina Boulevard property is also listed as an open remediation case on the SWRCB GeoTracker database (T10000005263). According to the database listings, soil analytical data indicates the presence of MGP residues including polycyclic aromatic hydrocarbons (PAHs). The residues are related to the historical wharf operations and spillage, associated with the nearby PG&E Former North Beach MGP (discussed further below). Soil, groundwater, and marina sediment investigations have been implemented to assess the lateral and vertical locations of the MGP residues near the shoreline that could potentially be a source of impact to harbor sediments and water. As of June 2025, a Final Feasibility Study was prepared for the property that evaluates cleanup options. The selected cleanup option includes dredging, capping, permeable reactive barrier at the shoreline, monitoring, and institutional controls. The RWQCB requested a Remedial Action Plan be submitted by December 2025. Because the subject property is not located along the wharf, it is unlikely that it was impacted by the historical wharf operations and spillage associated with the former PG&E Former North Beach MGP. Based on the downgradient location, regulatory closure for the former USTs, and distance from the wharf, this property is not considered an environmental concern to the subject property.

Fort Mason Center for Arts and Culture – 2 Marina Boulevard (northeastern adjoining, inferred downgradient)

The 2 Marina Boulevard property, located across Marina Boulevard to the northeast of the subject property, was identified on the RCRA NONGEN/NLR, E MANIFEST, and RCRA-Small Quantity Generator (SQG) databases. According to the database listings, the facility was verified as a non-generator of federal hazardous waste in 2013, 2017, and 2024. In 2017, approximately 0.84 tons of asbestos containing waste was removed from the property. This facility is not listed on a database indicative of a release; therefore, this property is not considered an environmental concern to the subject property.

Former CCSF Fort Mason Campus – Marina and Laguna Boulevard (northeastern adjoining, inferred downgradient)

The Marina and Laguna Boulevard property, located across Marina Boulevard to the northeast of the subject property, was identified on the RCRA NONGEN/NLR and E MANIFEST databases. According to the database listings, the facility was verified as a non-generator of federal hazardous waste in 2020. In 2019, approximately 30 gallons of liquid hazardous waste was removed from the property. This facility is not listed on a database indicative of a release; therefore, this property is not considered an environmental concern to the subject property.

PG&E Marina Substation/Former North Beach Manufactured Gas Plant – 1575 North Point Street (southern and western adjoining, inferred upgradient)

The 1575 North Point Street property, historically located across North Point Street to the south and west of the subject property, was identified on the CUPA Listings, ENVIROSTOR, CPS-SLIC, Voluntary Cleanup Program (VCP), DEED, and CERS databases. According to the database listings, the North Beach MGP was built in 1891 by San Francisco Gas Light Company. The facility produced gas used for lighting, cooking, and heating. Initially, the MGP produced gas from coal. By 1893, the MGP also produced gas from oil. By 1906, PG&E owned the facility.

Based on a review of the SWRCB GeoTracker database (T10000008919) and DTSC EnviroStor database (60001239 and 38490007), the North Beach MGP was destroyed in the 1906 earthquake and fire. Although gas production at the MGP was discontinued, the facility continued to be utilized for gasoline storage. PG&E currently owns one parcel of the land from the former MGP site (the Marina Substation). The remaining MGP site parcels were sold and redeveloped for various commercial and residential uses. Site soils and groundwater are impacted with MGP residues, including PAHs.

In 2010, PG&E entered into a Voluntary Clean Up Agreement (VCA) with the DTSC. The Remedial Action Plan (RAP) for investigation and cleanup of shallow soils on properties impacted by the former MGP recommended soil excavation and disposal; importing clean fill soil; and institutional controls to prevent contact with MGP-impacted soil. Site-wide and off-site investigation of MGP impacts to soil, soil vapor, and groundwater have been conducted since 2014. A Land Use Covenant (LUC) was recorded for the property in 2014. In 2016, PG&E excavated and disposed of approximately 9,000 cubic yards of impacted soil from the former PG&E MGP site. Because the former North Beach MGP historically surrounded the subject property to the south and the west, it is possible that some of the residual PAH contamination present at the subject property is a result of the former MGP operations. Therefore, Langan considers the former North Beach

MGP and know residual TPH and PAH contamination to be a CREC for the subject property (See Langan CREC 1).

Former Gram Properties, LLC – 3701 Buchanan Street (western adjoining, inferred cross-gradient)

The 3701 Buchanan Street property, located across Buchanan Street to the west of the subject property, was identified on the RCRA NONGEN/NLR and E MANIFEST databases. According to the database listings, the facility was verified as a non-generator of federal hazardous waste in 2020 and 2024. In 2020, approximately 2.52 tons of asbestos containing waste was removed from the property. This facility is not listed on a database indicative of a release; therefore, this property is not considered an environmental concern to the subject property.

Marina Cleaners, Inc./Former Buchanan Cleaners, Inc. – 3717 Buchanan Street (western adjoining, inferred cross-gradient)

The 3717 Buchanan Street property, located across Buchanan Street to the west of the subject property, was identified on the EDR Historical Cleaner, RCRA NONGEN/NLR, E Manifest, CERS Hazardous Waste, CERS, HAZNET, Drycleaners, CUPA listings and HWTS databases. According to the database listings, the facility has operated as a drycleaner from approximately 1986 through present day. The facility operates under a hazardous waste generator permit for the disposal of liquids with halogenated organic compounds. The SFDPH conducts routine compliance inspections at the facility. Recorded violations identified during routine inspections have since been returned to compliance and are not indicative of a release to the environment. However, it is possible for dry cleaners to have discharged hazardous substances to the subsurface environment. The results of the 2023 subsurface investigation conducted at the subject property indicate that PCE is present in soil vapor. Due to the proximity to the subject property, it is possible that this facility is the source of PCE below the subject property; therefore, Langan considers this property to be a REC (See Langan REC 1).

Former Larson H – 3733 Buchanan Street (western adjoining, inferred cross-gradient)

The 3733 Buchanan Street property, located across Buchanan Street to the west of the subject property, was identified on the EDR Historical Cleaner database. The facility operated as a dry cleaner in 1940. It is possible for dry cleaners to have discharged hazardous substances to the subsurface environment during this period; however, no violations have been recorded for this parcel and the address is not listed on databases indicative of release. Based on the cross-gradient location and the lack of information regarding a potential release, the historical dry

cleaner is unlikely to represent an environmental concern for the subject property and therefore is not considered a REC.

Former Kevin R Stone – 3727 Buchanan Street (western adjoining, inferred cross-gradient)

The 3727 Buchanan Street property, located across Buchanan Street to the west of the subject property, was identified on the RCRA NONGEN/NLR database. According to the database listings, the facility was verified as a non-generator of federal hazardous waste in 1992. This facility is not listed on a database indicative of a release; therefore, this property is not considered an environmental concern to the subject property.

Former Texaco Service Station – 1501 Beach Street (western adjoining, inferred cross-gradient)

The 1501 Beach Street property, located across Buchanan Street to the west of the subject property, was identified on the EDR Historical Automotive database. The database listing indicates that this former facility historically operated as a gasoline service station from approximately 1953 through 1982. No violations have been recorded, and the facility is not listed on a database indicative of a release; therefore, this property is not considered an environmental concern to the subject property.

Former PG&E East Marina Shoreline – Beach and Buchanan Street (northwestern adjoining, inferred downgradient)

The Beach and Buchanan Street property, located approximately 160 feet west of the intersection of Buchanan Street and Marina Boulevard, to the northwest of the subject property, was identified on the E MANIFEST, RCRA NONGEN/NLR, and RCRA-Very Small Quantity Generator (VSQG) databases. The database listings indicate the disposal of oily debris, soil with lead at concentrations exceeding State of California non-RCRA hazardous waste criteria, and soil with total petroleum hydrocarbon contamination. The property was registered as a VSQG and verified as a non-generator of hazardous waste in 2024. The contamination and disposal are associated with former PG&E MGP sites (See Langan CREC 1).

4.3.2 Surrounding Area

Langan evaluated each of the database listings for surrounding area properties (see Section 8.2). Those warranting further discussion in the context of potential to represent an environmental concern for the subject property are discussed below.

Former Chevron Station #90985 – 1598 Bay Street (approximately 284 feet south, inferred upgradient)

The 1598 Bay Street property, located approximately 284 feet south of the subject property, is listed on the UST, RCRA NONGEN/NLR, EnviroStor, VCP, DEED, HWTS, HAZNET, LUST, SWEEPS UST, Cortese, HIST Cortese, CERS, and EDR Auto databases. According to the database listings, a Chevron gasoline service station operated at the property from approximately 1971 through 2009. The SWRCB GeoTracker database (T0607500863) indicates that this property identified a leak from a former UST in 1998. The leak was limited to soil and contaminated material was excavated and removed from the property. The LUST case was closed in 1998 following excavation work.

Additionally, the property was formerly part of the larger PG&E MGP which operated from 1891 through 1906. MGP-contaminated soils were removed from the property as part of the PG&E MGP cleanup in 2016. A residential building was developed on the property and a vapor mitigation system (VMS) was installed below the building to mitigate vapor intrusion from former site operations. A land use covenant was also recorded for the property in 2018. Langan considers the former PG&E MGP site to be a CREC for the subject property (See Langan CREC 1).

Former Shell Service Station #5703 – 1600 Bay Street (approximately 317 feet south, inferred cross-gradient)

The 1600 Bay Street property, located approximately 317 feet southwest of the subject property, is listed on the LUST, RCRA NONGEN/NLR, FINDS, ECHO, Cortese, Historical Cortese, EDR HIST Auto, Historical UST, UST, SWEEPS UST, CA FID UST, and CERS databases. According to the database listings, a Shell gasoline service station operated at the property from approximately 1958 through 1987. The SWRCB GeoTracker database (T0607500287) indicates that this property identified a leak from a former UST in 1995. The leak was limited to soil and contaminated material was excavated and removed from the property. The LUST case was closed in 1998 following excavation work. Due to the limited release and closed regulatory status, this property is not considered an environmental concern to the subject property and therefore is not a REC.

## 5.0 CONCLUSIONS, FINDINGS AND OPINIONS

Langan completed a Phase I ESA consistent with the scope and limitations of ASTM E1527-21 for the property located at 15 Marina Boulevard in San Francisco, San Francisco County, California. Exceptions to, or deletions from, ASTM E1527-21 are described in Section 8 of this report.

This assessment has revealed the following RECs, CRECs, HRECs, de minimis conditions, and significant data gaps in connection with the subject property as presented in Table 5-1.

**TABLE 5-1**
**Conclusions, Findings and Opinions**

| ASTM E1527-21 Scope Items |
|---|
| **Recognized Environmental Conditions (RECs)** |
| *REC 1 – Presence of Volatile Organic Compounds in Soil Vapor:*<br>During the subsurface investigation conducted in April through August 2023, H&A collected six soil vapor samples at the subject property. Based on the analytical results, chloroform and PCE were detected in soil vapor samples at concentrations exceeding their respective RWQCB Commercial/Industrial ESLs. H&A concluded that the chloroform and PCE exceedances in soil vapor are not related to former subject property operations. According to H&A, chloroform is a chemical that is often associated with leaking sewer pipes, which is prevalent in the Marina District. Additionally, H&A stated that the PCE exceedances are associated with the known dry cleaner businesses in the vicinity of the subject property.<br><br>The 3717 Buchanan Street property, located across Buchanan Street to the west of the subject property, has been occupied by a dry-cleaning facility since 1986 (Marina Cleaners). The facility operates under a hazardous waste generator permit for the disposal of liquids with halogenated organic compounds. However, it is possible for dry cleaners to have discharged hazardous substances to the subsurface environment. Based on the results of the 2023 subsurface investigation and the proximity of this facility to the subject property, it is possible that this facility is the source of PCE below the subject property. Langan considers the adjoining dry cleaner facility and the presence of PCE and chloroform in soil vapor at concentrations exceeding RWQCB Commercial/Industrial ESLs to be a REC for the subject property. |
| **Controlled Recognized Environmental Conditions (CRECs)** |
| *CREC 1 – Presence of Petroleum Hydrocarbon and Polycyclic Aromatic Hydrocarbon Contamination:*<br>The subject property was formerly a steam electric power plant that operated through the 1950s and utilized crude oil for fuel. H&A prepared a Site Characterization Investigation Report in November 2023, on behalf of PG&E in response to the RWQCB April 2022 letter requesting a subsurface investigation of the former PG&E power plant. H&A conducted a subsurface investigation at the subject property between April and August 2023 which included the collection of 32 soil samples, seven groundwater samples, and six soil vapor samples (as discussed above). Based on the updated 2025 RWQCB ESLs for TPHd, six of the soil samples contained concentrations of TPHd exceeding Commercial/Industrial ESLs. Six PAHs were also detected at concentrations exceeding the 2025 RWQCB Commercial/Industrial ESLs in soil eight samples. Additionally, TPHd was detected in groundwater samples exceeding the respective RWQCB ESL for Saltwater Ecotox Aquatic Habitat. PAHs were not analyzed for the groundwater samples. Based on a review of the EDR database report, the former address 1575 North Point Street, historically to the west and south of the subject property, was utilized as the former North Beach MGP. The facility produced gas used for lighting, cooking, and heating from coal and oil. Based on a review of the SWRCB GeoTracker database (T10000008919) and DTSC EnviroStor database (60001239 and 38490007), the North Beach MGP was destroyed in the 1906 earthquake and resulting fire. Soils and groundwater are impacted with MGP residues, including PAHs. Site-wide and off-site investigation of MGP impacts to soil, soil vapor, and groundwater have been conducted since 2014. In 2016, PG&E excavated and disposed of approximately 9,000 cubic yards of impacted soil from the former PG&E MGP site. Because the former North Beach MGP historically surrounded the subject property to the south and the west, it is possible that some of the residual TPH and PAH contamination present at the subject property is a result of the former MGP operations. |

| ASTM E1527-21 Scope Items |
|---|
| Langan considers the presence of TPH and PAHs in soil at concentrations exceeding 2025 RWQCB Construction Worker and Commercial/Industrial ESLs and concentrations of TPHd in groundwater exceeding RWQCB ESL for Saltwater Ecotox Aquatic Habitat, to be an environmental concern for the subject property. However, because an RWQCB approved SMP has been prepared to manage the contamination in soil and groundwater below the subject property, Langan considers the known residual PAH and TPH contamination below the subject property to be a CREC. |
| **Historical Recognized Environmental Conditions (HRECs)** |
| *HREC 1 – Closed Regulatory Status*:<br>The subject property was formerly a steam electric power plant that operated through the 1950s and utilized crude oil for fuel. The RWQCB issued a letter in April 2022 requesting a subsurface investigation of the former PG&E power plant. A subsurface investigation was conducted in 2023 which identified limited petroleum contamination in soil. Based on a review of the SWRCB GeoTracker database (T10000017511), the RWQCB granted case closure with no further action for the subject property in November 2024, following the subsurface investigation and the preparation of an approved SMP. The no further action letter states that the closed regulatory status is only applicable to the release of petroleum hydrocarbons from historical operations (crude oil used in steam electric power plant). The letter states that closure is based on commercial land use and assumes that shallow groundwater beneath the site is not suitable for drinking water or use in landscaping. If conditions change, regulatory status will be reevaluated. Langan considers the closed regulatory status to be an HREC for the subject property. |
| **De Minimis Conditions (DMCs)** |
| Langan did not identify any DMCs. |
| **Significant Data Gaps** |
| Langan did not identify any significant data gaps. |
| **Business Environmental Risks (BERs)** |
| *BER 1 – Presence of Soil Vapor Probes:*<br>During the site reconnaissance, Langan observed two soil vapor probes within the subject property. The observed soil vapor probes are assumed to be associated with the subsurface investigation conducted by H&A in 2023. The existing soil vapor probes will need to be properly demolished by a State of California C-57 licensed driller under regulatory oversight prior to any construction activities. Langan considers the presence of the two soil vapor probes within the subject property boundary to be a BER for the subject property. |

## 6.0 ENVIRONMENTAL PROFESSIONAL STATEMENT

I declare that to the best of my professional knowledge and belief, I meet the definition of Environmental Professional as defined in Section 312.10 of 40 CFR Part 312 and I have the specific qualifications based on my education, training, and experience to assess a property of the nature, history, and setting of the subject property. I have developed and performed all appropriate inquiries in conformance with the standards and practices set forth in 40 CFR Part 312.

**Peter J. Cusack**
**Associate Principal (Environmental Professional)**

Resumes outlining the qualifications of the project team and the Environmental Professional are included in Appendix G.

## 7.0 REFERENCES

Langan used the following sources to complete this Phase I ESA.


- ASTM E1527-21, Standard Practice for Environmental Property Assessments: Phase I Environmental Property Assessment Process, published 16 November 2021
- California Waterboards Geotracker database: https://geotracker.waterboards.ca.gov/map/ searched 27 October 2025
- California Department of Toxic Substance Control database: https://www.envirostor.dtsc.ca.gov/public/ searched 27 October 2025
- EDR, Inc., Radius Map Report with GeoCheck, 27 October 2025
- EDR, Inc., City Directory Image Report, 27 October 2025
- EDR, Inc., Aerial Photographs, 27 October 2025
- EDR, Inc., Historical Topographic Map Report, 27 October 2025
- EDR, Inc., Sanborn Map Report, 27 October 2025
- EKI Environmental & Water, Inc., Results of Indoor Air Sampling, 15 Marina Boulevard, San Francisco, California, dated May 2024
- Haley & Aldrich, Inc., Site Characterization Investigation Report, 15 Marina Boulevard, San Francisco, California, dated November 2023
- Haley & Aldrich, Inc., Site Management Plan, 15 Marina Boulevard, San Francisco, California, dated August 2024
- Interstate Technology and Regulatory Council, Per and Polyfluoroalkyl Substances Technical and Regulatory Guidance, July 2023
- PFAS Exchange GIS Webviewer, https://experience.arcgis.com/experience/12412ab41b3141598e0bb48523a7c940/
- San Francisco Bay Regional Water Quality Control Board, Technical Report Requirements, Safeway, 15 Marina Boulevard, San Francisco, dated April 2022
- San Francisco Bay Regional Water Quality Control Board, No Further Action, San Francisco Marina Safeway, 15 Marina Boulevard, San Francisco, dated November 2024
- U.S. EPA 40 CFR Part 302 (EPA-HQ-OLEM-2019-0341; FRL-7204-03-OLEM), RIN 2050-AH09, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, Final Rule, 8 May 2024

- U.S. EPA ECHO database: http://echo.epa.gov/facilities searched 29 October 2025
- U.S. EPA ECHO: PFAS Analytic Tools - https://echo.epa.gov/trends/pfas-tools searched 31 October 2025
- U.S. EPA ENVIROFACTS database: https://www3.epa.gov/enviro/ searched 31 October 2025
- U.S. EPA MyProperty database: https://www3.epa.gov/enviro/facts/myproperty/ searched 31 October 2025

**TABLE 7-1**
**Dates of Assessment Components**

| COMPONENT | DATE |
|---|---|
| Interviews | 13 November 2025 |
| Review of government records | 27 October 2025 |
| Site reconnaissance | 14 November 2025 |
| Declaration by Environmental Professional | 18 November 2025 |

## 8.0 LIMITATIONS AND DEFINITIONS

This Phase I ESA report was prepared for the Client and is intended to be used in its entirety. Excerpts taken from this report are not necessarily representative of the assessment findings. The Client is the sole intended beneficiary of the report. The user requested no special terms or conditions regarding this Phase I ESA.

Langan’s scope of services, which is described in Section 1.2 and in the contract executed between Langan and the Client, was limited to that agreed to with the Client/user and no other services beyond those explicitly stated are implied. To the extent possible, the services performed and agreed upon for this Phase I ESA are consistent with the guidelines of ASTM E1527-21.

This report is not intended to be an exhaustive assessment of the subject property. The purpose of the Phase I ESA is to reduce uncertainty about unknown conditions at the subject property. No environmental site assessment can wholly eliminate uncertainty regarding the potential for RECs in connection with a subject property. Therefore, Langan cannot “verify,” “insure,” "certify," or “guarantee” that the subject property is free of environmental concerns.

No expressed or implied representation or warranty is included or intended in this report, except that our services were completed using the care and skill ordinarily followed by professionals providing similar services under similar circumstances in similar locations at the same point in time.

The conclusions provided in this report are based solely on information obtained through completing the standard activities required by ASTM E1527-21 and are intended exclusively for the purpose stated herein, at the specified subject property, as it existed at the point in time the assessment was completed. The conclusions provided in this report do not apply to conditions and features of which Langan was not made aware of through good faith efforts to complete the activities required by ASTM E1527-21 and did not have the opportunity to evaluate.

## 8.1 ASTM Definitions

The following definitions are provided in ASTM E1527-21 and presented below for reference. This section is not a comprehensive list of definitions provided in ASTM E1527-21 and is intended to summarize those pertinent to this Phase I ESA report.

Activity and use limitations (AULs): legal or physical restrictions or limitations on the use of, or access to, a site or facility: (1) to reduce or eliminate potential exposure to hazardous substances or petroleum products in the soil, soil vapor, groundwater, and/or surface water on the property, or (2) to prevent activities that could interfere with the effective-ness of a response action, in order to ensure maintenance of a condition of no significant risk to public health or the environment. These legal or physical restrictions, which may include institutional and/or engineering controls, are intended to prevent adverse impacts to individuals or populations that may be exposed to hazardous substances and petroleum products in the soil, soil vapor, groundwater, and/or surface water on a property.

Adjoining properties: any real property or properties the border of which is contiguous or partially contiguous with that of the subject property, or that would be contiguous or partially contiguous with that of the subject property but for a street, road, or other public thoroughfare separating them.

All Appropriate Inquiries: that inquiry constituting all appropriate inquiries into the previous ownership and uses of the subject property consistent with good commercial and customary practice as defined in CERCLA, 42 U.S.C.§ 9601(35)(B) and 40 C.F.R. Part 312, that will qualify a party to a commercial real estate transaction for one of the threshold criteria for satisfying the

LLPs to CERCLA liability (42U.S.C. §§ 9601(35)(A) & (B), § 9607(b)(3), § 9607(q), and§ 9607(r)), assuming compliance with other elements of the defense.

Approximate minimum search distance: the area for which records must be obtained and reviewed pursuant to ASTM E1527-21 Section 8 subject to the limitations provided in that section. This may include areas outside the subject property and shall be measured from the nearest subject property boundary. This term is used in lieu of radius to include irregularly shaped properties.

Business environmental risk (BER): a risk which can have a material environmental or environmentally driven impact on the business associated with the current or planned use of commercial real estate, not necessarily related to those environmental issues required to be investigated in this practice. Consideration of BER issues may involve addressing one or more non-scope considerations.

Controlled recognized environmental condition (CREC): recognized environmental condition affecting the subject property that has been addressed to the satisfaction of the applicable regulatory authority or authorities with hazardous substances or petroleum products allowed to remain in place subject to implementation of required controls (for example, activity and use limitations or other property use limitations).

Data gap: a lack of or inability to obtain information required by this practice despite good faith efforts by the environmental professional to gather such information. Data gaps may result from incompleteness in any of the activities required by this practice, including, but not limited to, site reconnaissance (for example, an inability to conduct the site visit), and interviews (for example, an inability to interview the key site manager, regulatory officials, etc.).

De minimis condition: a condition related to a release that generally does not present a threat to human health or the environment and that generally would not be the subject of an enforcement action if brought to the attention of appropriate governmental agencies. A condition determined to be a de minimis condition is not a recognized environmental condition nor a controlled recognized environmental condition.

Engineering controls: physical modifications to a site or facility (for example, capping, slurry walls, or point of use water treatment) to reduce or eliminate the potential for exposure to hazardous substances or petroleum products in the soil or groundwater on a property. Engineering controls are a type of activity and use limitation (AUL).

Environment: environment shall have the same meaning as the definition of environment in CERCLA 42 U.S.C. § 9601(8).

Historical recognized environmental condition (HREC): previous release of hazardous substances or petroleum products affecting the subject property that has been addressed to the satisfaction of the applicable regulatory authority or authorities and meeting unrestricted use criteria established by the applicable regulatory authority or authorities without subjecting the subject property to any controls (for example, activity and use limitations or other property use limitations). A historical recognized environmental condition is not a recognized environmental condition.

Institutional controls (IC): a legal or administrative mechanism (for example, "deed restrictions," restrictive covenants, easements, or zoning) on the use of, or access to, a site or facility to (1) reduce or eliminate potential exposure to hazardous substances or petroleum products in the soil or groundwater on the property, or (2) to prevent activities that could interfere with the effectiveness of a response action, in order to ensure maintenance of a condition of no significant risk to public health or the environment. An institutional control is a type of activity and use limitation (AUL).

Key site manager: the person identified by the owner or operator of a subject property as having good knowledge of the uses and physical characteristics of the subject property.

Material threat: obvious threat which is likely to lead to a release and that, in the opinion of the environmental professional, would likely result in impact to public health or the environment.

Obvious: that which is plain or evident; a condition or fact that could not be ignored or overlooked by a reasonable observer.

Property use limitation: limitation or restriction on current or future use of a property in connection with a response to a release, in accordance with the applicable regulatory authority or authorities that allows hazardous sub-stances or petroleum products to remain in place at concentrations exceeding unrestricted use criteria.

Reasonably ascertainable: information that is (1) publicly available, (2) obtainable from its source within reasonable time and cost constraints, and (3) practically reviewable.

Recognized environmental conditions: (1) the presence of hazardous substances or petroleum products in, on, or at the subject property due to a release to the environment; (2) the likely

presence of hazardous substances or petroleum products in, on, or at the subject property due to a release or likely release to the environment; or (3) the presence of hazardous substances or petroleum products in, on, or at the subject property under conditions that pose a material threat of a future release to the environment. For the purposes of this definition, "likely" is that which is neither certain nor proved but can be expected or believed by a reasonable observer based on the logic and/or experience of the environmental professional, and/or available evidence, as stated in the report to support the opinions given therein.

Release: a release of any hazardous substance or petroleum product shall have the same meaning as the definition of "release" in CERCLA 42 U.S.C. § 9601(22). There are a number of statutory exclusions from the definition of release that may impact the environmental professional's opinions and conclusions, such as the normal application of fertilizer.

Significant data gap: a data gap that affects the ability of the environmental professional to identify a recognized environmental condition.

Site reconnaissance: that part that is contained in Section 9 of ASTM E1527-21 and addresses what should be done in connection with the site visit. The site reconnaissance includes, but is not limited to, the site visit done in connection with such a Phase I Environmental Site Assessment.

Site visit: the visit of the subject property during which observations are made constituting the site reconnaissance section of this practice.

Subject property: the property that is the subject of the environmental site assessment described in this practice.

User: the party seeking to use ASTM E1527-21 to complete an environmental site assessment of the subject property.

### 8.2 Standard Environmental Record Sources

Langan reviewed an environmental database search report prepared by an environmental database search provider for the subject property and surrounding area. The database search report includes a listing of properties identified on select federal, state, local and tribal standard source environmental databases within the approximate minimum search radii outlined in ASTM E1527-21. This information was supplied to Langan by the environmental database search provider, and to the environmental database search provider by government sources; therefore,

neither Langan nor the environmental database search provider can verify the completeness and accuracy of the database information. Appendix F contains a copy of the report, with specific source and property descriptions, and the dates of the last update for each database searched. Langan reviewed the database search report on a record-by-record basis to evaluate if certain properties identified in the database report are likely to represent an environmental concern for the subject property. The evaluation criteria included factors such as distance, groundwater gradient, nature of the listing, and regulatory status. Unless specifically discussed in the body of this report, the facilities listed on the database do not appear to represent an environmental concern to the subject property.

# EXHIBIT 4

May 21, 2026

Stuart G. Gross, Esq.
Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

RE: Demonstrable Evidence of MGP Impacts
Marina Safeway, 15 Marina Boulevard, San Francisco

Dear Mr. Gross:

My review of the environmental investigations that have been performed at and in the vicinity of the above-referenced Marina Safeway site ("Site") demonstrates clear evidence of impacts from the former North Beach Manufactured Gas Plant ("MGP"), which existed to the west and south of the Site. This evidence was not evaluated in the Site environmental reports. As a result, the San Francisco Bay Regional Water Quality Control Board's ("Water Board's") understanding of the Site and prior correspondence with the Marina Community Association is based on an incomplete record. The Water Board was not provided with an evaluation of whether MGP-related impacts were present at the Site but instead was presented with a narrower evaluation directed to closure of a petroleum hydrocarbon release under the Low-Threat Underground Storage Tank ("UST") Case Closure Policy. When the available Site and adjacent right-of-way data are evaluated using standards and practices applicable to former MGP investigations, they demonstrate that impacts from the MGP extend onto the Site. Additionally, Site data call into question the *Site Characterization Investigation Report*'s[1] conclusion that no separate phase hydrocarbons were identified during the Site investigation.

This distinction is important because MGP impacts have redevelopment implications that are materially different from those associated with conventional petroleum UST sites. Consequently, the failure to evaluate MGP impacts at the Site has implications for the developer, construction workers, nearby residents and businesses, the surrounding community, and the ultimate residential and commercial users of the project. This is particularly true where the proposed redevelopment involves excavation on the order of 30 feet below grade, the handling and off-site transportation of significant volumes of soil, and pile driving or other intrusive construction activities that could encounter MGP tar, mobilize impacted material, or create vapor concerns for subsurface structures at depth.

Remediation and redevelopment projects on properties impacted with MGP waste in the Marina District have required careful evaluation and management of contaminated soil and groundwater, including evaluation and handling of federal hazardous waste, specially trained construction and

[1] Haley & Aldrich, *Site Characterization Investigation Report, 15 Marina Boulevard*, November 2023

excavation crews, worker and perimeter air monitoring, odor and vapor controls, waste profiling, waste transportation planning, and measures to protect nearby residents and businesses during intrusive work. For example, the former gas holder at 1598 Bay Street (which was substantially smaller than the gas holder upgradient and adjacent to the Site) required extensive remediation and protective measures during redevelopment, including a robust vapor intrusion mitigation system for the subsurface component of that project. Consequently, the former MGP impacts at the Site deserve careful consideration.

The Haley & Aldrich investigation expressly avoids contemplation of MGP impacts to the Site in its *Site Characterization Investigation Report* ("Report") and its *Site Management Plan* by limiting its evaluation to whether the Site is suitable for closure under the Low-Threat Underground Storage Tank (UST) Case Closure Policy. Potential MGP impacts from the neighboring former North Beach MGP were excluded from the evaluation, which the Report limited to a "hydrocarbon release that resulted from Site operations".

The Water Board's understanding of the Site, and its no further action letter ("NFA"), relied on the information provided by Haley & Aldrich. The NFA expressly caveats that reliance, stating that the determination is based on the assumption that "the information provided to this agency [the Water Board] was accurate and representative of site conditions". The NFA is also limited "only to releases of petroleum hydrocarbons associated with historical site use (storage of crude oil for steam electric power plant)". Therefore, the Water Board's understanding of the Site is not based on a determination that the Site was unaffected by the neighboring former MGP.

**FORMER MGP INVESTIGATION STANDARDS AND PRACTICES**

For over a decade, I have worked on dozens of sites affected by the former Fillmore MGP and former North Beach MGP, was co-lead of the joint investigation with PG&E conducted as part of an interim settlement of a related federal lawsuit, and was the lead environmental engineer on behalf of the San Francisco Herring Association in connection with the consent decree that resolved their federal lawsuit against PG&E related to offshore contamination caused by those MGPs. Throughout the Marina District, investigations and remediations have occurred, and are continuing to occur, both on and off the footprints of the former Fillmore MGP and former North Beach MGP, the bulk of which I have been, or am, involved in.

These investigations have identified a halo of shallow soil contamination related to MGP operations and facility demolition practices, as well as extensive groundwater impacts and MGP tars emanating from the former MGPs. In evaluating MGP impacts throughout the Marina District, Haley & Aldrich has compared benzo(a)pyrene equivalent ("BaP EQ") concentrations, a relative toxicity-based calculation of polyaromatic hydrocarbon contamination, to the Department of Toxic Substances Control's urban background estimate for PAHs of 0.9 mg/kg. Haley & Aldrich has also recognized field observations as an important line of evidence in identifying MGP impacts across the Marina District. However, on the Marina Safeway Site,

Haley & Aldrich did not evaluate BaP EQ concentrations, stating that "BaP EQ criteria are included in the Low-Threat Case Closure criteria only for sites that have Bunker C fuel and waste oil releases, so BaP EQ concentrations were not evaluated for this Site". This is despite field observations that Haley & Aldrich described in Section 5.1.1 of the Report as "possible MGP-related residues, including clinker-like material, asphalt-like material, coal-like material, and ash-like material," including a "slight mothball-like odor" at boring SWB-08, were not incorporated into an evaluation of potential MGP impacts. And as shown on attached Table 1, 50 percent of soil samples collected on the Site by Haley & Aldrich exceed the 0.9 mg/kg BaP EQ urban background estimate, with a maximum BaP EQ concentration of 127 mg/kg observed at location SWB-06 at 5.5 feet below ground surface, a concentration more than 140 times the urban background estimate. Furthermore, 69 percent of the soil samples exceed the risk-based BaP ESL for residential properties[2].

These results are not surprising given historical sampling conducted at the Site boundaries. In Section 3.2.1 of the Report, Haley & Aldrich notes that BaP EQ data for shallow soil samples collected adjacent to the Site range in concentration from 0.01 mg/kg to 139.98 mg/kg. These adjacent impacts indicate that the Site lies within the former North Beach MGP contamination halo. Because environmental contamination is not constrained by property boundaries, the adjacent data must be incorporated into the Site conceptual model and evaluated as part of the assessment of potential MGP impacts to the Site.

In addition to excluding BaP EQ from the shallow soil evaluation, the assertion that the separate-phase product observed at locations NB-ROW-TG80/NB-ROW-HA45 and NB-ROW-TG28 is not MGP-related is based on Haley & Aldrich's statement in the *Right-of-Way Areas, Mediated Investigation Agreement Joint Investigation Report* (October 2017) that the TarGOST® response was "not considered representative of MGP tar" because the response pattern was not considered "typical". However, that interpretation was not supported by additional forensic methods and is not conclusive. This uncertainty is acknowledged by Haley & Aldrich in Section 4.2.1, which states that "the source of the impacts [at TG80] is uncertain".

The former North Beach MGP operated using both coal and crude oil, and MGP tars can be highly variable depending on the manufacturing process, the stage of production at which the tar condensed or separated, and the degree and type of weathering. In the case of NB-ROW-TG80/NB-ROW-HA45 and NB-ROW-TG28, the locations are directly downgradient from the former MGP's largest gas holder. Reference tars from that area were not available to Haley & Aldrich when it formed its conclusion, because no investigation of the former gas holder area, which was developed as an apartment complex in the 1950s, had been identified then or to date

[2] As outlined in ATSDR's *Guidance for Calculating Benzo(a)pyrene Equivalents for Cancer Evaluations of Polycyclic Aromatic Hydrocarbons* (2022), the accepted approach is to apply potency equivalency factors (PEFs) to individual PAH congeners, "calculate a total BaP equivalent for each environmental sample collected within the exposure unit and then compare the maximum total BaP equivalent against the cancer CV for benzo(a)pyrene (i.e., the cancer risk evaluation guide for benzo[a]pyrene)"

by this author. Additionally, MGP tars proximate to the former gas holder could have a different signature than tars generated earlier in the process if they condensed or separated after purification, or during distribution and storage. Therefore, the absence of a "typical" TarGOST® response is not sufficient, by itself, to rule out an MGP-related source for the separate-phase product observed at these locations, and the available data suggest that MGP tars emanating from the former large gas holder may be impacting the Site.

**SOIL AND GROUNDWATER IMPACTS**

The Site evaluation also departs from accepted practices for evaluating whether light non-aqueous phase liquid ("LNAPL") exists at the Site. At location SWB-06, the sample collected at 5.5 feet below ground surface, the deepest sample collected at that location, contained motor-oil-range hydrocarbons above the Water Board soil saturation limit of 5,100 mg/kg, along with very high PAH concentrations. These data suggest that separate-phase product exists at that location. No groundwater sample was collected at SWB-06, and soil saturation limits were not discussed in the Report.

Groundwater samples collected at locations SWB-01 and SWB-03 contained motor-oil-range hydrocarbons significantly above solubility estimates, suggesting that separate-phase product exists at these locations. Additionally, the groundwater samples were collected using a peristaltic pump. Where LNAPL is being investigated, a disposable bailer is generally preferred because it facilitates sample collection at the groundwater interface and direct inspection of the interface water and/or product. Peristaltic pump sampling requires advancing the sample intake tubing below the free water surface and may miss floating product, thereby underestimating LNAPL concerns.

**CONCLUSION**

The available data do not support the conclusion that the Marina Safeway Site has been unaffected by the former North Beach MGP. The data also do not support the conclusion that potential separate-phase product concerns associated with on-Site operations have been adequately evaluated. Rather, the record indicates that the Water Board's prior understanding was based on a constrained evaluation of Site data that expressly excluded MGP-related impacts and did not evaluate water solubility or soil saturation related concerns regarding separate-phase product. The Site and adjacent right-of-way data include elevated BaP EQ concentrations, field observations consistent with MGP residues, separate-phase product concerns, and unresolved TarGOST® responses downgradient of the former MGP's largest gas holder. These lines of evidence warrant further consideration and evaluation, particularly in the context of Site redevelopment and the incomplete evaluation provided to the Water Board.

Without that evaluation, the redevelopment process may fail to account for conditions that could materially affect excavation safety, waste classification, waste transportation, vapor intrusion

mitigation, dewatering, air monitoring, protection of nearby residents and businesses, and redevelopment costs.

Please contact me if you have any questions.

Sincerely,

Michael Harrison, P.E.

Attach.

**TABLE 1: ANALYTICAL SUMMARY**
Marina Safeway, 15 Marina Boulevard
San Francisco, California

| | | | | BaP EQ Equivalency Factors | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 0.1 | 1 | 0.1 | 0.1 | 0.01 | 2.4 | 0.1 | | |
| Sample Location | Field Sample ID | Sample Depth | Sample Date | Benzo(a)anthracene | Benzo(a)pyrene | Benzo(b)fluoranthene | Benzo(k)fluoranthene | Chrysene | Dibenzo(a,h)anthracene | Indeno(1,2,3-cd)pyrene | Naphthalene | Benzo(a)pyrene Equivalent |
| *Units* | | | | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg |
| *RSL TEQ 0.1* | | | | 1.1 | 0.11 | 1.1 | 11 | 110 | 0.11 | 1.1 | 2 | 0.11 |
| *ESL Residential Soil* | | | | 1.1 | 0.11 | 1.1 | 11 | 110 | 0.11 | 1.1 | 3.8 | 0.1 |
| *Marina MGP Site-specific Remedial Goal* [1] | | | | | | | | | | | | 0.9 |
| SWB-01 | SWB-01-SO-1.3-042823 | 1.3 | 4/28/2023 | 2.3 | 1.9 | 2.3 | 0.82 | 2.2 | 0.26 | 1.3 | 0.05 | 3.2 |
| SWB-01 | SWB-01-SO-5.0-042823 | 5 | 4/28/2023 | 1.8 | 1.3 | 2.3 | 0.75 | 1.9 | 0.28 | 1.3 | 0.089 | 2.6 |
| SWB-01 | SWB-01-SO-7.0-042823 | 7 | 4/28/2023 | 1.7 | 1.5 | 1.9 | 0.69 | 1.7 | <0.50 | 1.1 | <0.50 | 2.7 |
| SWB-01 | SWB-01-SO-11.0-042823 | 11 | 4/28/2023 | 0.46 | 0.34 | 0.52 | <0.24 | 0.47 | <0.24 | 0.24 | <0.24 | 0.77 |
| SWB-01 | SWB-01-SO-15.0-042823 | 15 | 4/28/2023 | <0.0047 | <0.0047 | <0.0047 | <0.0047 | <0.0047 | <0.0047 | <0.0047 | <0.0047 | NA |
| SWB-02 | SWB-02-SO-1.0-042523 | 1 | 4/25/2023 | 6.4 | 9 | 8.9 | 2.9 | 6.9 | 1.5 | 5.8 | <0.29 | 15 |
| SWB-02 | SWB-02-SO-5.0-042523 | 5 | 4/25/2023 | 6.6 | 6.1 | 7.1 | 2.4 | 6.9 | 0.9 | 4.4 | 1.2 | 10 |
| SWB-02 | SWB-02-SO-8.0-042523 | 8 | 4/25/2023 | 0.41 | 0.35 | 0.43 | 0.18 | 0.44 | <0.070 | 0.26 | <0.070 | 0.57 |
| SWB-02 | SWB-02-SO-13.7-042523 | 13.7 | 4/25/2023 | 0.021 | 0.019 | 0.024 | 0.0081 | 0.022 | <0.0049 | 0.015 | <0.0049 | 0.032 |
| SWB-03 | SWB-03-SO-1.3-042123 | 1.3 | 4/21/2023 | 1.9 | 1.7 | 2.1 | 0.78 | 2.1 | 0.24 | 1.3 | 0.94 | 2.9 |
| SWB-03 | SWB-03-SO-5.0-042123 | 5 | 4/21/2023 | 0.099 | 0.083 | 0.094 | <0.072 | 0.11 | <0.072 | <0.072 | <0.072 | 0.20 |
| SWB-03 | SWB-03-SO-10.4-042123 | 10.4 | 4/21/2023 | 0.65 | 0.6 | 0.69 | 0.23 | 0.69 | 0.082 | 0.44 | <0.049 | 1.0 |
| SWB-03 | SWB-03-SO-15.0-042123 | 15 | 4/21/2023 | <0.0048 | <0.0048 | <0.0048 | <0.0048 | <0.0048 | <0.0048 | <0.0048 | <0.0048 | NA |
| SWB-04 | SWB-04-SO-1.0-042723 | 1 | 4/27/2023 | 0.061 | 0.061 | 0.083 | 0.03 | 0.069 | 0.0071 J | 0.03 | 0.0048 | 0.10 |
| SWB-04 | SWB-04-SO-5.0-042723 | 5 | 4/27/2023 | 0.46 | 0.38 | 0.66 | 0.23 | 0.55 | 0.049 | 0.19 | 0.034 | 0.66 |
| SWB-04 | SWB-04C-SO-10.0-050323 | 10 | 5/3/2023 | <0.0046 | <0.0046 | <0.0046 | <0.0046 | <0.0046 | <0.0046 | <0.0046 | <0.0046 | NA |
| SWB-04 | SWB-04C-SO-13.0-050323 | 13 | 5/3/2023 | <0.0049 | <0.0049 | <0.0049 | <0.0049 | <0.0049 | <0.0049 | <0.0049 | <0.0049 | NA |
| SWB-05 | SWB-05-SO-1.0-042623 | 1 | 4/26/2023 | 0.55 | 0.65 | 0.68 | 0.24 | 0.53 | 0.1 | 0.46 | 0.038 J | 1.1 |
| SWB-05 | SWB-05-SO-5.0-042623 | 5 | 4/26/2023 | 1.1 | 1.1 | 1.2 | 0.42 | 1 | 0.14 | 0.63 | 0.13 | 1.8 |
| SWB-05 | SWB-05-SO-9.5-042623 | 9.5 | 4/26/2023 | 2 | 1.5 | 2.8 | 0.89 | 2.3 | 0.31 | 1.2 | 0.13 | 3.0 |
| SWB-06 | SWB-06B-SO-1.5-041923 | 1.5 | 4/19/2023 | <0.0049 | <0.0049 | 0.0053 | <0.0049 | 0.0052 | <0.0049 | <0.0049 | <0.0049 | 0.010 |
| SWB-06 | SWB-06B-SO-5.0-041923 | 5 | 4/19/2023 | 16 | 12 | 14 | 5.7 | 15 | 1.7 | 8.4 | 14 | 21 |
| SWB-06 | SWB-06B-SO-5.5-041923 | 5.5 | 4/19/2023 | 81 | 77 | 74 | 27 | 91 | 11 | 43 | 26 | 127 |
| SWB-07 | SWB-07-SO-1.3-042023 | 1.3 | 4/20/2023 | 0.19 | 0.21 | 0.2 | 0.083 | 0.16 | 0.029 | 0.14 | 0.0072 | 0.34 |
| SWB-07 | SWB-07-SO-5.0-042023 | 5 | 4/20/2023 | 0.025 | 0.026 | 0.029 | 0.012 | 0.023 | <0.0047 | 0.02 | <0.0047 | 0.040 |
| SWB-07 | SWB-07-SO-10.0-042023 | 10 | 4/20/2023 | <0.0048 | <0.0048 | <0.0048 | <0.0048 | <0.0048 | <0.0048 | <0.0048 | <0.0048 | NA |
| SWB-08 | SWB-08-SO-2.0-050223 | 2 | 5/2/2023 | 9.5 | 7.5 | 8.9 | 3.3 | 9.6 | 1 | 4.3 | 0.86 | 12.6 |
| SWB-09 | SWB-09-SO-1.2-041823 | 1.2 | 4/18/2023 | 0.023 | 0.026 | 0.031 | 0.011 | 0.029 | 0.0052 | 0.02 | <0.0049 | 0.047 |
| SWB-09 | SWB-09-SO-5.0-041823 | 5 | 4/18/2023 | 39 | 31 | 34 | 14 | 36 | 4.1 | 21 | 2.6 | 52 |
| SWB-09 | SWB-09-SO-7.1-041823 | 7.1 | 4/18/2023 | 3.4 | 3 | 3.4 | 1.3 | 3.4 | 0.43 | 2.2 | <0.29 | 5.1 |
| SWB-10 | SWB-10-SO-1.3-042423 | 1.3 | 4/24/2023 | 0.17 | 0.16 | 0.21 | 0.077 | 0.18 | 0.03 | 0.14 | 0.013 | 0.29 |
| SWB-10 | SWB-10-SO-5.0-042423 | 5 | 4/24/2023 | 8.1 | 8 | 8.5 | 3 | 7.5 | 1.1 | 5.3 | 0.56 | 13 |

Note:
RSL Regional Screening Level used by the Department of Toxic Substances Control and the U.S. EPA
ESL Environmental Screening Level used by the California Regional Water Quality Control Board
<# Below detection limit
Shaded chemicals included in calculation of benzo(a)pyrene equivalent
J Result is less than the RL but greater than or equal to the MDL and the concentration is an approximate value.
1 95th percentile of the northern California ambient dataset referred to by Haley & Aldrich as "the established cleanup goal for CPAHs"
Data Source excluding BaP EQ: Haley & Aldrich, Site Characterization Investigation Report, 15 Marina Boulevard, November 2023 (Table 3)

# EXHIBIT 5

## Casey, Ryan (DPH)

| | |
|---|---|
| **From:** | Casey, Ryan (DPH) |
| **Sent:** | Thursday, January 22, 2026 2:56 PM |
| **To:** | Nicholas Targ |
| **Cc:** | Franklin.Munoz@hklaw.com; Peter Cusack; Henry, Jacob T.@Waterboards; Watkins, Jessica@Waterboards; Slattengren, Beronica (DPH); Sheyner, Tania (CPC); Huggins, Monica (CPC); Kane, David (DBI) |
| **Subject:** | 11-15 Marina - Phase 2 Work Plan Request Letter (SMED 2361) |
| **Attachments:** | 2026-01-22_Ph2WPReq-Letter (SMED 2361).pdf |

Good Afternoon Nicholas,

Please find attached our Phase 2 Work Plan Request letter for the proposed development at 11-15 Marina Boulevard (SMED 2361). Due to the presence of hazardous substances in the subsurface, submission of a Phase 2 Work Plan is required. Also, due to the size of the project and its proximity to sensitive receptors, submission of a site-specific dust control plan is required.

Please let me know if you have any further questions or would like to discuss.

Thanks,

**Ryan Casey, P.E. (CA)**
**Administrative Engineer**
-----------------------------------------------------
San Francisco Department of Public Health
Hunters Point Shipyard Program & Site Assessment & Mitigation Program
49 South Van Ness Avenue, Suite 600
San Francisco, California 94103
Office: 415-252-3992 | Mobile: 415-699-5987
Confidentiality Notice: This email message and attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use or distribution of the information included in this message and any other attachments is prohibited. If you have received this communication in error, please notify the sender immediately and permanently delete or otherwise destroy the information.

# EXHIBIT 6

**Casey, Ryan (DPH)**

| | |
|---|---|
| **From:** | Casey, Ryan (DPH) |
| **Sent:** | Thursday, March 5, 2026 2:33 PM |
| **To:** | 'Peter Cusack' |
| **Cc:** | Julian Marsh; Logan Williams; Dev Mukherjee; JW Victor; Tara.Sullivan@hklaw.com; Dulce Rodriguez; Watkins, Jessica@Waterboards |
| **Subject:** | RE: 11-15 Marina - SMED 2361 - Phase II Work Plan |

Thanks Peter,

I have reviewed your responses and have the following comments:

- **Hold Samples** – include your explanation provided below in the work plan text.
- **Safeway Samples** – include that additional samples will be collected under the existing Safeway at a later date.
- **Sample Locations** – revise the existing sampling locations, or include new locations, to capture the following historical samples (see 2023 investigation by Haley & Aldrich):
  - SWB-02 (Crude Oil Tank)
  - SWB-05 (Oil Tanks)
  - SWB-06B (elevated TPH results)

Please revise the Work Plan and resubmit. I have no further comments.

Thanks,

**Ryan Casey, P.E. (CA)** | Administrative Engineer | SFDPH | Office: 415-252-3992

---

**From:** Peter Cusack <pcusack@Langan.com>
**Sent:** Tuesday, February 24, 2026 2:08 PM
**To:** Casey, Ryan (DPH) <ryan.casey@sfdph.org>
**Cc:** Julian Marsh <jmarsh@alignrealestate.com>; Logan Williams <lwilliams@alignrealestate.com>; Dev Mukherjee <dmukherjee@alignrealestate.com>; JW Victor <jvictor@alignrealestate.com>; Tara.Sullivan@hklaw.com; Dulce Rodriguez <drodriguez@Langan.com>; Watkins, Jessica@Waterboards <jessica.watkins@waterboards.ca.gov>
**Subject:** RE: 11-15 Marina - SMED 2361 - Phase II Work Plan

Hi Ryan
At this time, the Safeway is an active store and are not allowing drilling within the store limits. We know that there is a data gap but we will sample beneath the building at a later date and prior to construction starting. The held samples would be analyzed if we had contamination at a discrete level and we need to delineate either horizonal and/or vertical.

Please let us know if you have any additional questions.
Thanks
Peter

**Peter J. Cusack**
**Associate Principal**

***LANGAN***

Direct: 408.283.3615
Mobile: 415.717.2517
File Sharing Link
www.langan.com

**Technical Excellence ● Practical Experience ● Client Responsiveness**

**CALIFORNIA NEW JERSEY NEW YORK CONNECTICUT MASSACHUSETTS PENNSYLVANIA VIRGINIA WASHINGTON, DC OHIO ILLINOIS NORTH CAROLINA TENNESSEE FLORIDA TEXAS ARIZONA COLORADO UTAH WASHINGTON OREGON NEVADA ATHENS CALGARY DUBAI LONDON PANAMA**

---

**From:** Casey, Ryan (DPH) <ryan.casey@sfdph.org>
**Sent:** Tuesday, February 24, 2026 12:27 PM
**To:** Peter Cusack <pcusack@Langan.com>
**Cc:** Julian Marsh <jmarsh@alignrealestate.com>; Logan Williams <lwilliams@alignrealestate.com>; Dev Mukherjee <dmukherjee@alignrealestate.com>; JW Victor <jvictor@alignrealestate.com>; Tara.Sullivan@hklaw.com; Dulce Rodriguez <drodriguez@Langan.com>; Watkins, Jessica@Waterboards <jessica.watkins@waterboards.ca.gov>
**Subject:** RE: 11-15 Marina - SMED 2361 - Phase II Work Plan

Good Morning Peter,

I've reviewed the Phase II Work Plan and have the following initial questions:

- **Soil Sampling under Safeway** – why are no soil samples proposed from within the existing building extent? This could pose a data gap issue as we continue with Maher Program compliance.
- **Hold Samples** – under what conditions will samples that are initially held be analyzed?

Thanks,

**Ryan Casey, P.E. (CA)** | Administrative Engineer | SFDPH | Office: 415-252-3992

---

**From:** Casey, Ryan (DPH)
**Sent:** Monday, February 23, 2026 11:40 AM
**To:** 'Peter Cusack' <pcusack@Langan.com>; Watkins, Jessica@Waterboards <jessica.watkins@waterboards.ca.gov>
**Cc:** Julian Marsh <jmarsh@alignrealestate.com>; Logan Williams <lwilliams@alignrealestate.com>; Dev Mukherjee <dmukherjee@alignrealestate.com>; JW Victor <jvictor@alignrealestate.com>; Tara.Sullivan@hklaw.com; Dulce Rodriguez <drodriguez@Langan.com>
**Subject:** RE: 11-15 Marina - SMED 2361 - Phase II Work Plan

Thanks Peter,

Receipt acknowledged. I will be reviewing this document within the next 30 days and will let you know if I have any questions or comments.

Thanks,

**Ryan Casey, P.E. (CA)** | Administrative Engineer | SFDPH | Office: 415-252-3992

---

**From:** Peter Cusack <pcusack@Langan.com>
**Sent:** Friday, February 20, 2026 3:44 PM
**To:** Casey, Ryan (DPH) <ryan.casey@sfdph.org>; Watkins, Jessica@Waterboards <jessica.watkins@waterboards.ca.gov>
**Cc:** Julian Marsh <jmarsh@alignrealestate.com>; Logan Williams <lwilliams@alignrealestate.com>; Dev Mukherjee <dmukherjee@alignrealestate.com>; JW Victor <jvictor@alignrealestate.com>; Tara.Sullivan@hklaw.com; Dulce Rodriguez <drodriguez@Langan.com>
**Subject:** 11-15 Marina - SMED 2361 - Phase II Work Plan

This message is from outside the City email system. Do not open links or attachments from untrusted sources.

Hi Ryan
Attach please find the requested Phase II Work Plan for the proposed 11-15 Marina Boulevard development project. Please let us know if you have any questions or require additional information.

Thanks and have a nice weekend.
Peter

**Peter J. Cusack**
**Associate Principal**

***LANGAN***

Direct: 408.283.3615
Mobile: 415.717.2517
File Sharing Link

Phone: 408.283.3600 Fax: 408.283.3601
1 Almaden Boulevard
Suite 590
San Jose, CA 95113
www.langan.com

**Technical Excellence • Practical Experience • Client Responsiveness**

**CALIFORNIA NEW JERSEY NEW YORK CONNECTICUT MASSACHUSETTS PENNSYLVANIA VIRGINIA WASHINGTON, DC OHIO ILLINOIS NORTH CAROLINA TENNESSEE FLORIDA TEXAS ARIZONA COLORADO UTAH WASHINGTON OREGON NEVADA ATHENS CALGARY DUBAI LONDON PANAMA**

This message may contain confidential, proprietary, or privileged information. Confidentiality or privilege is not intended to be waived or lost by erroneous transmission of this message. If you receive this message in error, please notify the sender immediately by return email and delete this message from your system. Disclosure, use, distribution, or copying of a message or any of its attachments by anyone other than the intended recipient is strictly prohibited.
This message may contain confidential, proprietary, or privileged information. Confidentiality or privilege is not intended to be waived or lost by erroneous transmission of this message. If you receive this message in error, please

notify the sender immediately by return email and delete this message from your system. Disclosure, use, distribution, or copying of a message or any of its attachments by anyone other than the intended recipient is strictly prohibited.

# EXHIBIT 7

San Francisco Planning

49 South Van Ness Avenue, Suite 1400
San Francisco, CA 94103
628.652.7600
www.sfplanning.org

July 20, 2026

Stephen Sherrill
District 2 Supervisor
City Hall
1 Dr. Carlton B. Goodlett Place, Room 244
San Francisco, CA 94102

Re: **15 Marina Boulevard**
**Planning Department File No. 2025-011405PRJ**

Dear Supervisor Sherrill,

This letter responds to your letters regarding the proposed project at 11-15 Marina Boulevard. That project, as originally filed, proposed to build a 25-story building(s) with 790 residential units, and a grocery store ("Marina Safeway project")[1]. On January 5, 2026, the Planning Department issued an Assembly Bill 2011 ("AB 2011") Environmental Site Criteria Memo finding that the project satisfied the environmental criteria for AB 2011.

Your office has questioned two components of the project's eligibility for AB 2011: does the parcel meet AB 2011's requirement that "at least 75 percent of the perimeter of the site adjoins parcels that are developed with urban uses;" and 2) does the project satisfy the environmental site criteria outlined in AB 2011, specifically in regard to the Cortese List.

**1) Urban Uses**

The statute requires that AB 2011 projects be located on parcels where "at least 75 percent of the perimeter of the site adjoins parcels that are developed with urban uses." "Urban uses" are defined to mean "any current or former residential, commercial, public institutional, public park that is surrounded by other urban uses, parking lot or structure, transit or transportation passenger facility, or retail use, or any combination of those uses." Significantly, the statute does not differentiate between accessory or primary uses, meaning a parcel does not need to be entirely used for, or even primarily used for any of the listed uses to be considered an "urban use." Because the term "urban use" includes any combination of a wide variety of uses, most parcels in dense urban environments like San Francisco will qualify as having an "urban use." The parking lot across Marina Boulevard is part of a larger parcel under the jurisdiction of the Recreation and Park Department. This does not change the fact that part of the parcel is used for parking, which constitutes an "urban use." By the same logic, the parcel to the east of the project site, Fort Mason, contains parking, retail, and residential uses. The combination of those uses means that the parcel is also considered to have an

[1] Note recently submitted revisions to the project propose shorter towers, at 18- and 22-stories, and increase the unit count to 848 units. Those revisions are currently under review.

"urban use" pursuant to AB 2011. After evaluating the use of the adjacent properties and the language of the statute, we consider the subject site to be surrounded by "urban uses."

**2) Environmental Site Criteria**

The Marina Safeway project satisfies the environmental site criteria outlined in AB 2011. Specifically, the property is not listed on the Cortese List—as verified by communications with the Regional Water Quality Control Board (RWQCB ) and the Department of Toxic Substances Control dated 12/5/25—and it is not located within a delineated earthquake fault zone or any special flood hazard area as identified by official maps published by the Federal Emergency Management Agency.

As required by AB 2011, a Phase I Environmental Assessment was completed and identified a recognized environmental condition. As a result, the proponent must conduct a preliminary endangerment assessment under Section 25319.5 of the Health and Safety Code to determine hazardous substance releases and potential health risks. However, this assessment is not part of the planning approval process under AB 2011; these requirements will be met later in the permitting and construction process through oversight by San Francisco's Public Health Department (SFDPH) and/or the RWQCB.

Sincerely,

Sarah Dennis Phillips
Planning Director
San Francisco Planning Department